**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| CITY OF EVANSTON and THE UNITED STATES CONFERENCE OF MAYORS, | |
| Plaintiffs, | |
| v. | Case No. 18-cv-4853 |
| JEFFERSON BEAUREGARD SESSIONS III, in his official capacity as Attorney General of the United States, | |
| Defendant. | |

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

The United States Conference of Mayors (the "Conference") and the City of Evanston, Illinois ("Evanston") (collectively, "Plaintiffs"), for their complaint against defendant Jefferson Beauregard Sessions III ("Defendant" or the "Attorney General"), state as follows:

**INTRODUCTION**

1.      The Conference and Evanston bring this action to stop the federal government's aggressive and escalating effort to force cities into becoming the deportation arm of the federal government. The Conference and Evanston seek to enjoin the Attorney General of the United States from imposing three sweeping and unlawful conditions on the Edward Byrne Memorial Justice Assistance Grant Program ("Byrne JAG")—an established federal grant program that provides crucial support for law enforcement in hundreds of cities nationwide.

2.      The Department seeks to impose three conditions on the fiscal year ("FY") 2017 Byrne JAG funds under a cloud of uncertainty created by the Department's increasingly aggressive positions. As a condition of receiving FY 2017 Byrne JAG funds, the Department requires that: (1) cities give the Department of Homeland Security ("DHS"), which includes U.S. Immigration and Customs Enforcement ("ICE"), 48 hours' notice, or at least as much notice "as

practicable" prior to releasing any alien in custody to allow ICE to take custody of that individual (the "notice condition"); (2) cities give DHS officials unlimited access to local law enforcement facilities to interrogate any suspected non-citizen held there, effectively federalizing city facilities (the "access condition"); and (3) the chief legal officer of each local government certify compliance with 8 U.S.C. § 1373 ("Section 1373"), a federal statute that purports to bar local governments from restricting the sharing of immigration status information with the federal government (the "compliance condition").

3.      These three conditions are unauthorized and unconstitutional. The conditions also fly in the face of longstanding and diverse policies in Evanston and other Conference member cities that promote cooperation between immigrant communities and local law enforcement, ensure access to essential services for all residents, and make residents safer. Compliance with the conditions would require many applicants to violate local law, undermine public safety and effective policing in the cities, and undermine the cities' policy choices. Neither federal law nor the United States Constitution permits the Attorney General to dictate local policy by imposing unauthorized conditions on a critical source of local government funding.

4.      The Department's newly imposed conditions on Byrne JAG funds are also directly at odds with Conference policy resolutions, which collectively represent the views of the nation's mayors. In 2017 and 2018, the Conference adopted policy resolutions addressed to the federal government's efforts to force localities to engage in federal immigration enforcement. The resolutions called for: (a) an end to unconstitutional funding threats to cities in an effort to coerce and compel them into implementing federal immigration law; (b) the end of the Department's unconstitutionally broad interpretation of Section 1373; and (c) the award of Byrne JAG funds to municipalities without the imposition of unconstitutional conditions.

5.      Because of the Department's imposition of the notice, access, and compliance conditions, Evanston and the Conference's other member cities face a Hobson's choice: agree to accept the Department's unconstitutional grant conditions or stand on their rights and forfeit crucial Byrne JAG funds.

6.      The Conference and Evanston seek a declaration that the Department's compliance, notice, and access conditions on Byrne JAG funding are unlawful. The Conference and Evanston also seek an injunction preventing the Department from imposing the notice, access, and compliance conditions on FY 2017 Byrne JAG funds, and from including the conditions in future applications and award documents.

## PARTIES

7.      Plaintiff The United States Conference of Mayors is a non-profit association organized under the laws of Illinois and with its offices in the District of Columbia. As the official non-partisan organization of United States cities with populations of 30,000 or more, the Conference represents the interests of over 1,400 cities in the United States. This includes numerous cities in this federal district and in every other jurisdiction in the country. Nearly 150 million people reside in these cities.

8.      Plaintiff Evanston is a municipal corporation and home rule unit of government organized and existing under the constitution and laws of the State of Illinois. Evanston was incorporated in 1857, and is home to approximately 74,895 residents, including a vibrant immigrant community.

9.      Defendant Jefferson Beauregard Sessions III is the Attorney General of the United States. He is sued in his official capacity. The Attorney General is the federal official in charge of the United States Department of Justice, which took, and threatens imminently to take, the governmental actions at issue in this lawsuit.

## JURISDICTION AND VENUE

10. The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1346. The Court is authorized to issue the relief sought here under the Administrative Procedure Act, 5 U.S.C. §§ 702, 705, 706, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202.

11. Venue is proper in the Northern District of Illinois under 28 U.S.C. § 1391(e). Defendant is a United States officer being sued in his official capacity. Evanston resides in this judicial district and substantial events giving rise to this action occurred in this judicial district. The Conference consents to adjudication of these issues in this district.

## FACTUAL ALLEGATIONS

### A. The Byrne JAG program provides critical funds to cities.

12. Congress established the Byrne JAG program in 2005 to serve as the primary source of federal criminal justice funding for states and localities. The Office of Justice Programs ("OJP") within the Department oversees the program.

13. The goal of the Byrne JAG program is to allow states and local governments the "flexibility to spend money for programs that work for them rather than to impose a 'one size fits all' solution" for local policing. *See* H.R. Rep. No. 109-233, at 89 (2005).[1] To that end, the Byrne JAG program is structured as a formula grant, which awards funds to all eligible grantees according to a prescribed formula. *See* 34 U.S.C. § 10156(d)(2)(A) (providing that the Attorney General "shall allocate to each unit of local government" funds consistent with the established formula).

---

[1] The Byrne JAG program was created in the Violence Against Women and Department of Justice Reauthorization Act of 2005, Pub. L. No. 109-162, 119 Stat. 2960 (2006), which in turn amended the Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, 82 Stat. 197.

14.     Byrne JAG funds are distributed across states and localities based on their population and relative levels of violent crime. The Byrne JAG distribution formula for states is a function of population and violent crime. 34 U.S.C. § 10156(a). The formula for local governments is a function of the state's allocation and the ratio of violent crime in the locality to violent crime in the state. *Id.* § 10156(d).

15.     The formula-based approach entitles cities to their share of the Byrne JAG formula allocation so long as their proposed programs meet at least one of eight broadly defined goals, *see* 34 U.S.C. § 10152(a)(1)(A)-(H) (listing eligible programs such as general law enforcement, prevention and education, drug treatment, and mental health), and their applications contain a series of statutorily required certifications and attestations. *Id.* § 10153(a).

