**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| CITY OF EVANSTON and THE UNITED STATES CONFERENCE OF MAYORS, | |
| Plaintiffs, | Case No. 18-cv-4853 |
| v. | |
| JEFFERSON BEAUREGARD SESSIONS III, in his official capacity as Attorney General of the United States, | |
| Defendant. | |

## PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

The City of Evanston, Illinois and the United States Conference of Mayors (the "Conference" and, together with Evanston, "Plaintiffs"), by their undersigned attorneys, and pursuant to Federal Rule of Civil Procedure 65, hereby move for a temporary restraining order and preliminary injunction against three unauthorized and unconstitutional conditions concerning federal civil immigration enforcement that Defendant Jefferson Beauregard Sessions III ("Defendant" or the "Attorney General") attempts to place on the Byrne JAG program.

## INTRODUCTION

1. The Attorney General has improperly forced upon Evanston and the Conference's other member cities a Hobson's choice: accept Congressionally mandated law enforcement grants only if their officers will do the Attorney General's bidding in enforcing federal civil immigration laws, and thereby make their cities less safe by hampering cooperation with local law enforcement, or take nothing and make their cities less safe by exposing their citizens to risks that could have been prevented with federal aid. The Attorney General now requires many cities to make this untenable choice by **August 10, 2018**.

2.     The Attorney General's actions are illegal, as this Court and the Court of Appeals already held, and will cause cities irreparable harm by making them less safe or, at a minimum, forcing them to choose between the right to receive important law enforcement funds and the right to be free from the federal government's unconstitutional bullying. Accordingly, the Attorney General's actions again must be enjoined.

## BACKGROUND

### The Byrne JAG Program

3.     The Edward Byrne Memorial Justice Assistance Grant ("Byrne JAG") program is a Congressionally mandated formula grant program intended to provide federal funds to assist cities and other local governments with life-saving, local law enforcement initiatives. 34 U.S.C. §§ 10151-58. The program has existed for more than a decade. Many of the Conference's member cities, including co-plaintiff Evanston, have been Byrne JAG recipients for many years. (Ex. 1, Cochran Declaration ("Decl."), ¶¶ 24-30; Ex. 2, Gergits Decl., ¶ 3.) Cities use Byrne JAG funds for critical life-saving law enforcement measures. (Ex. 1, Cochran Decl., ¶ 31; Ex. 2, Gergits Decl., ¶¶ 3, 14.)

### The Attorney General's Conditions

4.     Despite the importance of Byrne JAG funds to cities and other local governments, in fiscal year ("FY") 2017 the Attorney General hijacked the Byrne JAG program and held hostage over $200 million in Congressionally allocated grant funds as part of a campaign to force cities and other local jurisdictions to divert their attention and resources from fighting violent crime to helping the federal government with civil immigration enforcement. To this end, the Attorney General placed three immigration-enforcement-related conditions on the receipt of Byrne JAG

funds, referred to here as the (1) notice, (2) access, and (3) compliance conditions. Each of the conditions threatens irreparable harm to cities.

5. **The notice condition:** The FY 2017 solicitation stated that the awards would require recipients to provide "at least 48 hours' advance notice to [the Department of Homeland Security ("DHS")] regarding the scheduled release date and time of an alien in the jurisdiction's custody when DHS requests such notice in order to take custody of the alien." (Ex. 2, Gergits Decl., ¶ 6, Ex. 1 at 30.) More recently, the Attorney General has issued grant award documents that revise – and expand – on what the notice condition requires. From the date a city accepts the award and throughout its performance, each city must have in place an:

> ordinance, -rule, -regulation, -policy, or -practice . . . designed to ensure that, when a local-government (or local-government-contracted) correctional facility receives from DHS a formal written request . . . that seeks advance notice of the scheduled release date and time for a particular alien in such facility, such facility will honor such request and – as early as practicable . . . provide the requested notice to DHS.

