UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **CITY OF EVANSTON** and **THE UNITED STATES CONFERENCE OF MAYORS**, <br><br> *Plaintiffs*, <br><br> v. <br><br> **WILLIAM P. BARR, in his official capacity as Attorney General of the United States**, <br><br> *Defendant*. | Case No. 1:18-cv-04853 <br><br> Hon. Harry D. Leinenweber |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS, OR IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT, AND OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Respectfully Submitted,

JOSEPH H. HUNT
Assistant Attorney General

JOHN R. LAUSCH, JR.
United States Attorney

JOHN R. TYLER
BRAD P. ROSENBERG
Assistant Directors

*/s/ Daniel D. Mauler*
Daniel D. Mauler (Virginia State Bar No. 73190)
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20530
Phone: (202) 616-0773
Fax: (202) 616-8470
E-Mail:  dan.mauler@usdoj.gov

*Counsel for Defendant*

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

STATUTORY AND ADMINISTRATIVE BACKGROUND ............................................ 3

   I.   The Immigration and Nationality Act ............................................................... 3

   II.   DOJ Office of Justice Programs and the Byrne JAG Program ....................... 5

ARGUMENT ...................................................................................................................... 9

   I.   The City of Evanston Lacks Standing. ............................................................. 10

         A.   Evanston Lacks Standing Because it is Sub-Recipient to the City of Chicago .................................................................................................. 10

         B.   Evanston Lacks Standing to Challenge the FY 2018 Certification Requirement. ........................................................................................... 11

   II.   The Challenged Conditions are Permissible. .................................................. 12

         A.   The Challenged Conditions are Authorized by Statute and Do Not Violate the Separation of Powers .......................................................... 12

         B.   The Challenged Conditions are Consistent with the Spending Clause. ..................................................................................................... 16

              1.   These Conditions are Related to the Purposes of the Byrne JAG Program. ............................................................................... 17

              2.   These Conditions are Unambiguous. ................................................ 19

         C.   Plaintiffs' Claims under the Administrative Procedure Act Must Be Dismissed. ......................................................................................... 20

              1.   The APA Claims Do Not Challenge Final Agency Action Reviewable under the APA. ............................................................ 21

              2.   The Challenged Conditions are Reasonable under the Administrative Procedure Act ........................................................ 22

   III.  Any Injunction Should Be Limited to the City of Evanston .......................... 24

         A.   A Nation-wide or Program-wide Injunction is Inappropriate. ............. 24

         B.   This Court Should Limit Injunctive Relief to Only Those Cities that Affirmatively Request It, Have Authorization to Seek It, and Agree to be Bound by this Litigation. ................................................... 26

CONCLUSION .................................................................................................................. 33

# TABLE OF AUTHORITIES

### <u>Cases</u>

*Abbs v. Sullivan*,
    963 F.2d 918 (7th Cir. 1992) ................................................................. 21

*Apex Digital, Inc. v. Sears, Roebuck & Co.*,
    572 F.3d 440 (7th Cir. 2009) ................................................................... 9

*Arizona v. United States*,
    567 U.S. 387 (2012) ........................................................................ 4, 24

*Ass'n of Indep. Gas Station Owners v. QuikTrip Corp.*,
    No. 4:11-cv-2083 JCF, 2012 WL 2994079 (E. D. Mo. July 20, 2012) ................... 28

*Associated Gen. Contractors of N. Dakota v. Otter Tail Power Co.*,
    611 F.2d 684 (8th Cir. 1979) ................................................................. 30

*Balistreri v. Pacifica Police Dep't*,
    901 F.2d 696 (9th Cir. 1990) ................................................................... 9

*Barbour v. Wash. Metro. Area Transit Auth.*,
    374 F.3d 1161 (D.C. Cir. 2004) .............................................................. 17

*Bennett v. Spear*,
    520 U.S. 154 (1997) .......................................................................... 21

*Benning v. Georgia*,
    391 F.3d 1299 (11th Cir. 2004) .............................................................. 20

*Bigelow v. Virginia*,
    421 U.S. 809 (1975) .......................................................................... 11

*Bogues v. United States*,
    703 F. Supp. 2d 318 (S.D.N.Y. 2010) ....................................................... 14

*California v. Azar*,
    911 F.3d 558 (9th Cir. 2018) ................................................................. 25

*California v. Barr*,
    No. 3:18-cv-05169-WHO (N.D. Cal.) ....................................................... 26

*Eringer v. Principality of Monaco*,
    No. CV 10-1803 GAF (EX), 2011 WL 13134271 (C.D. Cal. Aug. 23, 2011) ........... 14

*Charles v. Verhagen*,
    348 F.3d 601 (7th Cir. 2003) ................................................................. 20

*Citizens for Appropriate Rural Roads v. Foxx*,
  815 F.3d 1068 (7th Cir. 2016) ............................................................ 21

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971) ................................................................ 22, 24

*City & Cty. of San Francisco v. Trump*,
  897 F.3d 1225 (9th Cir. 2018) ............................................................ 25

*City and County of San Francisco v. Barr*,
  17-cv-4642-WHO (N.D. Cal.) ............................................................ 28

*City and County of San Francisco v. Barr*,
  18-cv-05146-WHO (N.D. Cal.) ............................................................ 28

*City of Chicago v. Barr*,
  18-2885 (7th Cir.) ............................................................ 10

*City of Chicago v. Sessions*,
  321 F. Supp. 3d 855 (N.D. Ill. 2018) ............................................................ 2, 7

*City of Chicago v. Sessions*,
  888 F.3d 272 (7th Cir. 2018) ............................................................ 32

*City of Chicago v. Sessions*,
  No. 1:17-cv-05720 (N.D. Ill.) ............................................................ 10, 12

*City of Chicago v. Sessions*,
  No. 17-2991, 2018 WL 4268817 (7th Cir. June 4, 2018) ............................................................ 25

*City of New York v. Barr*,
  1:18-cv-06474-ER (S. D. N. Y.) ............................................................ 29

*City of Providence v. Barr*,
  1:18-cv-00437-JJM-LDA (D. Ri.) ............................................................ 26, 29

*Clinton v. City of N.Y.*,
  524 U.S. 417 (1998) ............................................................ 13

*Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*,
  527 U.S. 666, 686 (1999) ............................................................ 16

*DKT Mem'l Fund Ltd. v. AID*,
  887 F.2d 275 (D.C. Cir. 1989) ............................................................ 13

*Donovan v. Robbins*,
  752 F.2d 1170 (7th Cir. 1985) ............................................................ 31

*Duvall v. Atty. Gen. of U.S.*,

iv

436 F.3d 382 (3d Cir. 2006)................................................................. 17

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009).......................................................................... 22

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
528 U.S. 167 (2000).......................................................................... 31

*FW/PBS, Inc. v. City of Dallas*,
493 U.S. 215 (1990).......................................................................... 12

*Gill v. Whitford*,
138 S. Ct. 1916 (2018)...................................................................... 27

*Home Builders Ass'n of Greater Chicago v. U.S. Army Corps of Engineers*,
335 F.3d 607 (7th Cir. 2003) ............................................................. 21

*Hunt v. Washington State Apple Advert. Comm'n*,
432 U.S. 333 (1977)....................................................................... 27, 29

*Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock*,
477 U.S. 274 (1986).......................................................................... 27

*Korte v. Sebelius*,
735 F.3d 654 (7th Cir. 2013) ............................................................. 25

*Koslow v. Pennsylvania*,
302 F.3d 161 (3d Cir. 2002)............................................................... 18

*Los Angeles v. Barr*,
2:18-cv-07347 (C.D. Cal.) ............................................................. 26, 29

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992).......................................................................... 11

*Madsen v. Women's Health Ctr., Inc.*,
512 U.S. 753 (1994).......................................................................... 31

*Mayweathers v. Newland*,
314 F.3d 1062 (9th Cir. 2002) ........................................................ 17, 20

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
567 U.S. 519, 537 (2012)................................................................... 16

*New York v. United States*,
505 U.S. 144 (1992).......................................................................... 17

*Oregon v. Trump*,
No. 6:18-cv-01959-MC (D. Or.)......................................................... 26

*Orgone Capital III, LLC v. Daubenspeck*,
    912 F.3d 1039 (7th Cir. 2019) .............................................................. 10

*Padilla v. Kentucky*,
    559 U.S. 356 (2010) .......................................................................... 17

*Pozzie v. HUD*,
    48 F.3d 1026 (7th Cir. 1995) .............................................................. 22

*Retired Chicago Police Ass'n v. City of Chicago*,
    7 F.3d 584 (7th Cir. 1993) ................................................................. 28

*Retired Chicago Police Ass'n v. City of Chicago*,
    76 F.3d 856 (7th Cir. 1996) ............................................................... 28

*San Francisco v. Barr*,
    No. 3:18-cv-05146-WHO (N.D. Cal.) ................................................. 26

*Sierra Club v. EPA*,
    774 F.3d 383 (7th Cir. 2014) .............................................................. 22

*Sierra Club v. Franklin Cty. Power of Ill., Inc.*,
    546 F.3d 918 (7th Cir. 2008) .............................................................. 27

*South Dakota v. Dole*,
    483 U.S. 203 (1987) ..................................................................... 17, 19

*Steel Co. v. Citizens for a Better Environment*,
    523 U.S. 83 (1998) ............................................................................ 11

*Szabo v. Bridgeport Machines,
    Inc.*, 249 F.3d 672 (7th Cir. 2001) ....................................................... 9

*Taylor v. Sturgell*,
    553 U.S. 880 (2008) .......................................................................... 29