**B.     The Conference was formed to address the intersection of federal and local policy and has resolved to oppose the Attorney General's actions.**

16.     In 1932, during the midst of the Great Depression, the nation's cities were close to bankruptcy and their residents were largely unemployed and without access to sufficient food, housing, law enforcement, and other necessities. In response to the appeals of mayors across the country, Congress created a $300 million federal assistance program for cities, marking the first time in the nation's history that federal relief was provided directly to cities. A few weeks later, the Conference was founded to coordinate its cities' interactions with the federal government.

17.     Today the Conference's member cities are home to immigrant populations that are both recent arrivals and multigenerational families. The Conference proudly recognizes that cities are diverse, multicultural centers, and that their diversity reflects core American values, fosters economic prosperity and opportunity, enriches cities' cultures, and keeps our nation competitive and strong.

18.     The Conference's primary roles include promoting the development of effective national city and metro-area-focused policy; strengthening federal-city relationships; ensuring that federal policy meets urban needs; providing mayors with leadership and management tools that allow them to do their jobs better; and creating a forum in which mayors share ideas, information, and best practices, and through which cities coordinate on shared policy goals.

19.     Conference members speak with a united voice on organizational policies and goals. Mayors contribute to the development of national urban policy by serving on one or more of the Conference's standing committees or in another leadership role. A list of member cities whose mayors currently serve in leadership roles is attached as **Exhibit A** to this complaint.

20.     The adoption of a resolution is the principal means by which the Conference speaks on matters of policy. The policy positions adopted at the annual meeting collectively represent the views of the nation's mayors.

21.     Conference members met from June 23-26, 2017 for the 2017 annual meeting. The meeting was attended by over 250 mayors from cities across the country, including those from nearly every state and the Commonwealth of Puerto Rico.

22.     At the annual meeting, the Conference's members passed three resolutions recognizing the importance of immigrants to their communities, supporting immigrant rights, standing against policies that target immigrant communities, and opposing the administration's punitive welcoming city policies.

23.     First, the Conference passed a resolution titled "Opposing Punitive Sanctuary Jurisdiction Policies." (A true and correct copy of this resolution is attached as **Exhibit B** to this complaint.)

-6-

24.     This resolution reflected the Conference members' considered judgment that,

among other things:

(a)     Many local jurisdictions determined that their local law enforcement efforts and personnel have neither the authority, the priority, nor the resources to serve as immigration enforcement officers;

(b)     Trust between local law enforcement and the communities they serve is critical to preventing, solving, and prosecuting crimes, and many jurisdictions determined that having local law enforcement officers serve as immigration officers would break that trust;

(c)     Many local jurisdictions and authorities lack the law enforcement resources to act as immigration officers at the expense of local law enforcement priorities; and

(d)     Cities and other local government entities must have the discretion to make individualized determinations relative to local values, expenditure of resources, priorities, and liabilities assumed, all taking into account that immigrants residing in the nation's cities must be able to trust all of city government that their Fourth Amendment rights will be guaranteed, and that local law enforcement efforts to build trust and supportive relationships with all communities are essential to preventing and prosecuting crime and helping victims.

(Ex. B at 1-2.)

25.     Accordingly, the Conference resolved to:

(a)     Oppose punitive sanctuary jurisdiction policies that limit local control and discretion;

(b)     Urge Congress, the administration, and states to pursue immigration enforcement policies that recognize that local law enforcement has limited resources and community trust is critical to local law enforcement and community safety; and

(c)     Oppose federal and state policies that commandeer local law enforcement or require local authorities to (i) violate, or be placed at risk of violating, a person's Fourth Amendment rights; (ii) expend limited resources to act as immigration agents; or (iii) otherwise assist federal immigration authorities beyond what is determined by local policy.

(*Id.* at 2-3.)

26.     Second, the Conference passed a resolution titled "Supporting Immigrants,

Refugees and Asylum Seekers and Standing Against Discriminatory and Harmful Policies that

-7-

Target These Vulnerable Communities." (A true and correct copy of this resolution is attached as **Exhibit C** to this complaint.) This resolution recognized that cities across America are home to immigrant populations, including recent arrivals and multigenerational families; that immigrants contribute to cities in important ways; and that the administration has nonetheless antagonized and intimidated immigrant communities through executive orders and by threatening punitive actions against welcoming cities. (Ex. C at 1.) The Conference thus resolved to call on Congress to act against policies that discriminate against and target immigrants, and to oppose "the Administration's efforts to hold immigrants hostage as bargaining chips to threaten withholding federal funding from cities across the nation." (*Id.* at 1-2.)

27. Third, the Conference passed a resolution titled "Supporting Immigrant Rights." (A true and correct copy of this resolution is attached as **Exhibit D** to this complaint.) This resolution recognized that the United States is enriched by the diversity of immigrants; that cities are diverse, multicultural centers that reflect core American values and foster economic prosperity; and that data shows that welcoming cities are stronger economically and safer than other cities. (Ex. D at 1.) In addition, the resolution recognized that the federal government seeks to restrict funding to welcoming jurisdictions and coerce cities into becoming the deportation arm of the federal government, which undermines mayors' abilities to ensure community safety by eroding trust between local law enforcement and residents. (*Id.* at 1-2.) The Conference thus resolved to "call for an end to unconstitutional federal funding threats to states and local governments in an effort to coerce and compel them into implementing federal immigration law," and to "urge members of Congress to withdraw legislation that attempts to cut local law enforcement funding necessary to ensure the safety of our communities." (*Id.* at 2.)

28.     From June 8-11, 2018, Conference members met in Boston for this year's annual meeting. More than 240 mayors from cities across the country attended, including those from nearly every state and the Commonwealth of Puerto Rico.

29.     At the 2018 annual meeting, the Conference's members adopted an additional resolution, titled "Opposing Unconstitutional Requirements Placed on Byrne JAG Funding and Urging the Immediate Awarding of FY 2017 Byrne JAG Grants." (A true and correct copy of this resolution is attached as **Exhibit E** to this complaint.) The resolution stated that cities "will not be bullied, intimidated or coerced into making a false choice between grants with offensive conditions attached, on the one hand, and our values as welcoming cit[ies] and the principles of community policing, on the other." (Ex. E at 1.) The resolution recognized that the Department does not have the authority to impose new conditions on a grant program created by Congress and "cannot commandeer local law enforcement to carry out federal immigration law functions." (*Id.* at 2.) The Conference resolved to call on the Department "to award Byrne JAG funds to municipalities without imposing additional unconstitutional conditions." (*Id.* at 3.)