(Ex. 1, Cochran Decl., Ex. 4 at 19.) The award documents specify that DHS currently requests notice "as early as practicable (at least 48 hours, if possible)." (*Id.* at 18.)

6. **The access condition:** The FY 2017 Byrne JAG solicitation stated that the awards would also be conditioned on grant applicants permitting "personnel of [DHS] to access any correctional or detention facility in order to meet with an alien (or an individual believed to be an alien) and inquire as to his or her right to be or remain in the United States." (Ex. 2, Gergits Decl., ¶ 6, Ex. 1.) As with the notice condition, the FY 2017 award documents require cities to adopt a corresponding ordinance, rule, regulation, or policy. (Ex. 1 Cochran Decl., Ex. 4 at 19.)

7. **The compliance condition:** The FY 2017 Byrne JAG solicitation stated that to validly accept an award, a local government must certify compliance with 8 U.S.C. § 1373. (Ex. 2, Gergits Decl., Ex. 1 at 1.) The application and award require certifications by both a city's chief

3

legal officer and its chief executive, as well as certain ongoing compliance measures. (*Id.* at 22; Ex. 1, Cochran Decl., ¶ 6, Ex. 4 at 15-17.)

8. Section 1373 provides that state and local agencies may not "prohibit, or in any way restrict" their entities and officials from sending or receiving citizenship or immigration status information from or to DHS, maintaining such information, or exchanging such information with other agencies. 8 U.S.C. § 1373(a), (b).

**The Attorney General's conditions conflict with Conference and city policies.**

9. For decades, many cities have adopted policies that encourage cooperation between immigrant communities and law enforcement. These cities, and the Conference that supports them, adopt such policies because they recognize that the cooperation of immigrant populations is critical to effective law enforcement and public safety.

10. For example, Conference member Evanston decided that devoting local resources to immigration enforcement would be detrimental to community safety, and that concerns for safety are best addressed by promoting a policy of cooperation between local law enforcement and immigrants. This policy is codified in Evanston's "Welcoming City Ordinance." (Ex. 2, Gergits Decl., ¶¶ 8-10, Ex. 2, Evanston City Code § 1-22.) Many other Conference members have adopted similar policies. (Ex. 1, Cochran Decl., ¶ 36; *see also* https://www.ilrc.org/detainer-policies (identifying jurisdictions with similar policies) (last visited July 16, 2018).)

11. The Conference itself also adopted policies among its members to support cities' efforts to decide for themselves how best to maintain community safety, and has consistently opposed the federal government's efforts to dictate local law enforcement policy and to impose immigration-enforcement obligations upon cities. (Ex. 1, Cochran Decl., ¶¶ 12-21.) The Conference specifically opposes the conditions challenged in this action. (*Id.* ¶¶ 20-21.)

4

**Municipalities around the country have challenged the conditions.**

12.     The Department of Justice first announced the conditions as part of the solicitation package sent to grant applicants in the Summer of 2017. The conditions faced immediate challenges from states and cities that rely on Byrne JAG funding.

13.     In August 2017, the City of Chicago, a Conference member, filed a lawsuit challenging the three unauthorized and unconstitutional Byrne JAG conditions. *City of Chicago v. Sessions*, Case No. 17-cv-5720 (N.D. Ill.) (Leinenweber, J.). In addition to Chicago, to date the City of Philadelphia, City and County of San Francisco, City of Los Angeles, State of California, the City of West Palm Beach, City of New York, and the States of Illinois, New York, Connecticut, New Jersey, Massachusetts, Virginia, and Washington have filed lawsuits challenging the Byrne JAG conditions.[1]

14.     These challenges have thus far succeeded. On September 15, 2017, this Court granted Chicago's motion for a nationwide preliminary injunction as to the notice and access conditions, finding Chicago was likely to succeed on its claims that the Attorney General lacked the authority to impose those conditions. *City of Chicago v. Sessions*, 264 F. Supp. 3d 933, 943, 951 (N.D. Ill. 2017) ("The notice and access conditions therefore exceed statutory authority, and, consequently, the efforts to impose them violate the separation of powers doctrine and are *ultra vires*.").