*Thurman v. Lawrence*,
    No. 1:15-CV-01085-RLY, 2015 WL 6142819 (S.D. Ind. Oct. 18, 2015) ................. 9

*Town of Chester v. Laroe Estates, Inc.*,
    137 S. Ct. 1645 (2017) ................................................................. 25, 27

*Trump v. Hawaii*,
    138 S. Ct. 2392 (2018) ...................................................................... 25

*United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*,
    517 U.S. 544 (1996) .......................................................................... 25

*Van Wyhe v. Reisch*,

581 F.3d 639 (8th Cir. 2009) ................................................................ 20

*Virginia Soc'y for Human Life, Inc. v. FEC*,
   263 F.3d 379 (4th Cir. 2001) ........................................................... 25

*Warth v. Seldin*,
   422 U.S. 490 (1975) ............................................................... 27, 29

*Whitmore v. Arkansas*,
   495 U.S. 149 (1990) ............................................................... 11, 12

### **Statutes**

5 U.S.C. § 552 ...................................................................... 23

5 U.S.C. § 704 ...................................................................... 21

8 U.S.C. § 1101 ...................................................................... 3

8 U.S.C. § 1226 ..................................................................... 17

8 U.S.C. § 1227 .................................................................. 4, 17

8 U.S.C. § 1231 ...................................................................... 8

8 U.S.C. § 1252c ..................................................................... 5

8 U.S.C. § 1306 ...................................................................... 4

8 U.S.C. § 1324 ............................................................... 4, 5, 7

8 U.S.C. § 1357 ................................................................... 5, 8

8 U.S.C. § 1366 ...................................................................... 4

8 U.S.C. § 1373 ............................................................ 8, 10, 23

8 U.S.C. § 1644 ...................................................................... 8

18 U.S.C. § 1071 ..................................................................... 7

26 U.S.C. § 5853 .................................................................... 14

34 U.S.C. § 10102 ............................................................... *passim*

34 U.S.C. § 10141 ................................................................... 15

34 U.S.C. § 10152 ................................................................ 6, 17

34 U.S.C. § 10153 ............................................................................................ 6, 14

34 U.S.C. § 10154 ................................................................................................ 14

34 U.S.C. § 10156 .................................................................................................. 6

34 U.S.C. § 10202 .................................................................................................. 7

34 U.S.C. § 10251 ............................................................................................ 6, 17

42 U.S.C. § 3712 .................................................................................................. 15

Pub. L. No. 109-162, 119 Stat. 2960 (2005) ....................................................... 15

Pub. L. No. 90-351, 82 Stat. 197 (1968) ............................................................... 2

### **Regulations**

27 C.F.R. § 479.90 ............................................................................................... 15

8 C.F.R. § 287.5 .................................................................................................... 8

### **Other Authorities**

Exec. Order No. 13,688 .......................................................................................... 6

Exec. Order No. 13,809 ..................................................................................... 7, 8

MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 1998) ............................ 14

**INTRODUCTION**

Law enforcement in this country is a cooperative endeavor. Unlawful acts often implicate the jurisdiction of more than one agency, and local, state, tribal, and federal officials must work together in a variety of ways to fight crime and ensure public safety. In order to work together effectively and safely, the free flow of law enforcement information is essential. Each law enforcement agency possesses different information and different tools for collecting intelligence. When agencies operate in isolation, no agency has the complete picture, and the implications for public safety can be dire. Further, when agencies conduct law enforcement operations, they must "de-conflict" to protect officer safety and ensure that other agencies do not inadvertently jeopardize their operations. *See, e.g.*, Nationwide Officer Safety Event Deconfliction, National Criminal Intelligence Resource Center, https://www.ncirc.gov/ Deconfliction/ (last visited Feb. 25, 2019); Best Practices in Event Deconfliction, Commission on Accreditation for Law Enforcement Agencies, https://www.calea.org/ sites/ default/ files/ EventDeconfliction_PoliceFoundation.pdf (last visited Feb. 25, 2019). Obviously, information-sharing diminishes if agencies fear that recalcitrant jurisdictions will publicly release information shared through these channels for purposes of subverting the law.

In this case, the City of Evanston and the U.S. Conference of Mayors (the "Conference") challenge certain requirements in the Fiscal Year ("FY") 2017 and FY 2018 Edward Byrne Memorial Justice Assistance Grant Programs ("Byrne JAG Program"), including a requirement that protects sensitive federal law enforcement information. In a five-count Amended Complaint, the plaintiffs challenge these requirements under the Separation of Powers, the Spending Clause, and the Administrative Procedure Act, and plaintiffs seek summary judgment on three of these five counts. *See* Plaintiffs' Memorandum of Law in Support of Motion for Partial Summary Judgment (ECF No. 56) ("Pls.' Memo."), at 15.

1

Among other claims, Plaintiffs challenge the notice, access, and Section 1373 conditions which this Court previously considered in the context of the FY 17 Byrne JAG program in *City of Chicago v. Sessions*, 321 F. Supp. 3d 855 (N.D. Ill. 2018). Defendant respectfully disagrees with the Court's rulings in that case, and hereby reiterates, incorporates, and preserves for further review the arguments made therein regarding those FY 2017 conditions.[1] In light of those prior rulings, defendant also will not discuss at length in this motion certain FY 2018 grant conditions that are very similar to the FY 2017 conditions that this Court has already enjoined – specifically, the FY 2018 access, notice, and Section 1373 compliance conditions. Defendant also will not repeat at length their arguments regarding the constitutionality of Section 1373, which apply equally to Section 1644.

Plaintiffs, however, now challenge two new Byrne JAG conditions not previously considered by this Court. Beginning in FY 2018, the Office of Justice Programs ("OJP" or "Office") is requiring that Byrne JAG recipients refrain from publicly disclosing sensitive federal law enforcement information for the purpose of frustrating law enforcement operations, in addition to reporting whether recipients are subject to laws that affect communication with federal immigration agencies. That the Department of Justice ("Department" or "DOJ") would include such requirements as conditions on federal law enforcement funds should be unsurprising. When Congress created OJP, which is the Department's primary grant-making component, it made a specific finding that "law enforcement efforts must be better coordinated, intensified, and made more effective at all levels of government." Pub. L. No. 90-351, 82 Stat. 197 (1968).

Consistent with that congressional finding, the purpose of these Byrne JAG conditions are obvious: If law enforcement partners at various levels of government are going to work together to address public safety, they must be free to share information without fear that the information will be misappropriated and misused. That the plaintiffs are now seeking to vindicate a contrary position is

---

[1] *See City of Chicago v. Sessions*, No. 1:17-cv-05720 (N.D. Ill.), Dkt. Nos. 32, 139, 167.

2

remarkable. OJP's authority to include these conditions is clear: The Office is authorized to "maintain liaison with . . . State governments in matters relating to criminal justice." 34 U.S.C. § 10102(a)(2). The need for these conditions is even clearer given that an elected local official in another State recently made public an impending federal law enforcement operation, intentionally frustrating the enforcement of federal law and putting officers' lives at risk. Moreover, these conditions apply to federal law enforcement information regarding both illegal aliens and "fugitive[s] from justice" under the federal criminal laws, further illustrating the conditions' relationship to the purposes of the Byrne JAG Program.

Plaintiff's remaining claims not covered by this Court's prior ruling are non-justiciable and without merit. First, the City of Evanston lacks standing to challenge the requirement that an applicant for an FY 2018 Byrne JAG grant submit certifications stating that the jurisdiction has no laws or policies that impede the exercise of federal authority under certain statutes. OJP has announced that it is not enforcing this requirement in relation to Evanston (as a subrecipient of Chicago) in light of prior judicial rulings, so the requirement has had no effect on the City.

For these reasons, plaintiffs' claims should be dismissed with prejudice, or defendant should be granted summary judgment thereon.

## STATUTORY AND ADMINISTRATIVE BACKGROUND

### I.      The Immigration and Nationality Act

Enforcement of the immigration laws, including and especially the investigation and apprehension of criminal aliens, is quintessentially a law enforcement function. Through the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, Congress granted the Executive Branch significant authority to control the entry, movement, and other conduct of foreign nationals in the United States. These responsibilities are assigned to law enforcement agencies, as the INA authorizes the Department of Homeland Security ("DHS"), the Department of Justice, and other Executive

agencies to administer and enforce the immigration laws. The INA gives the Executive Branch considerable authority and discretion to conduct and direct immigration enforcement pursuant to federal policy objectives. *See Arizona v. United States*, 567 U.S. 387, 396-97 (2012).

Several outcomes and federal agency responsibilities under the INA turn on the existence and timing of local or state criminal proceedings against aliens. For example, the INA provides that aliens who have committed certain classes of crimes – whether federal, state, or local – shall be removed from the United States upon order of the Attorney General or the Secretary of Homeland Security. *See, e.g.*, 8 U.S.C. § 1227(a)(2). A specific statute provides that every twelve months, the Attorney General must report to the House and Senate judiciary committees on "the number of illegal aliens convicted of felonies in any Federal or State court [during the preceding year]" and "the number of illegal aliens incarcerated in Federal and State prisons for having committed felonies" – "stating the number incarcerated for each type of offense." *Id.* § 1366(1), (2).