30.     Each of these resolutions passed with a wide majority of the Conference members present for the annual meetings. In fact, after conclusion of a vote on a proposed resolution that passes, a member mayor who attended the vote may request to be recorded as having voted "No" on that specific resolution. Only five mayors in attendance at the annual meeting recorded a no vote as to any of the three 2017 resolutions. Only one mayor in attendance at the 2018 annual meeting recorded a no vote as to the 2018 resolution.

**C.     Conference members rely on Byrne JAG funds.**

31.     Many Conference members rely on Byrne JAG funds for critical law enforcement needs in their cities. (*See, e.g.*, Ex. A.) As such, the Conference has long supported the Byrne

JAG program. [2] Over the past decade, Conference members have routinely applied for and received those funds.

32.    Evanston, a Conference member, first received Byrne JAG funds in 2009 and has received funds every year since. Evanston uses Byrne JAG funds to train officers through the Police Learning Institute, pay personnel, and to purchase equipment. In FY 2016, Evanston received $14,685 through the Byrne JAG program.

33.    Evanston receives its Byrne JAG funds through the application submitted by Chicago, Illinois. Because Chicago's costs of preventing and investigating violent crimes exceed those of surrounding jurisdictions, 34 U.S.C. § 10156(d)(4) obligates Chicago to file a Byrne JAG application on behalf of itself and other, neighboring communities, including Evanston.

34.    Many of the Conference's members use Byrne JAG funds for diverse purposes, reflecting both the varied law enforcement needs of different communities and Congress's intent to preserve local discretion and flexibility in Byrne JAG-funded law enforcement programs. These include, for example, the following Conference members:

(a)    Iowa City, Iowa (population 74,398) uses Byrne JAG funds to promote traffic safety, to establish a search and rescue program aimed at individuals at risk for wandering, to partially fund a drug task force, and to purchase equipment.

(b)    Los Angeles, California (population 3,792,621) uses Byrne JAG funds for its Community Law Enforcement and Recovery (CLEAR) program, which aims to reduce gang violence in the city and rehabilitate communities that experienced significant crime. The program promotes and funds special criminal investigative units, an aggressive vertical prosecutorial program, probation and parole officers, youth intervention organizations, and schools.

(c)    New Orleans, Louisiana (population 391,495) uses Byrne JAG funds on gun violence reduction initiatives, alternatives to incarceration for municipal court, diversion programs for eligible defendants with mental illness, pre-trial and probation advocacy, domestic violence monitoring court, and technology

---

[2] *See* The U.S. Conference of Mayors, Public Safety First Resolution, June 2012, *available at* http://www.greenandhealthyhomes.org/sites/default/files/AdoptedResolutionsFull1.pdf.

upgrades including body cameras and audio surveillance equipment for its police force.

(d)     New York, New York (population 8,175,133) uses Byrne JAG funds to support a wide range of programs, including efforts to improve the collection, organization and evaluation of criminal justice data; a specialized unit that investigates illegal hotels, building violations, and illegal adult establishments; initiatives to reduce the number of people with mental and behavioral needs who cycle through the criminal justice system by connecting them with interventions and services; and initiatives to ensure the safety of students and reduce crime in schools. In addition, the City's five District Attorneys use Byrne JAG funds to support many programs, including the Kings County Drug Treatment Alternative-to-Prison program, which diverts hundreds of nonviolent offenders to community-based residential drug treatment programs, and the New York County Cybercrime and Identity Theft Bureau, which protects the public and institutions from organized cybercrime and identity theft schemes.

(e)     Portland, Oregon (population 639,863) has used Byrne JAG funds to support its New Options for Women (NOW) program, which provides services to women who experienced sexual exploitation while working in the commercial sex industry.

(f)     Providence, Rhode Island (population 178,042) uses Byrne JAG funds to pay personnel to conduct targeted enforcement patrols and to contract with Family Service of Rhode Island for the services of a part-time Bilingual Police Liaison.

(g)     Sacramento, California (population 493,025) uses Byrne JAG funds to support the ongoing maintenance and operations of its Police Department's helicopter program.

35.     Many other Conference members receive Byrne JAG funds and use them for still different, but no less critical, law enforcement purposes. These members include cities listed separately on Exhibit A, and many other cities like them.

**D.      The Conference, Evanston, and other Conference members promote policies of cooperation between local law enforcement and immigrants.**

36.     In exercising its discretion over local law enforcement policy, Evanston made the considered judgment that devoting local resources to immigration enforcement would be detrimental to community safety, and that concerns for safety are best addressed by promoting a

policy of cooperation between local law enforcement and immigrants. This policy judgment is codified in Evanston's "Welcoming City Ordinance." *See* Evanston City Code § 1-22.

37.     Evanston's Welcoming City Ordinance reflects the Evanston City Council's findings that "the cooperation of all persons, both documented citizens and those without documentation status, is essential to achieve the City's goals of protecting life and property, preventing crime and resolving problems" and that one of Evanston's "most important goals is to enhance the City's relationship with the immigrant communities." *Id.* § 1-22-2.

38.     In its current form, the Welcoming City Ordinance, codified as Chapter 22 of the Evanston City Code, contains several key provisions relevant to this lawsuit, including:

(a)     Subject to certain exceptions, no Evanston agent or agency shall "[s]top, arrest, search, detain or continue to detain a person solely on the belief that the person is not present legally in the United States, or that the person has committed a civil immigration violation." §1-22-10(A)(1).

(b)     Subject to certain exceptions, no Evanston agent or agency shall "[d]etain, or continue to detain, a person based upon an immigration detainer, when such immigration detainer is based solely on a violation of a civil immigration law." § 1-22-10(A)(3).

(c)     Nothing in section 1-22-10 "prohibits communication between federal agencies or officials and law enforcement or officials." §1-22-10(D).

(d)     Except as otherwise provided by federal law, no Evanston agent or agency shall disclose citizenship or immigration status information "unless required to do so by legal process or such disclosure has been authorized in writing by the individual to whom such information pertains." § 1-22-8.

39.     These and the other provisions of the Welcoming City Ordinance play a vital role in strengthening the relationship between Evanston's government, its police force, and its immigrant community. It is essential that Evanston's police officers have the flexibility needed to engage the immigrant community in their crime-fighting initiatives without projecting a constant threat of deportation.

40.     Evanston is not alone. Many other Conference members have adopted similar policies. These include, for example, Gary, Indiana; Los Angeles, California; New Orleans, Louisiana; New York, New York; Philadelphia, Pennsylvania; and Providence, Rhode Island. [3]

41.     Welcoming city policies and similar policies are sound. One study found that "crime is statistically significantly lower in sanctuary counties compared to nonsanctuary counties . . . controlling for population characteristics."[4] Indeed, a broad coalition of police chiefs explained that "build[ing] trusting and supportive relations with immigrant communities . . . is essential to reducing crime and helping victims."[5]

42.     Welcoming city policies are rooted in the judgment that restricting entanglement with ICE secures and enhances community trust in local law enforcement. Local law enforcement relies upon all community members (regardless of immigration status) to report crimes, serve as witnesses, and assist in investigations and prosecutions. Indeed, in the Conference members' experience, even the perception that local law enforcement is assisting in immigration enforcement can erode trust, disrupt lines of communication, and make law enforcement's job much more difficult.