---

[1] *City of Philadelphia v. Sessions* (No. 17-3894, E.D. Pa.); *City & County of San Francisco v. Sessions* (No. 17-4642, N.D. Cal.); *City of Los Angeles v. Sessions* (No. 17-7215, C.D. Cal.); *State of California v. Sessions* (No. 17-4701, N.D. Cal.); *City of West Palm Beach v. Sessions* (No. 18-80131, S.D. Fla.); *State of Illinois v. Sessions* (No. 18-4791, N.D. Ill.); *City of New York v. Sessions* (No. 18-6474, S.D.N.Y.); *State of New York, et al. v. Dep't of Justice* (No. 18-6471 S.D.N.Y.).

15.     The Conference supported Chicago as an *amicus* and sought leave to intervene as a co-plaintiff in the case. *Chicago*, No. 17-cv-5720, Dkt. 51, 91. While the Court recognized that the Conference had standing to represent its members' interests in the action, it declined to allow intervention, finding: "Unless and until the status of the nationwide injunction changes, there is no reason to permit an intervention that will further complicate this litigation." *City of Chicago v. Sessions*, No. 17-cv-5720, 2017 WL 5499167, at **5, 9-10 (N.D. Ill. Nov. 16, 2017).

16.     On April 19, 2018, the U.S. Court of Appeals for the Seventh Circuit affirmed this Court's ruling. *City of Chicago v. Sessions*, 888 F.3d 272, 293 (7th Cir. 2018). The panel unanimously concluded that "the district court did not err in determining that the City established a likelihood of success on the merits of its contention that the Attorney General lacked the authority to impose the notice and access conditions on receipt of the Byrne JAG grants," and two of the three judges held that the district court "did not abuse its discretion in granting the nationwide preliminary injunction." *Id.*

17.     The Attorney General subsequently filed a petition for rehearing en banc as to the scope of the preliminary injunction, but did not challenge the Seventh Circuit's ruling that the notice and access conditions are unauthorized. *Chicago*, No. 17-2991, Dkt. No. 119. On June 4, 2018, the Seventh Circuit voted to partially rehear the case en banc "only as to the geographic scope of the preliminary injunction entered by the district court." *Chicago*, No. 17-2991, Dkt. No. 128. On June 26, 2018, the Seventh Circuit stayed the preliminary injunction issued by the district court "as to geographic areas in the United States beyond the City of Chicago pending the disposition of the case by the en banc court." *Chicago*, No. 17-2991, Dkt. No. 134.

6

18.     The Seventh Circuit's stay has again placed Evanston and other Conference members at risk. However, its decision that the notice and access conditions are likely unauthorized stands as binding authority in this circuit.

19.     Other cities also successfully challenged the compliance condition, *see infra* ¶ 21, and the Supreme Court recently overturned the basis on which this Court initially upheld it. In sustaining the compliance condition at the preliminary injunction stage, this Court noted that whether Section 1373 violated the anti-commandeering doctrine presented a "unique and novel constitutional question." *Chicago*, 263 F. Supp. 3d at 949. The court ruled that under then-prevailing precedent, "only affirmative demands on states [and local governments] constitute a violation of the Tenth Amendment" and, because "[r]ead literally, Section 1373 imposes no affirmative obligation on local governments," it was likely acceptable. *Id.*

20.     Chicago did not challenge this ruling on appeal. However, the United States Supreme Court recently held that the distinction between affirmative demands and prohibitions on which this Court relied "is empty." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1478 (2018). Regardless whether a federal command is phrased as an affirmative demand or prohibition, the Supreme Court ruled, "[t]he basic principle—that Congress cannot issue direct orders to state legislatures—applies in either event." *Id.*