The connection between immigration law and criminal law is also reflected in the fact that the INA contains a number of criminal provisions related to immigration. For example, the statute imposes criminal penalties on an alien for failing to register with federal authorities and for failing to notify federal authorities of a change of address. *Id.* §§ 1306(a), (b). More seriously, the INA imposes criminal penalties on any person who conceals, harbors, or shields an alien from detention "in any place, including any building or any means of transportation," "knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law."[2] *Id.* § 1324(a)(1)(A)(iii). It also imposes penalties for "engag[ing] in any conspiracy to commit any of the preceding acts" and for "aid[ing] or abet[ting] the commission of any of [those] acts." *Id.* § 1324(a)(1)(A)(v).

---

[2] "Person" for purposes of that crime means "an individual or an organization." 8 U.S.C. § 1101(b)(3).

The INA repeatedly contemplates coordination between federal officials and state and local officials on immigration enforcement. For example, state and local officers are authorized to make arrests for violation of the INA's prohibitions against smuggling, transporting, or harboring aliens, *id.* § 1324(c), and to arrest certain felons who have unlawfully returned to the United States, *id.* § 1252c; *see id.* § 1357(g) (authorizing formal cooperative agreements under which trained and qualified state and local officers may perform specified functions of a federal immigration officer in relation to the investigation, apprehension, or detention of aliens). Consistent with this coordination and with the importance of state and local criminal proceedings under the INA, certain provisions of federal immigration law protect the transfer of information regarding aliens between and among federal officials and state and local government entities. Section 1373 of Title 8 provides that "a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from [federal immigration authorities] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." Section 1644 of Title 8 contains substantially the same proscription. Section 1373 also states that no person or agency may prohibit or restrict a federal, state, or local government entity from "[m]aintaining such information" or from "[e]xchanging such information with any other Federal, State, or local government entity." By the same token, the INA requires federal immigration authorities to "cooperate with the States" to ensure that state and local officials have information to assist them in making arrests under the INA. *Id.* § 1252c(b).

## II.    DOJ Office of Justice Programs and the Byrne JAG Program

As described in prior filings before this Court, the Assistant Attorney General ("AAG") for OJP possesses "[s]pecific, general and delegated powers," including the power to "maintain liaison with . . . State governments in matters relating to criminal justice." 34 U.S.C. § 10102(a)(2). The statute also authorizes the AAG to "exercise such other powers and functions as may be vested in [him] pursuant

to this chapter or by delegation of the Attorney General, including placing special conditions on all grants, and determining priority purposes for formula grants." *Id.* § 10102(a)(6).

The predecessor to the Byrne JAG Program was created in the same statute that created OJP. Under this program, OJP is authorized to "make grants to States and units of local government . . . to provide additional personnel, equipment . . . and information systems for criminal justice, including for any one or more of [certain enumerated] programs." *Id.* § 10152(a)(1). In the same chapter, "criminal justice" is defined broadly to include various activities of the police, the courts, and "related agencies." *Id.* § 10251(a)(1).

The Byrne JAG Program provides "formula grants" – that is, grants that, when awarded, must follow a statutory formula based on population, the rate of violent crime, and other factors. *Id.* § 10156. By statute, in order to request a Byrne JAG grant, the chief executive officer of a State or unit of local government must submit an application "in such form as the Attorney General may require," *id.* § 10153(a), and the application must include, among other things, "[a] certification, made in a form acceptable to the Attorney General . . . that . . . the applicant will comply with . . . all . . . applicable Federal laws," *id.* § 10153(a)(5)(D).

OJP has historically included a variety of conditions in Byrne JAG awards. For example, the Office has imposed, without objection, conditions related to information-sharing and privacy protection, *see* Defs' Request for Judicial Notice ("Def.'s RJN"), Ex. A (Chicago's FY 2016 Byrne JAG award) ¶ 30, research using human subjects, *see id.* ¶ 29, and training, *see id.* ¶¶ 32-33. *See also* Defendant's Local Rule 56.1 Statement of Undisputed Material Facts ("Def.'s LR 56.1 Statement"), at ¶ 9. Other historical conditions imposed by the Assistant Attorney General have been inspired by Executive Branch prerogatives, and in some instances resulted in *subsequent* congressional codification. One such condition, which prohibited use of Byrne JAG funds to purchase military style equipment, related in part to an Executive Order issued by President Obama in 2015. *See* Def.'s RJN, Ex. A ¶ 49; Exec. Order

6

No. 13,688, 80 Fed. Reg. 3451 (Jan. 16, 2015), *rescinded by* Exec. Order No. 13,809, 82 Fed. Reg. 41,499 (Aug. 28, 2017). Since 2012, other conditions have required that recipients: (a) comply with specific national standards when purchasing body armor and (b) institute a "mandatory wear" policy for any purchased armor. Def.'s RJN, Ex. A ¶¶ 38-39. While those conditions have now been codified by Congress, *see* 34 U.S.C. §§ 10202(c)(1)(B), (C), they originated as exercises of DOJ's authority to impose special conditions. And the AAG has imposed an "American-made" requirement for body armor purchases, something Congress did not choose to codify last year. Def.'s RJN, Ex. A ¶ 38. In recent years, the number of conditions attached to Byrne JAG Grants has typically numbered in the several dozen. *See* Def.'s RJN, Ex. A (Chicago's FY 2016 award, containing 52 conditions). The conditions attached to Byrne JAG grants have varied over time, depending on national law enforcement necessities and Department priorities.

In the Fiscal Year 2017 Byrne JAG grant cycle, OJP imposed the notice, access, and Section 1373 certification conditions. The Court is already familiar with these conditions. *See City of Chicago v. Sessions*, 321 F. Supp. 3d 855 (N.D. Ill. 2018).

For the current Byrne JAG grant cycle, Fiscal Year 2018, OJP notified potential applicants that awards under the Program would include certain conditions requiring modest cooperation with federal law enforcement responsibilities in the immigration setting. As now issued to most of the 2018 applicants, those conditions require Byrne JAG recipients, within the "program or activity" funded by the award:

- Consistent with the objectives of federal law enforcement statutes – including 8 U.S.C. § 1324(a), the smuggling/harboring statute referred to above, and 18 U.S.C. § 1071 – not to publicly disclose any sensitive federal law enforcement information in an attempt to harbor or shield from detection either a "fugitive from justice" under the federal criminal laws or an alien who "has come to, entered, or remains in the United States" in violation of federal immigration law, regardless of whether the disclosure would violate 8 U.S.C. § 1324(a) (the "public-disclosure condition"), Plaintiffs' Request for Judicial Notice in Support of Motion for Partial Summary Judgment (ECF No. 62) ("Pls.' RJN"), Ex. S ¶ 44 (Albuquerque's FY 2018 Byrne JAG award);

7

- Consistent with federal law enforcement statutes and regulations – including 8 U.S.C. § 1357(a)(1), the INA interrogation statute referred to above, and 8 C.F.R. § 287.5(a)(1) – not to interfere with the exercise of that authority by impeding the access of immigration officials to any correctional facility to meet with an alien for such an interrogation (the "FY 2018 access condition"), Pls.' RJN, Ex. S ¶ 45;

- Consistent with federal law enforcement statutes – including 8 U.S.C. §§ 1231(a) and 1226(c)(1), the statutes requiring federal immigration officials to take custody of a criminal alien "when the alien is released" from state or local custody – not to interfere with the removal process by failing to notify immigration officials "as early as practicable" regarding the scheduled release date and time of an alien in the grantee's custody when requested by immigration officials (the "FY 2018 notice condition"), Pls.' RJN, Ex. S ¶ 46; and

- To comply with 8 U.S.C. §§ 1373 and 1644, and not to obligate or draw down grant funds if the recipient is subject to any prohibition or restriction against providing information regarding immigration status to federal authorities (the "FY 2018 Section 1373/1644 compliance condition"), Pls.' RJN, Ex. S ¶ 41-43.

- To provide information to OJP regarding 1) whether a grantee's jurisdiction has laws, policies, or practices related to how employees may communicate with DHS or ICE, or 2) if the grantee is subject to laws from a superior political entity that address the same issue (the "information-reporting condition"), Pls.' RJN, Ex. H at 27-28, 52.

Under the "Rules of Construction" within those grant conditions, the FY 2018 award documents make clear that nothing in the FY 2018 notice condition requires a Byrne JAG grantee to detain "any individual in custody beyond the date and time the individual otherwise would have been released." Pls.' RJN, Ex. S ¶ 46(4)(B). The documents also make clear that this condition imposes no requirements in relation to any requests from federal immigration authorities to detain non-citizens, and that the condition requires "only as much advance notice as practicable" before the release of an alien. *Id.* Further, the award documents define "impeding" access to a correctional facility, for purposes of the interrogation condition, as taking any action or following any law or policy that "is designed to prevent or to significantly delay or complicate" such access or that "has the effect of preventing or of significantly delaying or complicating" such access. *Id.* ¶ 45.

In order to assess each applicant's ability to fulfill the FY 2018 access and notice conditions, the FY 2018 Byrne JAG solicitation stated that OJP would require each applicant to submit certifications

from its chief legal officer and chief executive stating that the jurisdiction had no laws or policies that impede the Federal Government's exercise of its authority under the statutes cited in those conditions (the "FY 2018 certification requirement"). Admin. Record at AR01193, AR01207, AR01207 (2018 Local Solicitation at 1, 41, 45).[3] The certifications were part of the application, and were due no later than when the applicant accepted an award. *Id.* at AR01193 (2018 Local Solicitation at 27).