---

[3] Gary – Ordinance No. 9100; The Los Angeles Police Department & Federal Immigration Enforcement: Frequently Asked Questions, *available at* http://assets.lapdonline.org/assets/pdf/immigrationfaq.pdf; New Orleans – New Orleans Police Department Operations Manual, Chapter 41.6.1, *available at* https://www.nola.gov/getattachment/NOPD/NOPD-Consent-Decree/Chapter-41-6-1-Immigration-Status-approval.pdf/; New York – Executive Order Nos. 34 and 41, *available at* https://www1.nyc.gov/assets/immigrants/downloads/pdf/eo-34.pdf and https://www1.nyc.gov/assets/immigrants/downloads/pdf/eo-41.pdf; Philadelphia – Executive Order No. 16, *available at* https://www.ilrc.org/sites/default/files/resources/2016-01_philadelphia_pep_order.pdf; Providence – Resolution of the City Council, *available at* https://www.ilrc.org/sites/default/files/resources/providence_resolution.pdf.
[4] Tom K. Wong, Center for American Progress, *The Effects of Sanctuary Policies on Crime and the Economy* 6 (2017), http://tinyurl.com/y75lsykd.
[5] Press Release, Major Cities Chiefs Ass'n, U.S. Mayors, Police Chiefs Concerned with Sanctuary Cities Executive Order (Jan. 25, 2017), http://tinyurl.com/y8zqhypw.

43. For these reasons, the Conference has for years opposed the federal government's attempts to penalize cities that adopt welcoming city policies such as those cited above. In 2015, for example, the Conference opposed Senate Bill 2146, the "Stop Sanctuary Policies and Protect Americans Act," which proposed to deny Community Development Block Grants and other federal aid to cities that adopted policies like those identified above.

44. Shifting the federal responsibility of enforcing civil immigration law to local governments diverts critical resources from their law enforcement agencies, compromises public safety, and hinders local police department policies. The Conference continues to oppose similar legislation when proposed (none of which Congress passed).

**E. The Department imposed three unlawful conditions on FY 2017 Byrne JAG funds.**

45. For over a decade, the Department administered the Byrne JAG program as Congress intended: funding critical local law enforcement initiatives without seeking to leverage funding to conscript local agencies to enforce federal immigration law. But now the Department seeks to impose three conditions on FY 2017 Byrne JAG funds under a cloud of uncertainty created by the Department's increasingly aggressive positions: (1) the notice condition; (2) the access condition; and (3) the compliance condition. Each condition is unauthorized and unlawful.

**1. The notice condition**

46. The FY 2017 Byrne JAG solicitation stated that the awards would be conditioned on grant applicants providing "at least 48 hours' advance notice to DHS regarding the scheduled release date and time of an alien in the jurisdiction's custody when DHS requests such notice in order to take custody of the alien pursuant to the Immigration and Nationality Act." (A true and correct copy of the U.S. Dep't of Justice, Edward Byrne Memorial Justice Assistance Grant

Program FY 2017 Local Solicitation is attached as **Exhibit F** and is available at https://www.bja.gov/Funding/JAGLocal17.pdf. The quoted language is found at page 30.)

47.     The FY 2017 Byrne JAG award documents, which the Department recently sent jurisdictions around the country, revise and expand on what the notice condition entails. From the date a city accepts the award and throughout the time of the award's performance, each city must have in place an "ordinance, -rule, -regulation, -policy, or -practice . . . designed to ensure that, when a local-government (or local-government-contracted) correctional facility receives from DHS a formal written request . . . that seeks advance notice of the scheduled release date and time for a particular alien in such facility, then such facility will honor such request and – as early as practicable . . . provide the requested notice to DHS." (A true and correct copy of the Department's sample award document is attached as **Exhibit G** and is available at https://www.bja.gov/Jag/SampleAwardDocument/. The quoted language is found at page 19.) The award document specifies that DHS currently requests notice "as early as practicable (at least 48 hours, if possible)." (Ex. G at 18.)

### 2.     The access condition

48.     The FY 2017 Byrne JAG solicitation stated that the awards would also be conditioned on grant applicants permitting "personnel of the [DHS] to access any correctional or detention facility in order to meet with an alien (or an individual believed to be an alien) and inquire as to his or her right to be or remain in the United States." (Ex. F at 30.) The requirement appears to mandate that federal immigration agents be given unprecedented and unfettered access to local law enforcement facilities and to any person being held there.

49.     The FY 2017 Byrne JAG award documents revise and expand on what the notice condition entails. From the date a city accepts the award and throughout the time of the award's performance, each city must have in place an "ordinance, -rule, -regulation, -policy, or -practice .

-15-

. . designed to ensure that [any, not just DHS] agents of the United States are given access [to] a local-government (or local-government-contracted) correctional facility" to permit the federal "agents to meet with individuals who are (or are believed by such agents to be) aliens and to inquire as to such individuals' right to be or remain in the United States." (Ex. G at 19.)

### 3. The compliance condition

50. The FY 2017 Byrne JAG solicitation stated that to validly accept an award, a local government must certify compliance with Section 1373. In fact, the application required certifications by both a city's chief legal officer and its chief executive. (Ex. F at 22-23.)

51. Section 1373 provides that state and local entities may not "prohibit, or in any way restrict" their entities and officials from sending or receiving citizenship or immigration status information from or to DHS. 8 U.S.C. § 1373(a). Section 1373 further states that no person or agency may "prohibit, or in any way restrict" state and local entities from sending, requesting, or receiving immigration status information from or to DHS; maintaining immigration status information; or exchanging immigration status information with other entities. 8 U.S.C. § 1373(b).

52. The FY 2017 Byrne JAG award documents revise and expand on what the compliance condition entails. The compliance condition is set forth in three separate award conditions— Conditions 52, 53, and 54. Condition 52 requires a local government to submit a certification of compliance with Section 1373 signed by the chief legal officer. (Ex. G at 15.) Condition 53 requires ongoing compliance with Section 1373, and requires subrecipients (*i.e.*, those who receive their funds through another applicant) to certify compliance with Section 1373. (*Id.* at 16.)