21.     These rulings foreclose all three of the Attorney General's conditions, as courts in other districts already concluded. The United States District Court for the Eastern District of Pennsylvania permanently enjoined the Attorney General from imposing the notice, access and compliance conditions upon Conference member Philadelphia. *City of Philadelphia v. Sessions*, No. 17-3894, 2018 WL 2725503, at *45 (E.D. Pa. June 6, 2018). Among other deficiencies, the court held that the notice and access conditions were unauthorized and *ultra vires*, that imposition

7

of all three conditions was arbitrary and capricious in violation of the Administrative Procedure Act ("APA"), and that the compliance condition violated the anti-commandeering doctrine as recently articulated by the Supreme Court. *Id.* at **24-33. *Accord United States v. California*, No. 2:18-cv-490-JAM-KJN, 2018 WL 3301414, at *14 (E.D. Cal. July 5, 2018) ("The Court finds the constitutionality of Section 1373 highly suspect.").

**Notwithstanding the decisions of multiple courts that the conditions are unlawful, the Attorney General has continued his campaign to force them upon cities.**

22.     Although the Attorney General has been enjoined from imposing the conditions on Chicago and Philadelphia, and declined to even defend the notice and access conditions before the Seventh Circuit en banc, he continues to insist upon forcing the conditions on other cities.

23.     On June 26, 2018, within mere hours of the Seventh Circuit's stay of the nationwide injunction in *Chicago v. Sessions*, the Attorney General issued award notifications to hundreds of cities and other local jurisdictions. (Ex. 1, Cochran Decl., ¶¶ 42-43, Exs. 4, 5.)  The Attorney General gave each city 45 days, or until **August 10, 2018**, to accept the award with all the conditions or to decline the funds. (*Id.*, Ex. 6 at 4.) Many Conference members received award notifications on June 26 and face the August 10 deadline. (*Id.* ¶ 44.) Absent relief, these cities imminently will be forced to accede to the Attorney General's unlawful demands or forego needed law enforcement funds.

24.     Still other cities, including Evanston, remain in limbo. The Attorney General continues to withhold awards to Evanston and many other cities. (Ex. 1, Cochran Decl., Ex.3; Ex. 2, Gergits Decl., ¶¶ 13-14.) Yet in lifting the injunction "as to geographic areas" outside Chicago's border, the Seventh Circuit's stay leaves open the possibility that the Attorney General could act at any time against them. Indeed, the Attorney General recently acted to impose the conditions even upon other cities in the Seventh Circuit. (Ex. 1, Cochran Decl., ¶ 45.)

## ARGUMENT

25.     "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "[W]hen the Government is the opposing party," the last two factors "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## I.     Evanston and the Conference are likely to succeed on the merits of their claims.

26.     The Attorney General's conditions are illegal. Two of them—the notice and access conditions—were never authorized by Congress. Both this Court and the United States Court of Appeals for the Seventh Circuit have now so held. The third condition—compliance with Section 1373—violates the anti-commandeering doctrine as articulated by the United States Supreme Court in *Murphy*. At a minimum, Plaintiffs have "some likelihood" of succeeding on these claims, which is all that is required at this stage. *See Chicago*, 888 F.3d at 282 (citation and quotation omitted).

### A.     Under binding Circuit law, the notice and access conditions are *ultra vires*.

27.     It is fundamental that Congress, not the Executive Branch, is vested with the authority to spend. *Id.* at 283. While Congress may delegate to an agency the right to control the purse, "the Executive Branch does not otherwise have the inherent authority . . . to condition the payment of . . . federal funds on adherence to its political priorities." *Id.* Agency attempts to act absent such delegation are *ultra vires* and must be enjoined. *Id.* at 283-87.

28.     In *Chicago*, the Attorney General acknowledged this limitation but argued that Congress "granted to the Assistant Attorney General the unbounded authority to impose his or her own conditions on the release of the Byrne JAG funds." *Id.* at 283. The Attorney General

9

purported to find this authority in 34 U.S.C. § 10102(a), a provision concerning the administrative duties of the Assistant Attorney General. *Id.* at 284. The Seventh Circuit affirmed this Court's ruling that the provision on which the Attorney General relied did not grant him or his Assistant any such authority. *Id.* at 283-87. *Accord City of Philadelphia*, 2018 WL 2725503, at \*\*24-25.