In light of this Court's ruling in *City of Chicago v. Sessions*, 1:17-cv-05720, and decisions in other courts, OJP has announced that it is not enforcing the FY 2018 access, notice, and Section 1373/1644 compliance conditions, or the FY 2018 certification requirement, in relation to Chicago and its sub-recipients (which includes Evanston). *See* Def.'s RJN, Ex. D.[4]

## ARGUMENT

Defendant moves for dismissal of plaintiffs' new claims under Rule 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. A motion under Rule 12(b)(1) challenges the subject matter jurisdiction of the court to reach a claim. A facial challenge to subject matter jurisdiction requires the court to "look to the complaint and see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction." *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir. 2009). A motion under Rule 12(b)(6) "tests the legal sufficiency of a pleading." *Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672, 675 (7th Cir. 2001). Dismissal under this rule is proper if there is a "lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990), *quoted in Thurman v. Lawrence*, No. 1:15-CV-01085-RLY, 2015 WL 6142819, at *1 (S.D. Ind. Oct. 18, 2015). Under both 12(b)(1) and 12(b)(6), the court "may take judicial notice of matters of public record." *Orgone Capital III, LLC v. Daubenspeck*, 912

---

[3] The Administrative Record in this action was filed with a Notice of Filing of Administrative Record on May 9, 2019. ECF No. 76.

[4] This Court, of course, has already entered a preliminary injunction regarding the challenged FY 2017 conditions as to the Conference's members. *See* Order Granting P.I. (ECF No. 23).

F.3d 1039, 1044 (7th Cir. 2019). Here, dismissal under Rule 12(b)(1) is necessary because the City of Evanston lacks standing, and the Conference lacks associational standing. Alternatively, defendant seeks dismissal under Rule 12(b)(6), or in the alternative, summary judgment under Fed. R. Civ. P. 56 on all counts in the Amended Complaint. As shown below, plaintiffs' challenges to the FY 2018 public-disclosure condition, the FY 2018 certification requirement, and the information-sharing requirement should be dismissed with prejudice under these standards.

With respect to other FY 2018 Byrne JAG conditions, as well as the challenged FY 2017 conditions, defendant recognizes that this Court has already ruled against the challenged FY 2017 conditions. *See* Memorandum Opinion and Order, Nov. 16, 2017, *City of Chicago v. Sessions*, 1:17-cv-5720 (N.D. Ill.) (ECF No. 125). Those FY 2017 conditions are similar to the FY 2018 access, notice, and Section 1373/1644 compliance conditions also being challenged here. Defendant also recognizes that this Court has ruled against the constitutionality of 8 U.S.C. § 1373. Defendant respectfully disagrees with those rulings, but does not now repeat in full his arguments in defense of those FY 2017 and FY 2018 conditions, other than to incorporate herein the arguments made previously and to preserve them for further review. *See City of Chicago v. Sessions*, No. 1:17-cv-05720 (N.D. Ill.), Dkt. Nos. 32, 139, 167. Defendant retains his right to elaborate upon those arguments based on the outcome of *City of Chicago v. Barr*, 18-2885 (7th Cir.), as well as other cases addressing related issues.

Finally, if the Court is inclined to grant injunctive relief to members of the Conference, the Court should limit the relief only to members that affirmatively request such relief, have authorization to seek such relief, and have agreed to be bound by the results of this litigation, as discussed *infra* at 24-33.

## I.      The City of Evanston Lacks Standing.

### A.      Evanston Lacks Standing Because it is Sub-Recipient to the City of Chicago.

Before this Court can even evaluate plaintiffs' claims, it must first determine whether plaintiffs

have standing. In order to have standing, Evanston must demonstrate the "triad of injury in fact, causation, and redressability[, which] constitutes the core of Article III's case-or-controversy requirement." *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 102-03 (1998) (footnote omitted). And to demonstrate injury-in-fact, Evanston must identify a "concrete and particularized" injury that is "actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (citation omitted). It cannot do so.

Because Evanston would receive its FY 2017 Byrne JAG funds only through a subaward from the City of Chicago, *see* PI Motion, Ex. 2, Decl. of Louis Gergits, ECF No. 10-3 ("Gergits Decl.") ¶ 4; Decl. of Tracey Trautman, ECF No. 15-1 ("Trautman Decl.") ¶¶ 2-3, Evanston's subaward would be subject, *mutatis mutandis*, to the challenged award conditions only to the extent that those conditions would apply to the Byrne JAG award to Chicago itself. *See* Trautman Decl. ¶ 4-5. So long as the permanent injunction as to Chicago remains in place, none of the challenged FY 2017 Byrne JAG award conditions would be enforced as to Evanston. *Id.* ¶ 5. And even if Chicago's permanent injunction were reversed on appeal, Evanston would lack any basis to challenge the conditions itself, because it would be bound by the judgment against Chicago. In short, a subrecipient cannot itself challenge grant conditions because it is bound by the terms and conditions that the actual grant recipient chooses to accept or fails to successfully challenge.

### B. Evanston Lacks Standing to Challenge the FY 2018 Certification Requirement.

The Amended Complaint challenges the FY 2018 certification requirement (*see* Am. Compl., ¶¶ 69-70). To satisfy the "irreducible constitutional minimum" of standing, a plaintiff must demonstrate an "injury in fact," a "fairly traceable" causal connection between the injury and defendant's conduct, and redressability. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102-03 (1998). The injury needed for constitutional standing must be "concrete," "objective," and "palpable," not merely "abstract" or "subjective." *See Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990); *Bigelow v. Virginia*,

11

421 U.S. 809, 816-17 (1975). Additionally, the injury must be "certainly impending" rather than "speculative." *Whitmore*, 495 U.S. at 157, 158. "[S]tanding is perhaps the most important of [the jurisdictional] doctrines." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (internal quotation marks omitted).

Applying these standards here, Evanston cannot show any "injury in fact" from the FY 2018 certification requirement. As noted earlier, OJP has publicly announced that it is not enforcing this requirement as to Chicago and its sub-recipients. Def.'s RJN, Ex. D. OJP has stated that if the posture of the applicable litigation were to change "in a manner such that DOJ decides to use or enforce" the certification requirement, the Department would provide "specific, formal, written notice of DOJ's intent" to do so. *Id.* Such a development, however, is "speculative" rather than "certainly impending." *Whitmore*, 495 U.S. at 157, 158.[5]

## II. The Challenged Conditions are Permissible.

### A. The Challenged Conditions are Authorized by Statute and Do Not Violate the Separation of Powers.

In Counts One, Two, and Four of its Amended Complaint, plaintiffs allege that the challenged FY 2017 and FY 2018 Byrne JAG conditions exceed DOJ's statutory authority and intrude upon the powers of Congress. *See* Am. Compl., ¶¶ 107-126, 149-159. As noted above, defendant reserves his arguments regarding the FY 2017 conditions and the FY 2018 conditions that are similar to the FY 2017 conditions, pending resolution in the Seventh Circuit. With respect to the remaining challenged conditions, an examination of the relevant statutes, with their framework and history, shows that the Assistant Attorney General for OJP possesses ample authority to impose these conditions.

---

[5] In any event, the FY 2018 certification requirement is permissible on its merits for the reasons stated in relation to the access, notice, and Section 1373 compliance conditions, which are incorporated herein by reference. *See City of Chicago v. Sessions*, No. 1:17-cv-05720 (N.D. Ill.), Dkt. Nos. 32, 139, 167.

As a preliminary matter, it is well-established that Congress may, consistent with the separation of powers, properly delegate to the Executive Branch the authority to impose requirements on recipients of agency spending. *See, e.g., Clinton v. City of N.Y.*, 524 U.S. 417, 488 (1998) ("Congress has frequently delegated the President the authority to spend, or not to spend, particular sums of money.") (Breyer, J. dissenting); *DKT Mem'l Fund Ltd. v. AID*, 887 F.2d 275, 280-81 (D.C. Cir. 1989) (upholding conditions on spending where statute authorized President to set certain "terms and conditions as he may determine"). Accordingly, plaintiffs' assertion that the conditions challenged here were never approved by Congress is beside the point. Rather, the sole relevant question is whether Congress has *delegated* sufficient authority to the Department to impose these requirements.

The content, history, and structure of the relevant statutes demonstrate that Congress has delegated such authority. Congress authorized the Assistant Attorney General for OJP to "maintain liaison with . . . State governments in matters relating to criminal justice," 34 U.S.C. § 10102(a)(2), to place "special conditions on all grants," and to determine "priority purposes for formula grants," *id.* § 10102(a)(6). The authority to "maintain liaison" is alone sufficient for the public-disclosure condition. Operational security – the confidentiality of law enforcement operations – is essential to law enforcement operations.[6] Law enforcement officials at different levels of government must able to share information, without a concern that a public official at another level might publicize it.

A liaison is defined as "a close bond or connection" or "a person who establishes and maintains communication for mutual understanding and cooperation." *See Liaison*, MERRIAM-WEBSTER'S

---

[6] Both the federal Freedom of Information Act and the Illinois Freedom of Information Act protect the confidentiality of operational law enforcement information. *See* 5 U.S.C. § 552(b)(7) (exempting "records or information compiled for law enforcement purposes" to the extent disclosure "could reasonably be expected to interfere with enforcement proceedings" or "disclose techniques and procedures for law enforcement investigations or prosecutions"); 5 Ill. Comp. Stat. Ann. § 140/7(d) (West 2018) (exempting law enforcement records whose disclosure would "interfere with pending or actually and reasonably contemplated law enforcement proceedings" or "disclose unique or specialized investigative techniques other than those generally used and known").