**F.    The conditions are ambiguous, arbitrary, and without justification.**

53.    The Department imposed the notice, access, and compliance conditions without any explanation, reasoning, or opportunity for exchange with local governments or law enforcement. In early July 2017, after demanding that cities justify their compliance with Section 1373, the Department cryptically announced that "[s]ome" jurisdictions "potentially violate" Section 1373, without indicating which certifications it found lacking and without identifying any defect.[6]

54.    In late July 2017, shortly before the Byrne JAG application for FY 2017 was set to go online, the Department suddenly announced significant changes to the Byrne JAG application process in a two-paragraph press release and accompanying press "backgrounder" document.[7] The Department's press release failed to explain how the Department arrived at the new conditions or what alternatives it considered. The press release was silent as to the Byrne JAG program's purpose and how the notice, access, and compliance conditions relate to, let alone serve to advance, the program's interests. The Department also failed to provide any guidance as to how the conditions will operate in practice.

55.    The notice, access, and compliance conditions are ambiguous, leaving cities uncertain as to how to comply. The ambiguity threatens to induce unconstitutional action. For example, the notice condition would require cities to detain individuals longer than they otherwise would, potentially violating the individuals' Fourth Amendment rights and state law and thereby expose these cities to liability; the access condition would demand that cities open

---

[6] Press Release, U.S. Dep't of Justice, Department of Justice Reviewing Letters from Ten Potential Sanctuary Jurisdictions (July 6, 2017), http://tinyurl.com/ybdhf7vy.

[7] *See* Press Release, U.S. Dep't of Justice, Attorney General Sessions Announces Immigration Compliance Requirements for Edward Byrne Memorial Justice Assistance Grant Programs (July 25, 2017), https://tinyurl.com/y9ttqhsl; U.S. Dep't of Justice, Backgrounder on Grant Requirements, https://tinyurl.com/ycfgbgl4.

their facilities to federal officials without regard to local detention needs. Evanston Police Department regulations and those of many Conference member cities' police forces require that individuals arrested without a warrant be released or transferred to court without unnecessary delay, but in any event no later than 48 hours after arrest. *See, e.g.*, Evanston Police Department Policy Manual § 900.3. Such matters are also informed by the law of many states, which require that certain detainees be released within 48 hours. *See, e.g.*, Ill. Admin. Code §§ 720.30, 720.150.

56.     Just as fundamentally, complying with the notice and access conditions would undermine public safety. Welcoming city policies assist effective policing by building trust between law enforcement officers and the immigrant community. Conversely, policing suffers when community members, whatever their immigration status, do not feel free to report crimes, assist in investigations, or testify as witnesses. The Department's insistence that cities nationwide give immigration enforcement agents on-demand access to their detention facilities to investigate potential civil immigration violations, and that cities detain individuals solely so to allow the investigation of possible civil immigration violations, undermines crucial public trust, cuts local law enforcement efforts off at the knees, and makes everyone in these cities less safe.

### G.     The Department lacks any authority to impose the three conditions.

57.     No legal basis exists for the three conditions. The Byrne JAG statute gives the Department no authority to impose the notice, access, and compliance conditions on Byrne JAG funds. Congress repeatedly demonstrates its ability (when it so desires) to expressly confer agency discretion to add substantive conditions to federal grants. In the same statute that includes the Byrne JAG grant, the Omnibus Crime Control and Safe Streets Act of 1968, Congress created a different grant program that expressly authorized administering agencies to impose reasonable grant conditions. *See* 34 U.S.C. § 10446(e)(3) (Attorney General may "impose

-18-

reasonable conditions on grant awards . . . .”). And Congress expressly conferred such authority in other federal grant programs. *See, e.g.*, 47 U.S.C. § 1204(b)(2) (Under Secretary of Commerce can “establish such conditions . . . as may be appropriate to ensure the efficiency and integrity of the grant program”); 25 U.S.C. § 1652(b) (similar).

58.     The Byrne JAG statute gives the Attorney General limited ministerial authority to specify the “form” of the application, 34 U.S.C. § 10153(A) (requiring jurisdictions to submit an application containing the enumerated components “in such form as the Attorney General may require”). However, the statute nowhere authorizes the Attorney General or the Department to impose additional substantive conditions to the application. Indeed, doing so would upend Congress’s formula approach for distributing funds based on population and violent crime, and instead allocate grants using criteria invented by the Department.

59.     Although the Byrne JAG statute requires that grantees comply with “all applicable Federal laws,” that phrase refers to the host of laws that regulate the conduct of federal grant recipients *as grant recipients*.[8] It does not refer to every section of the U.S. Code that could possibly apply to a state or local government. Section 1373 does not regulate grantees as grantees nor do its terms mention federal grants or funds. In fact, none of the three conditions concerns applicable federal requirements. Each condition addresses civil immigration

---

[8] *See, e.g.*, 41 U.S.C. § 4712(a)(1) (“An employee of a contractor, subcontractor, grantee, or subgrantee or personal services contractor may not be discharged, demoted, or otherwise discriminated against as a reprisal for disclosing to a person or body . . . information that the employee reasonably believes is evidence of gross mismanagement of a Federal contract or grant, a gross waste of Federal funds . . . .”); 42 U.S.C. § 2000d (“No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.”); 29 U.S.C. § 794(a) (“No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.”).

enforcement, which is wholly inapplicable to criminal justice grants. In addition, there is no federal law requiring cities to provide ICE with "at least 48 hours' advance notice" before releasing anyone in custody, and no federal law requires local police departments to give DHS officials access to detention facilities.

60.     In fact, Congress considered, but did not pass, legislation that would penalize cities for seeking to set their own law enforcement priorities. *See* Stop Sanctuary Policies and Protect Americans Act, S. 2146, 114th Cong. (2015) (proposing funding cuts for any sanctuary jurisdiction that violates Section 1373 or "prohibits any government entity or official from complying with a detainer"). Notably, however, Congress never passed legislation authorizing the executive branch to impose any penalty on local jurisdictions based on the refusal to comply with detainer or other immigration enforcement requests.

61.     The notice, access, and compliance conditions represent a sharp break with past agency practice. The Department never before imposed any conditions of this nature on Byrne JAG funds.

62.     The three conditions also violate core constitutional principles. Separation of powers principles operate as independent restraints on cooperative federalism arrangements like the Byrne JAG program. The Constitution gives the spending power to Congress, not the executive branch. Federal agencies therefore may not invent funding conditions out of whole cloth.

63.     The notice, access, and compliance conditions also run afoul of the Tenth Amendment. The anti-commandeering principle ensures that the sovereign states are free to legislate as they see fit to promote the safety and welfare of their residents. The principle forbids

Congress to "unequivocally dictate[] what a state [or local] legislature may and may not do." *Murphy v. NCAA*, 138 S. Ct. 1461, 1478 (2018).