29.     Evanston and the Conference make the same claims as Chicago. The Seventh Circuit's decision thus definitively establishes their likelihood of success as to the unenforceability of the notice and access conditions.

**B.     The compliance condition is unconstitutional because Section 1373 contravenes the anti-commandeering doctrine.**

30.     The anti-commandeering doctrine is "the expression of a fundamental structural decision incorporated into the Constitution, *i.e.*, the decision to withhold from Congress the power to issue orders directly to the States." *Murphy*, 138 S. Ct. at 1475. The Constitution "confers upon Congress the power to regulate individuals, not States." *Id.*, quoting *New York v. United States*, 505 U.S. 144, 166 (1992). Thus, "even where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the States to require or prohibit those acts." *Id.* at 1477.

31.     The Supreme Court repeatedly has stricken down statutes that contravene these principles. In *Murphy*, the Court unanimously invalidated a federal statute that prohibited state legislatures from authorizing sports gambling. *Id.* at 1478. In *New York*, the Court struck down a statute that purported to require states and their political subdivisions to regulate radioactive waste according to Congress's instructions. 505 U.S. at 175. In *Printz v. United States*, the Court held that Congress's attempt to require state and local law enforcement officers to perform background checks and related tasks in connection with applications for handgun licenses was unconstitutional. 521 U.S. 898, 935 (1997). In each instance, the Court reasoned that "[t]he Federal Government

10

may not command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *Murphy*, 138 S. Ct. at 1477, quoting *Printz*, 521 U.S. at 935. This is true regardless of whether Congress' instructions to states and cities are framed as an affirmative obligation to perform some act or merely a prohibition on state and local policies that conflict with Congressional preferences. *Id.* at 1478. The rule also applies regardless of whether it is directed at state and local officers with policymaking responsibility or "those assigned more mundane tasks." *Id.* at 1477.

32. Section 1373, and the Attorney General's insistence that cities certify their compliance with it, violates these principles because, by its plain terms, 8 U.S.C. § 1373 prevents state and local entities and officials from engaging in certain activities. *See Philadelphia*, 2018 WL 2725503, at *32. Because Section 1373 "unequivocally dictates what a state [or local] legislature may and may not do," *Murphy*, 138 S.Ct. at 1478, it is unconstitutional and cannot be imposed on Evanston or the Conference's other members.

## II. Evanston and the Conference will be irreparably harmed absent injunctive relief.

*33.* A constitutional violation is often sufficient to establish irreparable harm as a matter of law. *Chicago*, 264 F. Supp. 3d at 950 ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." (citation and quotation omitted)). *Accord Ezell v. City of Chicago*, 651 F. 3d 684, 698-700 (7th Cir. 2011); *Doe v. Mundy*, 514 F.2d 1179, 1183 (7th Cir. 1975). Moreover, as this Court held, "a Hobson's choice can establish irreparable harm." *Chicago*, 264 F. Supp. 3d at 950 (citing *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992)). *See also County of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 537 (N.D. Cal. 2017) (finding irreparable harm where plaintiff would be "forced to comply with an unconstitutional law or else face financial injury"). Significantly, in appealing this

11

Court's decision, the Attorney General did not challenge the Court's rulings that Chicago faced irreparable harm or that the balance of harms favored Chicago. *Chicago*, 888 F. 3d at 282, 287.