COLLEGIATE DICTIONARY (10th ed. 1998). Thus, the AAG is responsible for maintaining "a close bond or connection" between federal and state criminal justice authorities and for facilitating "mutual understanding and cooperation" among such authorities. This clearly encompasses, at minimum, protecting the confidentiality of federal law enforcement information provided to state and local agencies. *Cf. Eringer v. Principality of Monaco*, No. CV 10-1803 GAF (EX), 2011 WL 13134271, at *5 (C.D. Cal. Aug. 23, 2011) (stating that plaintiff's contract for "maintaining liaison" between the Principality and foreign intelligence agencies entailed "regularly shar[ing] sensitive intelligence information"), *aff'd*, 533 F. App'x 703 (9th Cir. 2013). The challenged conditions enable federal, state, and local law enforcement officials to work together effectively and safely – that is, to "maintain liaison."

The information-reporting and certification conditions are also justified by the express statutory requirement to submit a Byrne JAG application "in such form as the Attorney General may require," 34 U.S.C. § 10153(a). This confirms OJP's authority to require applicants to include certain information about any laws or policies regarding communication with federal immigration authorities. And the authority to dictate the "form" of an application necessarily encompasses the authority to "disapprove any application," 34 U.S.C. § 10154, that fails to comply with the required form. That authority necessarily encompasses requiring that certain information be included in an application rather than only setting forth its "structure." *Cf. Bogues v. United States*, 703 F. Supp. 2d 318, 329 (S.D.N.Y. 2010) (authority to dictate "form" and "manner" of application encompasses authority to determine when a new application must be submitted to continue the status granted pursuant to earlier application). After all, the purpose of an application form is to collect information to determine whether to grant or deny the application; therefore, determining the "form" of an application necessarily includes deciding what information to seek. Indeed, many federal regulations enacted pursuant to an agency's authority to determine the "form" of an application set forth the information required in the application. *See, e.g.*, 26 U.S.C. § 5853(c) (authorizing Secretary of the Treasury to determine "form and manner" of application

14

to exempt certain firearms transfers from tax); 27 C.F.R. § 479.90 (setting forth content of application for tax-exempt firearms transfer and procedure for claiming exemption).

Further, the challenged conditions also fall within the AAG's authority to place "special conditions on all grants" and to determine "priority purposes for formula grants," 34 U.S.C. § 10102(a)(6). Congress created the current version of the Byrne JAG Program in 2006, when the Reauthorization Act merged two earlier programs. Pub. L. No. 109-162, 119 Stat. 2960. Before the 2006 amendments, the relevant statute provided only that the AAG for OJP was authorized to "exercise such other powers and functions as may be vested in the [AAG] pursuant to this chapter or by delegation of the [Attorney General]." *See* 42 U.S.C. § 3712(a)(6) (2005). In the Reauthorization Act, Congress expressly amended this provision by inserting the words "including placing special conditions on all grants, and determining priority purposes for formula grants." Pub. L. No. 109-162, § 1152(b), 119 Stat. 2960, 3113 (2005); *see* 34 U.S.C. § 10102(a)(6). And confirming this amendment's plain text, the House Judiciary Committee report accompanying the Act states unequivocally that the amendment would "allow[] the Assistant Attorney General to place special conditions on all grants and to determine priority purposes for formula grants." H.R. Rep. No. 109-233, at 101 (2005).

Moreover, the AAG's authority to place "special conditions on all grants" and to determine "priority purposes for formula grants" clearly applies to the Byrne JAG Program. Section 10102(a) sets forth the general duties and authorities of the AAG for OJP, and the Bureau of Justice Assistance, which directly administers the Byrne JAG Program, is part of OJP. By statute, the Director of the Bureau of Justice Assistance "report[s] to the Attorney General through the Assistant Attorney General [for OJP]." 34 U.S.C. § 10141(b); *see* About Us, OJP, https://ojp.gov/ about/ about.htm (OJP organizational chart) (last visited Feb. 28, 2019). Thus, the authority conferred on the AAG by Section 10102(a)(6) necessarily reaches all programs under his supervision, including the Byrne JAG Program.

Further, the independent authority to "determin[e] priority purposes for formula grants" plainly reflects an intent to allow the AAG to exercise a degree of discretion over *formula* grants in particular. Such discretion must, if this language is to be afforded any meaningful legal effect, encompass at least the minimal authority to (1) articulate broad priorities for a given Fiscal Year's grant program; (2) include, on program application forms, inquiries regarding the designated priority purpose; and (3) protect the confidentiality of related federal law enforcement information. In other words, the authority to "determine priority purposes" necessarily includes the authority to *prioritize* federal grant monies for those state and local jurisdictions that assist in furthering relevant federal *purposes*. Additionally, because States and localities would decline to participate in – and thus, effectively annul – the Byrne JAG Program were this authority invoked to impose unreasonable conditions, any arguable risk of overreach that might otherwise inhere in this authority has a built-in structural check.

### B. The Challenged Conditions are Consistent with the Spending Clause.

In Count Three of their Amended Complaint, plaintiffs allege that the challenged conditions violate the Spending Clause. *See* Am. Compl., ¶¶ 127-148. Under its spending authority, Congress "may offer funds to the States, and may condition those offers on compliance with specified conditions." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 537 (2012). It is well-established that the Spending Clause confers broad authority, such that conditions imposed pursuant to this authority may permissibly require States to "tak[e] certain actions that Congress could not [otherwise] require them to take." *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 686 (1999). Nevertheless, the spending authority is subject to certain discrete limitations, two of which are purportedly at issue here: (1) "conditions on federal grants may be illegitimate if they are unrelated to the federal interest in particular national projects or programs"; and (2) conditions must be

"unambiguous[]." *South Dakota v. Dole*, 483 U.S. 203, 207 (1987). The challenged conditions easily satisfy both of these aspects of *Dole*.

> **1.      These Conditions are Related to the Purposes of the Byrne JAG Program.**

Initially, it is well-established that the "relatedness" aspect of *Dole* does not pose a difficult hurdle; to the contrary, the Supreme Court has held that only "some relationship" is needed between spending conditions and "the purpose of the federal spending." *New York v. United States*, 505 U.S. 144, 167 (1992); *see Mayweathers v. Newland*, 314 F.3d 1062, 1067 (9th Cir. 2002) (stating that this "low-threshold" inquiry "is a far cry from . . . an exacting standard for relatedness"). As the D.C. Circuit has observed, the Supreme Court has never "overturned Spending Clause legislation on relatedness grounds." *Barbour v. Wash. Metro. Area Transit Auth.*, 374 F.3d 1161, 1168 (D.C. Cir. 2004).

The Byrne JAG Program promotes "criminal justice" by supporting programs such as law enforcement, prosecution, crime prevention, and corrections. 34 U.S.C. § 10152(a)(1). The term "criminal justice" is defined broadly under the Byrne JAG statute to include various activities of the police, the courts, and "related agencies." *Id.* § 10251(a)(1). Further, immigration enforcement, which the challenged conditions promote, undoubtedly intersects with the Byrne JAG Program's criminal justice purposes, at a minimum for the simple reason that a conviction for any of a wide variety of criminal offenses renders an alien removable from this country. *See* 8 U.S.C. § 1227(a)(2). Indeed, the term "criminal alien" appears multiple times in the INA, and "[a] primary goal of several recent over-hauls of the INA has been to ensure and expedite the removal of aliens convicted of serious crimes." 8 U.S.C. §§ 1226(c), 1228(a), 1231(a)(6), 1378; *Duvall v. Atty. Gen. of U.S.*, 436 F.3d 382, 391 (3d Cir. 2006); *see Padilla v. Kentucky*, 559 U.S. 356, 360 (2010) (observing that "deportation or removal is now virtually inevitable for a vast number of noncitizens convicted of crimes") (citation omitted). Once removed, a criminal alien who has committed a removable offense – for example, an aggravated

felony, domestic violence, child abuse, or certain firearm offenses – is no longer present in this country with the potential to re-offend.

Thus, the challenged conditions ensure that any "program or activity" funded by the Byrne JAG Program does not thwart the federal government's exercise of its ability to remove aliens not lawfully present in the United States or removable due to a criminal conviction.  *See Koslow v. Pennsylvania*, 302 F.3d 161, 176 (3d Cir. 2002) (observing that the challenged condition "govern[ed] only a 'program or activity' receiving federal funds," and noting that this limitation aided in satisfying "the 'relatedness' requirement articulated in *Dole*").  Declining to fund jurisdictions that disclose federal law enforcement information in an attempt to hinder federal law enforcement operations is plainly related to the criminal-justice purposes of the Byrne JAG Program.  The relationship of the public-disclosure condition to the purposes of this program are even clearer given that the condition protects not only federal law enforcement information regarding illegal aliens, but also information regarding "fugitive[s] from justice" under the federal criminal laws.  Pls.' RJN, Ex. C ¶ 44 (FY 2018 Byrne JAG award).  Similarly, the information-reporting condition allows the Department to learn about potential situations where a jurisdiction is subject to laws that are adverse to federal law enforcement goals.  And finally, the certification condition ensures that grantees will faithfully comply with their requirements under this voluntary grant program.

Recent events further illustrate the need for this condition and its relationship to the purposes of the program.  Included in the Administrative Record in this action are public Twitter and Facebook posts by the mayor of a California city informing residents of an impending operation by federal immigration authorities.  *See* Admin. Record at AR01038-39.  In those communications, the executive of a U.S. jurisdiction specifically made a "public disclosure [of] federal law enforcement information in a direct or indirect attempt to conceal, harbor, or shield from detection . . . any alien who [had] come to, entered, or remain[ed] in the United States" in violation of law.  Federal law enforcement

officials must be able to inform state and local officials of impending operations without fear of compromising those operations. Such basic coordination is essential not only for the success of operations but also for the safety of law enforcement personnel and the public.