64.     Section 1373 "unequivocally dictates" to cities that they may not promulgate policies or regulations that prohibit local officials from sharing immigration status information with federal officials. *Id.*; *see, e.g.*, *City of Philadelphia v. Sessions*, No. 17-3894, 2018 WL 2725503, at *28-33 (E.D. Pa. June 6, 2018); *accord United States v. California*, No. 2:18-cv-490-JAM-KJN, 2018 WL 3301414, at *14 (E.D. Cal. July 5, 2018) ("The Court finds the constitutionality of Section 1373 highly suspect.").

65.     The notice and access conditions "unequivocally dictate[]" to cities that they must enact ordinances or policies concerning the administration of detention facilities and providing advance notification to federal officials. The notice condition seeks to fundamentally reorganize the way the Conference's members balance their Fourth Amendment obligations against their interest in effective law enforcement. The access condition requires a fundamental restructuring of police procedures and functions to accommodate on-demand access to detainees by federal agents. The federalization of bedrock local government functions violates the Tenth Amendment's anti-commandeering principle. *See Murphy*, 138 S. Ct. at 1477 ("The Federal Government may not command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program.") (quoting *Printz v. United States*, 521 U.S. 898, 935 (1997)).

### H.     The Department's unlawful conditions will injure Evanston and the Conference's other members, forcing them to choose between vital law enforcement funding and their constitutional rights.

66.     Evanston and the Conference's other members now face an impossible choice: sacrifice their sovereignty and their residents' safety by acceding to unlawful funding demands that will undermine community-officer trust and cooperation, or forfeit crucial monies used to

fund essential policing operations. The Department cannot force the Conference's members to choose between their right to exercise municipal sovereignty and their right to receive formula grant funds that Congress allocated to them.

67.     The importance of Byrne JAG funds and the choice cities now face is underscored by the number of local governments challenging the conditions. In August 2017, the City of Chicago, a member of the Conference, filed a lawsuit challenging the three unauthorized and unconstitutional Byrne JAG conditions. *City of Chicago v. Sessions*, Case No. 17-cv-5720 (N.D. Ill.) (Leinenweber, J.) In addition to Chicago, the State of Illinois, City of Philadelphia, City and County of San Francisco, City of Los Angeles, State of California, and City of West Palm Beach filed lawsuits challenging the Byrne JAG conditions.[9]

68.     On September 15, 2017, the district court granted Chicago's motion for a nationwide preliminary injunction as to the notice and access conditions because Chicago was likely to succeed on its claims that the Department lacked the authority to impose those conditions. *City of Chicago v. Sessions*, 264 F. Supp. 3d 933, 943, 951 (N.D. Ill. 2017) ("The notice and access conditions exceed statutory authority, and, consequently, the efforts to impose them violate the separation of powers doctrine and are *ultra vires*.").

69.     On September 26, 2017, the Attorney General filed a motion to stay the nationwide preliminary injunction. *Chicago*, No. 17-cv-5720, Dkt. 80. Two days later, on September 28, 2017, counsel for the Conference appeared at the presentment of the Attorney General's motion to stay and alerted the court that the Conference intended to seek leave to

---

[9] *State of Illinois v. Sessions* (No. 18-cv-4791, N.D. Ill.); *City of Philadelphia v. Sessions* (No. 17-3894, E.D. Pa.); *City & County of San Francisco v. Sessions* (No. 17-4642, N.D. Cal.); *City of Los Angeles v. Sessions* (No. 17-7215, C.D. Cal.); *State of California v. Sessions* (No. 17-4701, N.D. Cal.); *City of West Palm Beach v. Sessions* (No.18-cv-80131, S.D. Fla.).

intervene in the case. The Conference filed its motion to intervene on October 6, 2017. *Id.*, Dkt. 91.

70.     On November 16, 2017, the district court denied the Conference's motion to intervene. At that time, the district court explained that the Conference "can represent the interests of its members who may suffer an impending injury caused by the defendant's acts." *Chicago*, 2017 WL 5499167, at *5 (N.D. Ill. Nov. 16, 2017). However, the court denied intervention because the nationwide injunction in place at the time protected the Conference's member cities' interests. *Id.* at *9-10 ("Unless and until the status of the nationwide injunction changes, there is no reason to permit an intervention that will further complicate this litigation.").

71.     On April 19, 2018, the United States Court of Appeals for the Seventh Circuit affirmed the district court's grant of a nationwide injunction as to the notice and access conditions. *City of Chicago v. Sessions*, 888 F.3d 272, 293 (7th Cir. 2018). The panel unanimously concluded that "the district court did not err in determining that the City established a likelihood of success on the merits of its contention that the Attorney General lacked the authority to impose the notice and access conditions on receipt of the Byrne JAG grants," and two of the three judges held that the district court "did not abuse its discretion in granting the nationwide preliminary injunction." *Id.*

72.     The Attorney General subsequently filed a petition for rehearing en banc as to the scope of the preliminary injunction. *Chicago*, No. 17-2991, Dkt. 119. Notably, the Attorney General did not request rehearing on the Seventh Circuit's decision that Chicago established a likelihood of success on its claims that the Attorney General lacked authority to impose the notice and access conditions.

73.     On June 4, 2018, the Seventh Circuit voted to partially rehear the case en banc "only as to the geographic scope of the preliminary injunction entered by the district court." *Chicago*, No. 17-2991, Dkt. 128. On June 26, 2018, the Court stayed the preliminary injunction issued by the district court "as to geographic areas in the United States beyond the City of Chicago pending the disposition of the case by the en banc court." *Chicago*, No. 17-2991, Dkt. 134.

74.     Even though the Attorney General did not appeal the Seventh Circuit's decision that Chicago was likely to succeed on the merits of its claims that the Attorney General lacks the authority to impose the notice and access conditions, the Department began issuing FY 2017 Byrne JAG award notification documents as soon as the Seventh Circuit stayed the preliminary injunction as to geographic areas outside the City of Chicago. A few hours after the Seventh Circuit stayed the nationwide injunction, on June 26, 2018, the Department issued FY 2017 Byrne JAG award notifications to Conference member cities. (*See* Ex. A.) Upon information and belief, the Department issued awards containing all three challenged conditions to hundreds of municipalities.[10]

75.     However, the Department continues to withhold FY 2017 Byrne JAG award documents from many Conference member cities, including the cities located within Illinois, Wisconsin, Indiana, California, Oregon, and Vermont. The Department's refusal to disperse the FY 2017 Byrne JAG funds to certain states and local governments adds confusion and uncertainty to the award process.