34.     Like Chicago, Evanston and the Conference's other members will be irreparably harmed absent an immediate injunction against these illegal conditions. *First*, like Chicago, they face a Hobson's choice. Among the Conference's members are dozens of cities to which Defendant has now issued grant awards, but only if they agree by August 10, 2018 to the three illegal and unauthorized conditions. (Ex. 1, Cochran Decl., ¶ 42-43.) *Second*, accepting the conditions means not only acquiescing to the federal government's bullying in an area Constitutionally reserved for city government, but overriding local policies designed to maintain cities' trust and goodwill with immigrant populations. (*Id.* ¶¶ 34-37, 48; Ex. 2, Gergits Decl., ¶¶ 9-10.) The threatened loss of such goodwill is also irreparable injury. *See Chicago*, 264 F. 3d at 950 (citing *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F. 2d 380, 386 (7th Cir. 1984)); *City of El Cenizo v. State*, 264 F. Supp. 3d 744, 811 (W.D. Tex. 2017); *County of Santa Clara*, 250 F. Supp. 3d at 537.

## III.    The balance of harms and the public interest favor Plaintiffs.

35.     "Enforcement of an unconstitutional law is always contrary to the public interest." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013); *accord Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012). Numerous additional factors weigh in favor of an injunction here. *First*, Evanston and other cities have an independent interest in an injunction that protects local autonomy. State sovereignty is among the most fundamental of the Constitution's protections; it "is not just an end in itself," but a guarantee that "secures to citizens the liberties that derive from the diffusion of sovereign power." *Bond v. United States*, 564 U.S. 211, 221 (2011). *Second*, millions of city residents have a vital interest in maintaining strong relationships between their police forces and immigrant communities—and the public safety benefits that flow from those

relationships—that welcoming city policies promote. (*See* Ex. 1, Cochran Decl., ¶¶ 34-37, 48.)

Cities also have an interest in ensuring that Congressionally allocated funds are used on vital public

safety needs rather than redistributed away or simply lost. *Chicago*, 888 F.3d at 291. Injunctive

relief is particularly appropriate where, as here, it protects not just a plaintiff, but those whom the

plaintiff serves. *See Planned Parenthood of Ind., Inc. v. Comm'r of Indiana State Health Dept.*,

699 F.3d 962, 981 (7th Cir. 2012).

**IV.    The Court should enter program-wide injunctive relief or, alternatively, issue an order in favor of Evanston and all other impacted Conference members.**

36.    In upholding the district court's nationwide injunction in Chicago's case, a panel

of the Seventh Circuit recognized that "nationwide injunctions should be utilized only in rare

instances," but found that Chicago's case presented such an instance. *Chicago*, 888 F.3d at 288-

93. The panel emphasized that Chicago's "case presents essentially a facial challenge to a policy

applied nationwide, the balance of equities favors nationwide relief, and the format of the Byrne

JAG grant itself renders individual relief ineffective to provide full relief." *Id.* at 290. *See also id.*

at 288-89 (citing *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087-88 (2017) and

*Decker v. O'Donnell*, 661 F.2d 598, 618 (7th Cir. 1980) as further examples of cases in which

nationwide injunctive relief was held to be proper).

37.    This ruling comports with Congress's instructions in the APA that courts "shall . .

. set aside agency action" that is unlawful or unconstitutional. 5 U.S.C. § 706(2). Indeed, where

the unlawful agency action is a program-wide decision, as it is in this case, the "ordinary result" is

"that the rules are vacated—not that their application to the individual petitioners is proscribed."

*Harmon v. Thornburgh*, 878 F. 2d 484, 495 n. 21 (D.C. Cir. 1989); *see also Owner-Operator*

*Indep. Drivers Ass'n, Inc. v. Fed'l Motor Carrier Safety Admin.*, 656 F. 3d 580, 589 (7th Cir. 2011)

(vacating regulation); *Decker*, 661 F.2d at 618 (enjoining federal statute and regulation in facial

13

challenge). *Cf. Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2307 (2016) ("[I]f the arguments and evidence show that a statutory provision is unconstitutional on its face, an injunction prohibiting its enforcement is 'proper.'")