In sum, ensuring that jurisdictions receiving federal law enforcement funds do not hinder the enforcement of immigration law supports the purposes the Byrne JAG Program.

### 2. These Conditions are Unambiguous.

Another limitation on the spending power is that when the Federal Government "desires to condition the States' receipt of federal funds, it must do so unambiguously, enabling the States to exercise their choice knowingly, cognizant of the consequences of their participation." *Dole*, 483 U.S. at 207 (citation omitted). The conditions easily satisfy this aspect of *Dole*, especially in light of the accompanying "Rules of Construction."

The public-disclosure condition states very clearly that it prohibits the "public disclosure [of] federal law enforcement information in a direct or indirect attempt to conceal, harbor, or shield from detection any fugitive from justice under 18 U.S.C. ch. 49, or any alien who has come to, entered, or remains in the United States in violation of 8 U.S.C. ch. 12 – without regard to whether such disclosure would constitute (or could form a predicate for) a violation of 18 U.S.C. [§§] 1071 or 1072 or of 8 U.S.C. [§] 1324(a)." Pls.' RJN, Ex. S, ¶ 44. The Rules of Construction, moreover, define "alien," "federal law enforcement information," and "public disclosure" in detail. *See id.* at ¶ 44(4). Similarly, the information-reporting condition and the certification condition are clearly set forth in the Byrne JAG award documents, as evidenced by the plaintiffs' ease of quoting them. *See* Pls.' Memo., at 9-10. To the extent any uncertainty might possibly remain, the grant award documents specifically direct that "[a]ny questions about the meaning or scope" of the conditions "should be directed to OJP." *See id.* at ¶¶ 42(5)(B).[7]

_____

[7] Many of the operative phrases in the public-disclosure condition also appear in Illinois

Any arguable marginal uncertainty regarding the outer boundaries of this condition would not render it unconstitutionally ambiguous. Indeed, as the Court of Appeals has observed, "the exact nature of [grant] conditions may be 'largely indeterminate,' provided that the existence of the conditions is clear, such that [grantees] have notice that compliance with the conditions is required." *Charles v. Verhagen*, 348 F.3d 601, 607 (7th Cir. 2003) (quoting *Mayweathers*, 314 F.3d at 1067); *see Benning v. Georgia*, 391 F.3d 1299, 1306 (11th Cir. 2004) ("Once Congress clearly signals its intent to attach . . . conditions . . . it need not specifically identify and proscribe in advance every conceivable state action that would be improper." (citation omitted)); *see also Van Wyhe v. Reisch*, 581 F.3d 639, 650 (8th Cir. 2009) (finding notice requirement satisfied even where condition "provides a pliable standard").

### C. Plaintiffs' Claims under the Administrative Procedure Act Must Be Dismissed.

Count Five of plaintiffs' Amended Complaint alleges that the decision to impose the challenged conditions was arbitrary and capricious under the Administrative Procedure Act ("APA") because the "Department failed to rely on reasoned decision-making and, to the extent it cited reasons at all, those reasons are contradicted by the evidence." Am. Compl., ¶ 162. Plaintiffs cannot, however, rely on the APA because they do not challenge final agency action. And, in any event, plaintiffs' "arbitrary and capricious" challenge to the conditions is without merit.

---

statutes without explanation. *See* 720 Ill. Comp. Stat. Ann. § 5/31-5(a) (West 2018) ("Every person not standing in the relation of husband, wife, parent, child, brother or sister to the offender, who, with intent to prevent the apprehension of the offender . . . harbors, aids or conceals the offender, commits a Class 4 felony."); 820 Ill. Comp. Stat. Ann. § 305/8.1a(b)(1) (West 2018) (stating that state Department of Insurance "may not publicly disclose" any "confidential, proprietary, or trade secret information" submitted by preferred provider programs); 720 Ill. Comp. Stat. Ann. § 5/17-52.5(b) (West 2018) (criminalizing any attempt to use data encryption "directly or indirectly" to commit a criminal offense).

1.    **The APA Claims Do Not Challenge Final Agency Action Reviewable under the APA.**

"[T]he APA allows judicial review of the actions by federal agencies only over final agency action for which there is no other adequate remedy in a court." *Home Builders Ass'n of Greater Chicago v. U.S. Army Corps of Engineers,* 335 F.3d 607, 614 (7th Cir. 2003) (citing 5 U.S.C. § 704). Such finality, a jurisdictional requirement, is satisfied only when the challenged action (1) "mark[s] the consummation of the agency's decisionmaking process," and (2) is "one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citations omitted).

Notwithstanding this black-letter requirement, Evanston's APA claim fails to identify any qualifying final agency action. The decision to impose the challenged conditions does not constitute "final agency action" under the APA. Rather, the relevant agency action for purposes of APA review in the context of the Byrne JAG Program would be a decision to grant or deny an application. Although OJP has issued the Evanston's FY 2018 Byrne JAG award pursuant to court injunctions, OJP has not yet determined to grant or deny the application administratively. Thus, the consummation of OJP's decision-making process has not yet occurred, Evanston's "rights or obligations" have not been determined, and no "legal consequences" have arisen. *Cf. Citizens for Appropriate Rural Roads v. Foxx*, 815 F.3d 1068, 1079 (7th Cir. 2016) (affirming dismissal because "a challenge to agency conduct is ripe only if it is filed after the final agency action"; the challenge otherwise "rests upon contingent future events that may not occur as anticipated, or that may not occur at all"); *Abbs v. Sullivan*, 963 F.2d 918, 927 (7th Cir. 1992) ("A challenge to administrative action . . . falls outside the grant of jurisdiction in . . . the Administrative Procedure Act when the only harm the challenger seeks to avert is the inconvenience of having to go through the administrative process before obtaining a definitive declaration of his legal rights.").

Similarly, the Conference has no standing to bring an APA challenge because it does not identify specific final agency action, *i.e.*, a specific denial of a particular city's Byrne JAG grant application. While the plaintiffs attempt to waive away this requirement by arguing that the Department will impose the challenged conditions on every future awardee (*see* Pls.' Memo., at 15), such a claim is unripe and has not yet accrued. The plaintiffs are not free to ignore such a core principal of standing. This Court should, accordingly, dismiss plaintiffs' APA claims on this threshold jurisdictional ground alone.

### 2. The Challenged Conditions are Reasonable under the Administrative Procedure Act

Further, plaintiffs' "arbitrary and capricious" challenge to the conditions are without merit. As an initial matter, if these conditions are statutorily authorized and comport with the Spending Clause – which, as shown above, they do – it is unclear how "arbitrary or capricious" scrutiny could otherwise limit the Department's broad discretion. In any event, when a court reviews an agency's action under the "arbitrary or capricious" standard, it is required to be "highly deferential" and to "presum[e] that agency actions are valid as long as the decision is supported by a rational basis." *Sierra Club v. EPA*, 774 F.3d 383, 393 (7th Cir. 2014); *Pozzie v. HUD*, 48 F.3d 1026, 1029 (7th Cir. 1995). This standard of review is "narrow," and does not authorize a district court "to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).

Here, plaintiffs' claim fails because "the agency's reasons for" imposing the challenged conditions "were entirely rational." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 517 (2009). Even assuming OJP's imposition of these conditions was subject to arbitrary-and-capricious review notwithstanding the absence of any statutory standards governing the choice of special conditions and priority purposes, it is reasonable for OJP to deny federal law enforcement funding to a jurisdiction that publicly discloses sensitive federal law enforcement information in an attempt to shield an alien

or fugitive from detection. Indeed, the public-disclosure condition protects some of the same information covered by the law enforcement exemption to the federal Freedom of Information Act, which exempts from disclosure, among other things, information compiled for law enforcement purposes whose disclosure "could reasonably be expected to interfere with enforcement proceedings" or to "endanger the life or physical safety of any individual." 5 U.S.C. § 552(b)(7); *cf.* 5 Ill. Comp. Stat. Ann. § 140/7(d) (West 2018). Similarly, the information-reporting condition allows the Federal Government to learn if immigration enforcement agents will operate in jurisdictions with laws or policies at odds with their mission. Thus, the challenged conditions are a "common-sense measure[]," Admin. Record at AR00993, and "even in the absence of evidence, the agency's predictive judgment (which merits deference) makes entire sense" as "an exercise in logic rather than clairvoyance." *Fox Television*, 556 U.S. at 521.

In any event, the Administrative Record submitted by the defendant further supports the rationality of the challenged conditions. Prompted partly by an Inspector General report describing deteriorating local cooperation with "efforts to remove undocumented criminal aliens from the United States," Admin. Record at AR00366, the Department of Justice under the prior Administration instituted a requirement for FY 2016 Byrne JAG grantees to certify compliance with 8 U.S.C. § 1373 in order to protect the exchange of information among federal, state, and local law enforcement. *Id.* at AR00392-97. For the FY 2017 grant cycle, the Department maintained that condition and added conditions similar to the notice and access conditions described above, to "increase[e] information sharing between federal, state, and local law enforcement" so that "federal immigration authorities have the information they need to enforce the law and keep our communities safe." *Id.* at AR00993 (Backgrounder on Grant Requirements). The FY 2018 requirements responded to further developments, including, in relation to the public-disclosure condition, at least one instance in which

an elected official in another State publicly disclosed an impending federal law enforcement operation designed to apprehend suspected illegal aliens. *Id.* at AR01038-39.