76.     The Department's imposition of the notice, access, and compliance conditions and its continued refusal to issue awards to certain cities pose a threat of imminent harm to Evanston

---

[10] *See* https://ojp.gov/funding/Explore/OJPAwardData htm.

-24-

and the Conference's other members. Without Byrne JAG funds, Evanston and the Conference's other members will have to shut down important local programs; change program staffing, scope, or goals; or divert funds from other policing objectives to sustain the programs.

77.     The Conference and Evanston, therefore, bring this action and seek to enjoin the Attorney General from imposing the unlawful conditions.

## COUNT ONE: ULTRA VIRES

78.     The Conference and Evanston incorporate by reference the preceding paragraphs' allegations.

79.     The Department of Justice may only exercise authority conferred by statute.

80.     The Department lacks statutory authority to condition Byrne JAG funds on the notice, access, and compliance conditions. Indeed, such authority is at odds with the text, structure, and purpose of the Byrne JAG statute.

81.     The Byrne JAG statute gives the Department no authority to impose additional substantive grant conditions on Byrne JAG funds. *City of Chicago v. Sessions*, 888 F.3d 272, 285 (7th Cir. 2018). The Department lacks statutory authority to impose the notice, access, and compliance conditions on Byrne JAG funds. The three conditions are not "applicable Federal law" and do not deal with the administration and spending of funds.

82.     The formula-grant structure of the Byrne JAG program also contradicts the Department's purported authority to promulgate the conditions. Unlike discretionary grants, which agencies award on a competitive basis subject to agency discretion, formula grants are awarded pursuant to a statutory formula. If the Department had the authority to impose new substantive conditions on all grantees, the effect would be to contradict Congress's formula and reallocate funds to jurisdictions that adopted the Department's preferred policy. It would also contradict Congress's intent to give states and local governments the "flexibility to spend money

for programs that work for them rather than to impose a 'one size fits all' solution." H.R. Rep. No. 109-233, at 89 (2005).

83.    As a direct and proximate result of these unlawful conditions, Evanston and the Conference's other members will be forced to accept unlawful and unconstitutional grant conditions or forego Byrne JAG funds and shut down the programs the funds support.

84.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, the Conference and Evanston are entitled to a declaration that the Attorney General is without authority to impose the notice, access, and compliance conditions on FY 2017 Byrne JAG funds; and a permanent injunction preventing the conditions from going into effect.

### COUNT TWO: SEPARATION OF POWERS

85.    The Conference and Evanston incorporate by reference the preceding paragraphs' allegations.

86.    The Constitution vests the spending power in Congress, not the executive branch. U.S. Const. art. I § 8, cl. 1. Absent a statutory provision or express delegation, only Congress is entitled to attach conditions to federal funds.

87.    The executive branch "does not have unilateral authority to refuse to spend . . . funds" that Congress already appropriated "for a particular project or program." *In re Aiken Cty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013); *see also Train v. City of New York*, 420 U.S. 35, 44 (1975). Imposing a new condition on a federal grant program amounts to refusing to spend money appropriated by Congress unless that condition is satisfied.

88.    The notice condition was not imposed by Congress, but rather by the Department in issuing the FY 2017 Byrne JAG application. Therefore, the notice condition amounts to improper usurpation of Congress's spending power by the executive branch.

89. The access condition was not imposed by Congress, but rather by the Department in issuing the FY 2017 Byrne JAG application. Therefore, the access condition amounts to improper usurpation of Congress's spending power by the executive branch.

90. The compliance condition was not imposed by Congress, but rather by the Department in issuing its OJP guidance and the FY 2016 and FY 2017 Byrne JAG applications. Therefore, the compliance condition amounts to improper usurpation of Congress's spending power by the executive branch.

91. Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, the Conference and Evanston are entitled to a declaration that the notice, access, and compliance conditions for the FY 2017 Byrne JAG funds violate the constitutional principle of separation of powers and impermissibly arrogate to the executive branch power that is reserved to the legislative branch; and a permanent injunction preventing the conditions from going into effect.

## COUNT THREE: SPENDING CLAUSE

92. The Conference and Evanston incorporate by reference the preceding paragraphs' allegations.

93. Not only did Congress not authorize (expressly or impliedly) the notice, access, and compliance conditions; but Congress could not have authorized the conditions because they do not satisfy additional requirements of the Spending Clause.

94. *First*, the notice, access, and compliance conditions are not germane to the stated purposes of the Byrne JAG funds. None of the conditions are relevant to the federal interest in the Byrne JAG funds that Conference members receive or to the Byrne JAG program generally.

95. The notice and access conditions are not relevant to the federal interest in the Byrne JAG funds the Conference's members receive. Information about when detainees will be released, and policies related to access for federal agents bear no relevance to the purchase of

equipment, community programs, or other uses to which Conference members put Byrne JAG funds.

96.    The compliance condition is not relevant to the federal interest in the Byrne JAG funds the Conference's members receive. Sharing information about immigration status with federal officials bears no connection to the purchase of equipment, community programs, or other uses to which Conference members put Byrne JAG funds.

97.    The compliance, notice, and access conditions also are not relevant to the federal interest in the Byrne JAG program more generally. The conditions actively undermine Congress's goals of dispersing funds across the country, targeting funds to combat violent crime, and respecting local judgment in setting law enforcement strategy.

98.    **Second**, the notice, access, and compliance conditions would impermissibly induce Byrne JAG recipients to engage in unconstitutional activity.

99.    The Spending Clause prohibits the federal government from imposing spending conditions to "induce the States to engage in activities that would themselves be unconstitutional." *S. Dakota v. Dole*, 483 U.S. 203, 210 (1987). The three conditions seek to require Byrne JAG recipients to engage in unconstitutional activity, such as detaining individuals without probable cause in violation of the Fourth Amendment.

100.    **Third**, the notice, access, and compliance conditions are unconstitutionally ambiguous.

101.    Federal restrictions on state and local funding must be articulated unambiguously to allow the recipient to knowingly accept the conditions and ascertain what is expected.

102.    The three conditions are ambiguous as to what is expected of grant recipients, particularly given Evanston's and other Conference members' welcoming city policies and other

relevant policies and practices. The conditions do not provide cities with notice to make a choice knowingly and cognizant of the consequences of their participation.

103.    Many interpretations of the three conditions raise serious constitutional concerns. Where a grant recipient must resolve tension between the Constitution and a federal agency's informal interpretation announced in a guidance document to ascertain what is expected of it, a condition cannot be characterized as unambiguous.