38.     The balance of harms strongly favors such relief. Any "harm to the Attorney General is minimized because the Attorney General can distribute the funds without mandating the conditions—as has been done for over a decade—and nothing in the injunction prevents any state or local government from coordinating its local law enforcement with the federal authorities and complying with the conditions sought here." *Chicago*, 888 F. 3d at 291. Conversely, the harm to cities is significant:

> On the other hand, the impact on localities forced to comply with these provisions could be devastating. Those local and state governments have concluded that the safety of their communities is furthered by a relationship of trust with the undocumented persons and lawful immigrants residing therein—and those localities are clearly in the best position to determine the security needs of their own communities. Such trust, once destroyed by the mandated cooperation and communication with the federal immigration authorities, would not easily be restored. And given the significance of the federal funds at issue, amounting to hundreds of thousands to millions of dollars for each state, noncompliance is a particularly poor option. *Id.*

39.     Moreover, even an injunction that extends to the Conference's members will not be effective relief. For one thing, the Attorney General's actions against neighboring communities will impact Conference members. *See, e.g.*, Br. of Amicus Curiae Current and Former Law Enforcement Leaders, *Chicago*, No. 17-2991, Dkt. 87, at 5-15, 19 (noting the nationwide impact of the Attorney General's actions on law enforcement). Additionally, many Conference members receive their grants indirectly through counties and states. (Ex. 1, Cochran Decl., ¶¶ 28-29.) Imposition of the conditions upon those other jurisdictions is thus likely to be felt by those Conference members. Finally, while the Conference's members include many Byrne JAG recipients, counties and smaller cities, many of whom lack the resources to sue, are not among

14

them. "The public interest would be ill-served here by requiring simultaneous litigation of this narrow question of law in countless jurisdictions." *Chicago*, 888. F. 3d at 292. Nor would it be served by simply leaving those jurisdictions without the resources to sue out in the cold, particularly given the narrow window of time within which jurisdictions must act. *Id.*

40.     Alternatively, and at a minimum, the Court should grant an injunction against imposition of the three conditions upon Evanston and any Conference member that has applied for, or been awarded, Byrne JAG funds for fiscal year 2017 and beyond. This Court already affirmed the Conference's right to seek such relief, *City of Chicago v. Sessions*, No. 17-cv-5720, 2017 WL 5499167, at *5 (N.D. Ill. Nov. 16, 2017).

## CONCLUSION

WHEREFORE, The United States Conference of Mayors and the City of Evanston pray that this Court grant a program-wide temporary restraining order and preliminary injunction against imposition of the notice, access and compliance conditions on the receipt of Byrne JAG funds.

Dated:  July 20, 2018                                Respectfully submitted,

Brian C. Haussmann                              THE UNITED STATES CONFERENCE
John M. Fitzgerald                                  OF MAYORS
Katherine M. O'Brien
Kyle A. Cooper                                        By:  /s Brian C. Haussmann
TABET DIVITO & ROTHSTEIN LLC                    One of Its Attorneys
209 South LaSalle Street, 7th Floor
Chicago, IL  60604
Telephone: (312) 762-9450
Facsimile: (312) 762-9451
bhaussmann@tdrlawfirm.com
jfitzgerald@tdrlawfirm.com
kobrien@tdrlawfirm.com
kcooper@tdrlawfirm.com

Michelle L. Masoncup                        CITY OF EVANSTON
Corporation Counsel
Law Department                              By: /s Michell L. Masoncup
City of Evanston                            One of Its Attorneys
2100 Ridge Avenue
Evanston, IL 602011
Telephone: (847) 448-8009
mmasoncup@cityofevanston.org

16

## CERTIFICATE OF SERVICE

I hereby certify that on July 20, 2018, I electronically filed the foregoing document by using the Court's CM/ECF system. Counsel for all parties are registered CM/ECF users, and service will be accomplished by the CM/ECF system.

Additionally, I certify that I served a copy of the foregoing document by e-mail upon all counsel of record in the related case *City of Chicago v. Sessions*, Case No. 17-cv-5720.

By:     /s/ Brian C. Haussmann
        Brian C. Haussmann