Finally, as discussed above in relation to the Spending Clause, immigration enforcement undoubtedly relates to criminal justice. Numerous federal statutes expressly connect these two subjects. *See supra* text at 15-17. The challenged conditions thus rationally promote interests in "maintain[ing] liaison" among tiers of government "in matters relating to criminal justice," 34 U.S.C. § 10102(a)(2), and comports with the intergovernmental cooperation that Congress plainly contemplates in immigration enforcement. *See, e.g.,* 8 U.S.C. §§ 1226(d), 1357(g), 1373; *see also Arizona v. United States*, 567 U.S. 387, 411-12 (2012) ("Consultation between federal and state officials is an important feature of the immigration system" and Congress "has encouraged the sharing of information about possible immigration violations.").

Accordingly, the challenged conditions are entirely rational, and this Court should not "substitute its judgment" for that of the Department of Justice. *Citizens to Preserve Overton Park, Inc.*, 401 U.S. at 416.

## III. Any Injunction Should Be Limited to the City of Evanston.

### A. A Nation-wide or Program-wide Injunction is Inappropriate.

Finally, the plaintiffs' seek a permanent injunction against use of the challenged conditions in the Byrne JAG Program overall, without regard to the identity of the applicant or grantee. Pls.' Memo., at 26-27. Plaintiffs lack standing to seek such an injunction on behalf of parties not properly before this Court.

As an initial matter, the plaintiffs argue that the defendant has somehow waived all objections to the Conference's standing on prudential grounds in this case by not asserting it as an affirmative defense to the *initial* Complaint. *See* Memo., at 14. Plaintiffs do not explain why they are still concerned with their *initial* Complaint at this stage, as the *Amended* Complaint has replaced the *initial*

Complaint. *See* Am. Compl. (ECF No. 46). In other words, once the plaintiffs decided to file an Amended Complaint, they effectively wiped the slate clean of the initial Complaint.

Significantly, and as permitted by order of this Court, the defendant has not yet answered the Amended Complaint (*see* Order, Dec. 13, 2018 (ECF No. 47)), so no affirmative defenses have been waived. Moreover, plaintiffs offer only two inapposite cases to support their waiver argument. *See* Memo., at 14. First, *United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544 (1996), merely concluded that the third element of the *Hunt* test is a prudential limitation on standing. *See id.* at 555. Second, *Korte v. Sebelius*, 735 F.3d 654 (7th Cir. 2013) found a waiver after a party failed to raise the argument in the district court prior to an appeal. *See id.* at 668 ("By failing to raise the shareholder-standing rule in the district court or here, the government waived it."). Both of these cases are far cries from the situation at bar, where the defendant is timely and appropriating raising the argument in a motion challenging the Amended Complaint itself.

Turning to the merits of the request for injunctive relief, as the Supreme Court has observed many times, a plaintiff "must establish standing separately for each form of relief sought," *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017), and a "plaintiff's remedy must be limited to the inadequacy that produced [its] injury in fact," *Gill v. Whitford,* 138 S. Ct. 1916 (2018); *see City of Chicago v. Sessions*, No. 17-2991, 2018 WL 4268817 (7th Cir. June 4, 2018) (vacating nationwide aspect of injunction); *accord California v. Azar*, 911 F.3d 558, 582-84 (9th Cir. 2018) (reversing nationwide preliminary injunction as abuse of discretion); *City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1243-45 (9th Cir. 2018) (vacating and remanding nationwide injunction). Moreover, as an equitable matter, nationwide injunctions "take a toll on the federal court system – preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch." *Trump v. Hawaii*, 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring); *see Virginia Soc'y for Human Life, Inc. v. FEC*, 263 F.3d 379, 393

(4th Cir. 2001) (noting tendency of nationwide injunctions to "thwart the development of important questions of law by freezing the first final decision rendered on a particular legal issue"). Indeed, many of the issues presented herein regarding the FY 2017 and FY 2018 Byrne JAG Program are, in fact, pending in multiple other cases throughout the country, *e.g*, *Los Angeles v. Barr*, No. 2:18-cv-07347-R-JC (C.D. Cal.); *City of Providence v. Barr*, No. CA-18-437-JJM-LDA (D.R.I.); *San Francisco v. Barr*, No. 3:18-cv-05146-WHO (N.D. Cal.); *California v. Barr*, No. 3:18-cv-05169-WHO (N.D. Cal.); *Oregon v. Trump*, No. 6:18-cv-01959-MC (D. Or.), and a program-wide injunction by this Court would risk conflicting with any orders entered by other district courts. At minimum, therefore, if the Court were to enter a nationwide injunction, its application beyond the plaintiffs should be stayed pending appeal.

### B. This Court Should Limit Injunctive Relief to Only Those Cities that Affirmatively Request It, Have Authorization to Seek It, and Agree to be Bound by this Litigation.

Defendant recognizes that this Court has previously concluded that the Conference has standing as an association to sue on behalf of its members. *See* Order Granting PI (ECF No. 23) at 5-7. Defendant respectfully maintains that the Conference has not adequately established its standing to sue. *See* Def.'s PI Opp'n (ECF No. 15) at 4-10. For the reasons stated by the Defendant in its Opposition to the Preliminary Injunction (*see id.*), Defendant renews its challenge to the Conference's associational standing and moves the Court to dismiss the Conference from this action. Assuming the Court again rejects that argument, however, the Court must still address the separate question of what relief is appropriate assuming plaintiffs prevail on their claims. *Cf.* Order Granting PI (ECF No. 23) at 7 ("Having determined that Plaintiffs have standing, the question remains whether the Court should order the injunctive relief they seek."). Here, given the unique features of this lawsuit, even assuming plaintiffs prevail, this Court should not grant injunctive relief to all of the Conference's members; instead, the Court should limit any injunctive relief to only those cities that, before summary judgment, affirmatively request such relief, have demonstrated their authorization to seek it, and have

agreed to be bound by the results of this litigation. Tailoring the relief in this manner would best accord with bedrock principles of Article III jurisdiction and equity.

In general, associational standing allows an organization to sue "solely as the representative of its members," *Warth v. Seldin*, 422 U.S. 490, 511 (1975), and to "assert the claims of its members[.]" *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 342 (1977). In other words, associations merely stand in the shoes of their injured members. Associations may therefore assert only those claims—and seek only those types of relief—that the associations' members themselves have standing to pursue. *See Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) ("Our standing decisions make clear that standing is not dispensed in gross. To the contrary, a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." (citations omitted)); *see also Warth*, 422 U.S. 490, 511 (1975) ("The possibility of such representational standing . . . does not eliminate or attenuate the constitutional requirement of a case or controversy.").

The three-factor test set forth in *Hunt* establishes the "prerequisites" for an association to have *standing* to sue, 432 U.S. at 343, and thus for an association to obtain a legal ruling on the merits. Accordingly, an association can establish standing merely by showing that a single member would have standing to seek relief. *See Sierra Club v. Franklin Cty. Power of Ill., Inc.*, 546 F.3d 918, 924 (7th Cir. 2008). But the fact that a single member has standing to seek relief (and thus to obtain a legal ruling on the merits) does not imply that the association has standing to obtain relief on behalf of all of its members. *See Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018) ("Standing is not dispensed in gross: A plaintiff's remedy must be tailored to redress the plaintiff's particular injury." (internal quotation omitted)). Thus, the test for associational standing cannot determine the separate issue of what relief is warranted in the event that the association prevails. *See Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock*, 477 U.S. 274, 290 (1986) (acknowledging potential concerns about whether associations that satisfy the *Hunt* test will necessarily be adequate representatives for their

27

members).

The Supreme Court has made clear, in addition, that when there is reason to doubt an association's ability to adequately stand in the shoes of its members, courts must "consider how [that problem] might be alleviated." *Id.* That is particularly true with respect to organizations that have members with potentially divergent interests. *See Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 607 (7th Cir. 1993) (even when there is no "profound" conflict among association members sufficient to deny standing, courts "must assess whether . . . other approaches less drastic than denying group standing[] will provide adequate protection for the interests of those whose position is not represented by the group") [hereafter *RCPA I*]; *see also Retired Chicago Police Ass'n v. City of Chicago*, 76 F.3d 856, 866–67 (7th Cir. 1996) (denying associational standing because the conflict among members "cannot be negated by a remedy directed at a discrete group of the association's members") [hereafter *RCPA II*]; *Ass'n of Indep. Gas Station Owners v. QuikTrip Corp.*, No. 4:11-cv-2083 JCF, 2012 WL 2994079, at * 4 (E. D. Mo. July 20, 2012) (denying associational standing to a group of gas station owners that brought an unfair pricing claim and noting the individualized proof needed after some members went out of business while other members chose to compete in price competition).

Here, several features of this lawsuit create significant doubts about the Conference's ability to validly stand in the shoes of its members and represent all of those members' interests. For one thing, the Conference does not even view itself as representing its members or asserting those members' claims; the Conference maintains that resolution of its claims in this lawsuit does not bind any individual member. *See* Pls.' PI Reply (ECF No. 19) at 13 (stating that it "is correct that the Conference does not purport to bind those cities that separately sued or may do so in the future"). Indeed, as the Conference notes, several member cities of the Conference are actively pursuing their own lawsuits challenging the same policies. This includes the following pending litigation:

- *City and County of San Francisco v. Barr*, 17-cv-4642-WHO (N.D. Cal.), *appeal pending*, 18-

28

17311 (9th Cir.) (San Francisco's challenge to FY 2017 Byrne JAG conditions).

- *City and County of San Francisco v. Barr*, 18-cv-05146-WHO (N.D. Cal.), *appeal pending*, 19-15947 (9th Cir.) (San Francisco's challenge to FY 2018 Byrne JAG conditions).