104.    The compliance condition is ambiguous, and many interpretations of the condition raise serious constitutional concerns. Section 1373 uses sweeping language with no discernable limiting principle. The Department added to the confusion by suggesting without explanation that Section 1373 implicates a wide range of state and local governance practices, from formal laws to informal cultural norms. In addition, the Department compounded the confusion by questioning the compliance of many jurisdictions with Section 1373 without deciding whether the Department believes those jurisdictions' policies comply.[11]

105.    **Fourth**, the notice, access, and compliance conditions are unconstitutionally coercive.

106.    The Spending Clause prohibits grant conditions that are "so coercive as to pass the point at which 'pressure turns into compulsion.'" *Dole*, 483 U.S. at 211 (citation omitted).

107.    As a direct and proximate result of the notice, access, and compliance conditions, the Conference's members are forced to either accept unlawful and unconstitutional grant conditions or forego Byrne JAG funds. The three conditions threaten financial consequences that exceed the point at which pressure turns to constitutionally impermissible compulsion.

---

[11] Press Release, U.S. Dep't of Justice, Department of Justice Reviewing Letters from Ten Potential Sanctuary Jurisdictions (July 6, 2017), http://tinyurl.com/ybdhf7vy.

108. Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, the Conference and Evanston are entitled to a declaration that the notice, access, and compliance conditions for the FY 2017 Byrne JAG funds violate the Constitution's Spending Clause; and a permanent injunction preventing the conditions from going into effect.

## COUNT FOUR: COMMANDEERING

109. The Conference and Evanston incorporate by reference the preceding paragraphs' allegations.

110. The Tenth Amendment prohibits the federal government from requiring states and localities "to administer or enforce a federal regulatory program." *Murphy v. NCAA*, 138 S. Ct. 1461, 1477 (2018). The anti-commandeering principle prevents the federal government from shifting the costs of regulation to states and local governments. *Id.* Where the "whole object" of a federal statutory provision is to "direct the functioning" of state and local governments, that provision is unconstitutional and must be enjoined. *Printz*, 521 U.S. at 932, 935; *New York v. United States*, 505 U.S. 144, 186-187 (1992). That description precisely fits each of the three conditions.

111. When Congress enacted Section 1373, it sought to ensure that "[t]he acquisition, maintenance, and exchange of immigration-related information by State and local agencies" could be used to enforce federal law. S. Rep. No. 104-249, at 19-20 (1996). In doing so, it sought to "require [state and local officers] to provide information that belongs to the State and is available to them only in their official capacity"—in other words, to engage in unconstitutional commandeering. *Printz*, 521 U.S. at 932 n.17.

112. Further, Section 1373 prohibits state and local governments from engaging in a core aspect of governing: controlling the actions of their own employees. Compliance with Section 1373 results in the federal government commandeering cities by directing how city

-30-

personnel should act and handle data under local control to advance a federal program. In fact, the Department instructed that states and local governments may need to provide affirmative instruction to employees to comply.[12] Section 1373 requires local officers to follow federal directives and usurps the local policymaking process.

113.     The notice and access condition impermissibly commandeer cities and cannot be validly imposed on Byrne JAG funding recipients. The notice condition seeks to fundamentally reorganize not just how cities' officers spend their time, but also the way the Conference's members balance their Fourth Amendment obligations against their interest in effective law enforcement. The access condition requires a fundamental restructuring of police procedures and functions to accommodate on-demand access to detainees by federal agents.

114.     As a direct and proximate result of these unconstitutional conditions, the Conference's members will be forced to accept unlawful and unconstitutional grant conditions or forego Byrne JAG funds and shut down or materially alter the programs the funds support.

115.     Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, the Conference and Evanston are entitled to a declaration that the notice, access, and compliance conditions for the FY 2017 Byrne JAG funds violate the Tenth Amendment; and a permanent injunction preventing the conditions from going into effect.

## COUNT FIVE: ADMINISTRATIVE PROCEDURE ACT
### (Arbitrary and Capricious)

116.     The Conference and Evanston incorporate by reference the preceding paragraphs' allegations.

---

[12] *See* Memorandum from Michael E. Horowitz, Inspector Gen., U.S. Dep't of Justice, to Karol V. Mason, Assistant Attorney Gen., Office of Justice Programs, U.S. Dep't of Justice, Department of Justice Referral of Allegations of Potential Violations of 8 U.S.C. § 1373 by Grant Recipients 6 (May 31, 2016), https://tinyurl.com/y9rpwge4.

117.    In addition to the Attorney General lacking statutory and constitutional authority to impose the notice, access, and compliance conditions, the conditions are arbitrary and capricious, in violation of the Administrative Procedure Act, 5 U.S.C. § 706.

118.    The Department's decision to condition FY 2017 Byrne JAG funds on compliance with the three conditions deviates from past agency practice without reasoned explanation or justification. The Department failed to rely on reasoned decision-making and, to the extent it cited reasons at all, those reasons are contradicted by evidence.

119.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, the Conference and Evanston are entitled to a declaration that the notice, access, and compliance conditions for the FY 2017 Byrne JAG funds violate the APA; and a permanent injunction preventing those conditions from going into effect.

**PRAYER FOR RELIEF**

WHEREFORE, The United States Conference of Mayors and the City of Evanston pray that this Court:

a)      Declare that the notice, access, and compliance conditions for the FY 2017 Byrne JAG program are unlawful;

b)      Preliminarily and permanently enjoin the Attorney General from imposing the notice, access, and compliance conditions on FY 2017 Byrne JAG funds; and from imposing the notice, access, and compliance conditions on future Byrne JAG funds;

c)       Retain jurisdiction to monitor the Department's compliance with this Court's judgment;

d)      Award Plaintiffs their reasonable attorney fees, expenses, and costs as permitted by federal law, including the Administrative Procedure Act and 28 U.S.C. § 2412; and

e)      Grant such other relief as this Court may deem proper.

Dated: July 16, 2018              Respectfully submitted,

                                      THE UNITED STATES CONFERENCE OF
MAYORS and CITY OF EVANSTON

By: /s/ Brian C. Haussmann
    Counsel for the United States Conference of Mayors

        Brian C. Haussmann
        John M. Fitzgerald
        Katherine M. O'Brien
        Kyle A. Cooper
        TABET DIVITO & ROTHSTEIN LLC
        209 South LaSalle Street, 7th Floor
        Chicago, IL 60604
        Telephone: (312) 762-9450
        bhaussmann@tdrlawfirm.com
        jfitzgerald@tdrlawfirm.com
        kobrien@tdrlawfirm.com
        kcooper@tdrlawfirm.com

By: /s/ Michelle L. Masoncup
    Counsel for City of Evanston

        Michelle L. Masoncup
        Corporation Counsel
        Law Department
        City of Evanston
        2100 Ridge Avenue
        Evanston, IL 60201
        Telephone: (847) 448-8009
        mmasoncup@cityofevanston.org