- *Los Angeles v. Barr*, 18-cv-7347 (C.D. Cal.), *appeal pending* 18-56292 (9th Cir.) (Los Angeles's challenge to FY 2017 Byrne JAG conditions).

- *Los Angeles v. Barr*, 2:18-cv-07347 (C.D. Cal.), *appeal pending* 19-55314 (9th Cir.) (Los Angeles's challenge to FY 2018 Byrne JAG conditions).

- *City of New York v. Barr*, 1;18-cv-06474-ER (S. D. N. Y.), *appeal pending* 19-275 (2d. Cir.) (City of New York's challenge to FY 2017 and FY 2018 Byrne JAG conditions).

- *City of Providence v. Barr*, 1:18-cv-00437-JJM-LDA (D. Ri.) (Challenge to FY 2017 and FY 2018 Byrne JAG conditions by the City of Providence, Rhode Island).

All of the foregoing cities are members of the Conference and are maintaining their own separate lawsuits at the same time as the Conference is supposedly litigating on their behalf. Thus, the Conference cannot purport to be vindicating its member cities' claims—despite that being the very foundation of associational standing. *See Hunt*, 432 U.S. at 342; *Warth*, 422 U.S. at 511. Instead, the Conference is suing solely to pursue its *own* interests, as confirmed by its position that resolution of this case does not bind any individual members. This is further confirmed by the fact that, if the Conference ultimately were to lose this case, there would be serious due process concerns with binding the Conference's members to the adverse judgment. *See Taylor v. Sturgell*, 553 U.S. 880, 900-01 (2008). If the Conference's members are not bound when they lose—yet nevertheless still benefit if they win—it cannot reasonably be said that the Conference is acting "solely as the representative of its members." *Warth*, 422 U.S. at 511.

The factual record here further underscores that the Conference is not genuinely suing on behalf of its members. For example, "the decision to file this action was not put to a vote of the Conference's members," and "[t]he Conference does not know the position of all of its members regarding whether the Conference should be pursuing this litigation." Joint Stipulation (ECF No. 74-1) ¶ 4. Those problems are particularly acute where the Conference purports to press the claims of

governmental entities. Localities often have their own requirements under local law for authorizing and initiating suits, and the Conference acknowledges that it has made no effort to determine whether any of its members had followed these processes before bringing this suit, much less actually sought such authorization for itself. *See id.* ¶ 9. For example, the City of St. Petersburg, Florida, is a member of the Conference, and its Charter requires the City Council to approve lawsuits before they are brought by the city, other than for violations of city ordinances. *See* Def.'s LR 56.1 Statement, ¶¶ 47-48. Yet, the Conference has made no showing that the City Council of St. Petersburg has approved this lawsuit, or that any of its other municipal members are legally permitted to assert claims in this litigation. This is grounds for limiting the scope of any injunctive remedy, if not disqualifying the Conference on associational standing grounds entirely. *See Associated Gen. Contractors of N. Dakota v. Otter Tail Power Co.*, 611 F.2d 684, 691 (8th Cir. 1979) (denying associational standing to a group of construction workers seeking to work a project because, in part, "[s]ome members are not qualified . . . to work on the project.").

Finally, the record demonstrates that there are conflicts within the Conference's membership: "The Conference has a diverse membership. Cities have varying policies regarding immigration and law enforcement matters. The Conference's members set their own policies regarding these, and other, matters." *Id.* ¶ 5. An example of this conflict is presented by the City of Pensacola, Florida, which sought to file a brief *amicus curiae* opposing the preliminary injunction sought by the Conference earlier in this case, even though Pensacola is a member of the Conference. Joint Stipulation, ¶ 8 (ECF No. 74-1); Amici Brief by Mayors of the Cities of Allen, Celina, College Station, Farmers Branch, Mason, and Midland, Texas; Pensacola, Florida, and the Former Mayor of Little Elm, Texas (ECF No. 18).[8] Such a conflict of views among an organization's members was recognized by the Eighth

---

[8] While the Court denied the motion for leave to file the amici brief after the preliminary injunction motion was decided on August 9, 2018, *see* Order Granting P.I., Aug. 9, 2018 (ECF No. 23); Order denying motion for leave to file amicus briefs, Aug. 13, 2018 (ECF No. 29), the amici brief

Circuit as indicative of a failure of associational standing. *See Otter Tail Power Co.*, 611 F.2d at 691 (denying associational standing to a group of construction workers seeking to work on a project because "[s]ome members . . . are not willing to work on the project.").

In light of the above, even if this Court concludes that the Conference has established its standing to sue as an association, and even if the Conference prevails on its claims, the Court should not *as a remedial matter* automatically enter injunctive relief that would apply to all of the Conference's members. There are simply too many reasons to doubt whether the Conference is genuinely asserting the claims of its members and representing the interests of its members: neither the Conference nor its members believe that any member city would be bound by any judgment in this case; the Conference is unaware of whether its member cities have validly authorized their claims to be asserted by the Conference; and at least some of the members of the Conference affirmatively do not want the relief being requested by the Conference.

Given these circumstances, providing relief to all of the Conference's members would be legally inappropriate and would also raise serious practical problems. Most fundamentally, such relief would necessarily extend broader than what Article III or equity permits—because the relief would apply to every member of the Conference without regard to whether those members would themselves have standing to obtain such relief, and without regard to whether those members even *want* such relief. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000) ("[A] plaintiff must demonstrate standing separately for each form of relief sought."); *see also Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) ("[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs."); *Donovan v. Robbins*, 752 F.2d 1170, 1176-77 (7th Cir. 1985) (a court in equity "has to consider whether the decree

---

remains on the case docket and represents an example of a member differing with the litigation position taken by the Conference.

he is being asked to sign is lawful and reasonable" and does not "harm [third-parties] unjustly").

Moreover, granting injunctive relief applicable to all of the Conference's members would effectively allow such lawsuits to operate as a "one-way-ratchet," *City of Chicago v. Sessions*, 888 F.3d 272, 298 (7th Cir. 2018) (Manion, J., dissenting), with all members obtaining relief if the association prevails but none being bound if the association is unsuccessful. Indeed, granting this relief would permit, if not encourage, exactly the type of claim-splitting and duplicative litigation that has occurred here—with the Conference purporting to seek relief on behalf of all member cities in one forum, and several of those member cities pursuing their own lawsuits in different fora. The same underlying party-in-interest should not be permitted to pursue the same relief through multiple lawsuits, *i.e.*, one in its own name and another brought by an association of which the party is a member. Finally, providing sweeping relief to all of the Conference's members would effectively circumvent local policy, by allowing cities to bring suit through an association without having to comply with local procedures or requirements for asserting claims in litigation. *Cf. RCPA II*, 76 F.3d at 865 (considering a lack of "evidence that the litigation was properly authorized" in connection with an association's adequacy of representing its members).

Rather than grant relief to all of the Conference's members, therefore, this Court should adopt a more tailored remedy to "alleviate[]" the problems identified above. *Brock*, 477 U.S. at 290; *see also RCPA II*, 76 F.3d at 866-67 (considering whether the identified problems with an association could be "negated by a remedy directed at a discrete group of the association's members"). The appropriate solution would thus be to limit any injunctive relief to only those member cities that, before summary judgment, (1) affirmatively request such relief; (2) have confirmed their authorization under local law to seek such relief; and (3) agree to be bound by a judgment in this case (and have not separately filed suit). Limiting relief to only those cities meeting those requirements would alleviate the defects identified above—*i.e.*, because relief would not apply to member cities that do not want it; cities could

32

not get multiple bites at the apple through multiple lawsuits; and there would be no ambiguity over whether member cities are even authorized to obtain such relief in this case.

This approach also would not impose any material burdens on the Conference. If the Conference is genuinely acting in a representative capacity on behalf of its members (as the Conference claims), it should be easy for the Conference to contact those members and determine which ones affirmatively agree to the above requirements. In fact, the Seventh Circuit has previously embraced such an approach. *See Local 194, Retail, Wholesale & Dep't Store Union v. Standard Brands, Inc.*, 540 F.2d 864, 866-68 & n.5 (7th Cir. 1976) (even when "conflicting interests" among union members were not enough to "defeat the union's standing," the court nonetheless required the union to "give notice of its representation to all its members" and to give members the option not "to be included in the litigation"). Similarly here, the Court should require the Conference to give notice of this suit to all of its members, and then to file with the Court a list of those member cities that meet the three requirements set forth above. Any injunctive relief entered by the Court should then be limited to only those member cities identified by the Conference as meeting all three requirements.

This narrower form of relief would best accord with fundamental principles of Article III and equity, even assuming the Conference has established its standing to sue. Thus, independent of any other issue, as a remedial matter the Court should limit any injunctive relief to only those member cities that, before summary judgment, (1) affirmatively request such relief; (2) have confirmed their authorization under local law to seek such relief; and (3) agree to be bound by a judgment in this case (and have not separately filed suit).

## **CONCLUSION**

Accordingly, the Court should dismiss this lawsuit or, alternatively, grant summary judgment to the defendant.

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

JOHN R. LAUSCH, JR.
United States Attorney

JOHN R. TYLER
BRAD P. ROSENBERG
Assistant Directors

*/s/ Daniel D. Mauler*
Daniel D. Mauler (Virginia State Bar No. 73190)
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20530
Phone: (202) 616-0773
Fax: (202) 616-8470
E-Mail: dan.mauler@usdoj.gov

*Counsel for Defendant*

34