**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

CITY OF EVANSTON and THE UNITED
STATES CONFERENCE OF MAYORS,

          Plaintiffs,

    v.

WILLIAM P. BARR, in his official capacity
as Attorney General of the United States,

          Defendant.

Case No. 18-cv-4853

**PLAINTIFFS' COMBINED REPLY IN SUPPORT
OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT
AND OPPOSITION TO DEFENDANT'S CROSS-MOTION**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

ARGUMENT ....................................................................................................................... 3

I.      Plaintiffs have standing to challenge the unlawful conditions ............................................. 3

      A.      Legal Standard. .................................................................................. 3

      B.      Evanston has standing to challenge the unlawful conditions ................................. 4

      C.      The Conference has standing to assert the interests of its members ....................... 6

II.      The challenged conditions are unlawful, and Plaintiffs are entitled to summary judgment on Counts I, II, and IV. ......................................................................... 9

      A.      The notice, access, and compliance conditions are ultra vires and unconstitutional. ................................................................................ 9

      B.      The harboring condition, questionnaire condition, and certification requirement are ultra vires and unconstitutional. ..................................................... 10

            1.      Section 10102(a)(2) does not give the Attorney General the authority to impose the challenged conditions ............................................. 10

            2.      Section 10102(a)(6) does not give the Attorney General the authority to impose the challenged conditions ............................................. 12

            3.      Sections 10153 and 10154 do not give the Attorney General the authority to impose any of the challenged conditions, including the harboring condition, the questionnaire condition, and the certification requirement. ................................................................... 16

III.      The Court should deny dismissal of Plaintiffs' remaining claims and deny the Attorney General's alternative request for summary judgment ....................................... 18

      A.      Legal Standard ................................................................................. 18

      B.      The challenged conditions fail to satisfy the Spending Clause's requirements .... 19

            1.      The challenged conditions are unconstitutionally ambiguous. ................. 19

            2.      None of the challenged conditions relate to the Byrne JAG program's purposes. ............................................................... 24

      C.      The challenged conditions violate the APA ......................................... 26

1.      The imposition of the challenged conditions constitutes final
        agency action under the APA. .................................................................. 26

2.      The Attorney General acted arbitrarily and capriciously in adopting
        the conditions. ........................................................................................... 28

IV.     Plaintiffs are entitled to an on-going, permanent, program-wide injunction. ................... 32

A.      Plaintiffs are entitled to a permanent injunction. .................................................. 32

B.      The Court should again reject the Attorney General's request to impose new
        requirements on the Conference's ability to seek relief for its members. ............ 33

C.      Plaintiffs are entitled to program-wide relief. ....................................................... 36

D.      Plaintiffs are entitled to ongoing, forward-looking injunctive relief. ................... 38

CONCLUSION ........................................................................................................................... 38

# TABLE OF AUTHORITIES

## Cases

*Access Living of Metropolitan Chicago, Inc. v. City of Chicago*,
    372 F. Supp. 3d 663 (N.D. Ill. 2019) .........................................................................4

*Alliance of Automobile Manufacturers, Inc. v. Jones*,
    897 F. Supp. 2d 1241 (N.D. Fla. 2012)....................................................................32

*Arizona v. United States*,
    567 U.S. 387 (2012)................................................................................................26

*Association for Fairness in Business, Inc. v. New Jersey*,
    82 F. Supp. 2d 353 (D.N.J. 2000) ....................................................................32, 34

*Automobile Workers v. Brock*,
    477 U.S. 274 (1986)................................................................................................34

*California ex rel. Becerra v. Sessions*,
    284 F. Supp. 3d 1015 (N.D. Cal. 2018) .................................................................27

*Benning v. Georgia*,
    391 F.3d 1299 (11th Cir. 2004) .............................................................................23

*Bogues v. United States*,
    703 F. Supp. 2d 318 (S.D.N.Y. 2010)....................................................................17

*Bond v. United States*,
    564 U.S. 211 (2011)..........................................................................................35, 36

*Charles v. Verhagen*,
    348 F.3d 601 (7th Cir. 2003) ...........................................................................23, 24

*Chicago-Midwest Meat Association v. City of Evanston*,
    589 F.2d 278 (7th Cir. 1978) .................................................................................33

*Citizens for Appropriate Rural Roads v. Foxx*,
    815 F.3d 1068 (7th Cir. 2016) ...............................................................................27

*City & County of San Francisco v. Sessions*,
    349 F. Supp. 3d 924 (N.D. Cal. 2018) ...........................................................*passim*

*City & County of San Francisco v. Sessions*,
    No. 18-5146, 2019 WL 1024404 (N.D. Cal. Mar. 4, 2019) ...........................*passim*

*City & County of San Francisco v. Trump*,
    897 F.3d 1225 (9th Cir. 2018) .............................................................................4, 5

*City of Chicago v. Sessions,*
    321 F. Supp. 3d 855 (N.D. Ill. 2018) .......................................................... *passim*

*City of Chicago v. Sessions,*
    888 F.3d 272 (7th Cir. 2018) ...................................................................... *passim*

*City of Chicago v. Sessions,*
    No. 17-5720, 2017 WL 5499167 (N.D. Ill. Nov. 16, 2017) .........................7, 33, 37

*City of Los Angeles v. Sessions,*
    No. 18-7347, 2019 WL 1957966 (C.D. Cal. Feb. 15, 2019) ....................................1

*City of New York v. Department of Justice,*
    343 F. Supp. 3d 213 (S.D.N.Y. 2018)........................................................ *passim*

*City of Philadelphia v. Attorney General of United States,*
    916 F.3d 276 (3d Cir. 2019)....................................................................... *passim*

*City of Philadelphia v. Sessions,*
    280 F. Supp. 3d 579 (E.D. Pa. 2017) ....................................................19, 20, 24, 26

*City of Philadelphia v. Sessions,*
    309 F. Supp. 3d 271 (E.D. Pa. 2018) ....................................................................27

*City of Philadelphia v. Sessions,*
    309 F. Supp. 3d 289 (E.D. Pa. 2018) ....................................................................31

*City of Providence v. Sessions,*
    No. 18-437, ECF No. 30 (D.R.I. June 10, 2019) ..............................................1, 10

*County of Santa Clara v. Trump,*
    250 F. Supp. 3d 497 (N.D. Cal. 2017) .................................................................4, 8

*Encino Motorcars, LLC v. Navarro,*
    136 S. Ct. 2117 (2016)............................................................................................32

*Eringer v. Principality of Monaco,*
    No. 10-1803, 2011 WL 13134271 (C.D. Cal. Aug. 23, 2011) ...............................11

*Ezell v. City of Chicago,*
    651 F.3d 684 (7th Cir. 2011) ...........................................................................32, 34

*In re Forty-Eight Insulations, Inc.,*
    115 F.3d 1294 (7th Cir. 1997) ...............................................................................37

*Freedom From Religion Foundation, Inc. v. Concord Community Schools,*
    885 F.3d 1038 (7th Cir. 2018) ............................................................................5, 6

*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*,
    528 U.S. 167 (2000).................................................................................5

*Gattem v. Gonzales*,
    412 F.3d 758 (7th Cir. 2005) ...............................................................30

*Hunt v. Washington State Apple Advertising Commission*,
    432 U.S. 333 (1977)..........................................................................32, 34

*Illinois v. Sessions*,
    No. 18-4791, ECF No. 25 (N.D. Ill. Sept. 26, 2018) ............................1

*Lewert v. P.F. Chang's China Bistro, Inc.*,
    819 F.3d 963 (7th Cir. 2016) ..................................................................4

*Local 194, Retail, Wholesale & Department Store Union v. Standard Brands, Inc.*,
    540 F.2d 864 (7th Cir. 1976) ...........................................................34, 35

*Mayweathers v. Newland*,
    314 F.3d 1062 (9th Cir. 2002) ..............................................................23

*MCI WorldCom Network Services, Inc. v. Atlas Excavating, Inc.*,
    No. 02-4394, 2006 WL 3542332 (N.D. Ill. Dec. 6, 2006)....................38

*Motor Vehicle Manufacturers Association of United States v. State Farm*,
    463 U.S. 29 (1983)......................................................................28, 29, 30

*National Association of Manufacturers v. Department of Defense*,
    138 S. Ct. 617 (2018)............................................................................14

*Owner-Operator Indepedent Drivers Association v. Federal Motor Carrier
Safety Administration*,
    656 F.3d 580 (7th Cir. 2011) ................................................................29

*Remijas v. Neiman Marcus Group, LLC*,
    794 F.3d 688 (7th Cir. 2015) ..................................................................3

*Retired Chicago Police Association v. City of Chicago*,
    76 F.3d 856 (7th Cir. 1996) ....................................................................7

*Russian Media Group, LLC v. Cable America, Inc.*,
    598 F.3d 302 (7th Cir. 2010) ................................................................36

*South Dakota v. Dole*,
    483 U.S. 203 (1987)......................................................................19, 23, 24

*Texas Democratic Party v. Benkiser*,
    459 F.3d 582 (5th Cir. 2006) ................................................................34

*United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*,
517 U.S. 544 (1996) ..........................................................................34

*Van Wyhe v. Reisch*,
581 F.3d 639 (8th Cir. 2009) ...........................................................23

*Village of Sugar Grove v. FDIC*,
No. 10-3562, 2011 WL 3876935 (N.D. Ill. Sept. 1, 2011) ................18

*Wisconsin Right to Life, Inc. v. Schober*,
366 F.3d 485 (7th Cir. 2004) .............................................................5

*Zero Zone, Inc. v. United States Department of Energy*,
832 F.3d 654 (7th Cir. 2016) ...........................................................29

## Docketed Materials

*City of Chicago v. Sessions*,
No. 18-6859 (N.D. Ill.) ....................................................................38

## Statutes and Regulations

5 U.S.C. § 706 ......................................................................................28

8 U.S.C. § 1324 ....................................................................................22

26 U.S.C. § 5853 ..................................................................................17

34 U.S.C. §10102 ...........................................................................*passim*

34 U.S.C. § 10152 ................................................................................24

34 U.S.C. § 10153 ...........................................................................16, 17

34 U.S.C. § 10154 ...........................................................................16, 17

34 U.S.C. § 10228 ................................................................................16

34 U.S.C. § 10251 ...........................................................................24, 25

42 U.S.C. § 3753 (2000) ......................................................................15

Violence Against Women and Department of Justice Reauthorization Act of 2005,
Pub. L. No. 109-162, 119 Stat. 2094 (2006) ....................................15

## Legislative Materials

Enforce the Law for Sanctuary Cities Act, H.R. 3009, 114th Cong. (2015) ................................15

H.R. Rep. No. 109-233 (2005)..................................................................................15

Mobilizing Against Sanctuary Cities Act, H.R. 3002, 114th Cong. (2015) ..................................15

Stop Dangerous Sanctuary Cities Act, H.R. 5654, 114th Cong. (2016)........................................15

Stop Sanctuary Cities Act, S. 3100, 114th Cong. (2016) ...........................................................15

Stop Sanctuary Cities Act, S. 1814, 114th Cong. (2016) ...........................................................15

Stop Sanctuary Policies and Protect Americans Act, S. 2146, 114th Cong. (2016).....................15

## **Other Authorities**

Federal Rule of Civil Procedure 12 ........................................................................3, 4

Federal Rule of Civil Procedure 54 ...........................................................................39

MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 1998) .................................................11

Nick Miroff & Maria Sacchetti, *Trump vows mass immigration arrests, removals of 'millions of illegal aliens' starting next week*, Wash. Post (June 17, 2019).......................22

## INTRODUCTION

The United States Conference of Mayors (the "Conference") and one of its members, Evanston, Illinois, brought this action because the Attorney General refuses to release hundreds of millions of dollars in Congressionally allocated grant funds under the Byrne JAG program unless the Conference's member cities agree to several immigration-related conditions the Attorney General unilaterally imposed upon them.

It is now beyond question that the Attorney General's actions are unlawful. In at least ten decisions, district and appellate courts around the country, including this Court, have held that the Attorney General lacks legal authority to impose these conditions, or any other immigration-related conditions, on the receipt of Byrne JAG funds.[1] However, rather than release the critically needed funds, the Attorney General has chosen to wield his administrative control over the funds to continue punishing cities and other grant recipients that do not acquiesce to his unlawful demands.

---

[1] *See* ECF No. 23 at 1, 7 (granting preliminary injunction as to notice, access, and compliance conditions); ECF No. 33 at 2 (Seventh Circuit ordering that the district court's preliminary injunction "shall be in effect as originally ordered"); *City of Chicago v. Sessions*, 888 F.3d 272, 293 (7th Cir. 2018) (affirming preliminary injunction against notice and access conditions); *City of Chicago v. Sessions*, 321 F. Supp. 3d 855, 879 (N.D. Ill. 2018) (Leinenweber, J.) (permanently enjoining notice, access, and compliance conditions); *Illinois v. Sessions*, No. 18-4791, ECF No. 25 (N.D. Ill. Sept. 26, 2018) (Leinenweber, J.) (permanently enjoining notice, access, and compliance conditions); *City of Philadelphia v. Att'y Gen. of U.S.*, 916 F.3d 276, 293 (3d Cir. 2019) (affirming permanent injunction against notice, access, and compliance conditions); *City of Los Angeles v. Sessions*, No. 18-7347, 2019 WL 1957966, at *4-5 (C.D. Cal. Feb. 15, 2019) (permanently enjoining notice, access, compliance, harboring, and questionnaire conditions); *City & County of San Francisco v. Sessions*, No. 18-5146, 2019 WL 1024404, at *2 (N.D. Cal. Mar. 4, 2019) (same); *City & County of San Francisco v. Sessions*, 349 F. Supp. 3d 924, 934 (N.D. Cal. 2018) (permanently enjoining the notice, access, and compliance conditions); *City of New York v. Dep't of Justice*, 343 F. Supp. 3d 213, 246 (S.D.N.Y. 2018) (permanently enjoining notice, access, and compliance conditions); *City of Providence v. Sessions*, No. 18-437, ECF No. 30 at 7-8 (D.R.I. June 10, 2019) (permanently enjoining notice, access, and compliance conditions).

For example, the Attorney General re-imposed the same notice, access, and compliance conditions for fiscal year ("FY") 2018 that courts uniformly rejected for FY 2017. He did so again in 2019, and will presumably continue to do so year after year, apparently on the theory that even though he lacks legal authority to impose them, forcing cities to challenge these conditions in each separate grant year will, as a practical matter, require recipients to cave to his demands or give up the funds. The Attorney General also imposed two additional conditions on FY 2018 (and FY 2019) funds—the harboring and questionnaire conditions—even though courts uniformly ruled that the Attorney General lacks authority to impose any such conditions.

The Attorney General's unlawful harassment has not stopped at the courthouse doors. With each new lawsuit and motion filed, the Attorney General continues to advance arguments that lack substantial justification, and that courts have repeatedly rejected, often trying to dress the arguments up as "new" authority. For example, the Attorney General now presses the absurd claim that the Assistant Attorney General's statutory authorization to "maintain liaison" with local governments means that the Attorney General can unilaterally withhold grant funds from recipients if they do not acquiesce to his conditions, even though no common sense reading of the term "maintain liaison" supports such a claim and the U.S. Court of Appeals for the Seventh Circuit, among every other court to consider the issue, held that the statute authorizing "liaison" concerns only administrative duties of the Assistant Attorney General and provides no authority to impose conditions. *City of Chicago*, 888 F.3d at 284-85.

In similar fashion, the Attorney General again takes unjustified aim at the Conference's ability to represent its members. Although he acknowledges that this Court already ruled that the Conference has standing as an association to seek relief for its member cities, the Attorney General claims, without citation to even a single case so holding, that the Court may nonetheless

withhold relief from the Conference's members unless each member appears before the Court to confirm its authorization under local laws to seek relief and meets a number of other individualized requirements the Attorney General alone proposes. The Attorney General's novel proposal is contrary to forty years of established law governing associational standing. It is also a transparent tactic designed to erect pointless barriers to relief for cities.

Enough is enough. The Conference's members are entitled to receive the grant funds Congress allocated to them without adhering to the Attorney General's unlawful conditions. Accordingly, and for the reasons set forth below and in their opening motion, the Conference and Evanston respectfully ask that this Court grant their motion for summary judgment, deny the Attorney General's motion to dismiss and cross-motion for summary judgment, enjoin the Attorney General from imposing the challenged conditions for fiscal years 2017 and 2018 and in each successive grant year, extend relief at a minimum to all affected Conference members, and grant Plaintiffs leave to file a motion seeking their attorney fees.

## ARGUMENT

## I.      Plaintiffs have standing to challenge the unlawful conditions.

As an initial matter, the Attorney General argues that Evanston's and the Conference's claims should be dismissed under Rule 12(b)(1) for lack of standing. The Court should again reject this argument.

### A.      Legal Standard.

When considering a motion to dismiss for lack of standing, courts must accept all material allegations of the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Remijas v. Neiman Marcus Grp., LLC*, 794 F.3d 688, 691 (7th Cir. 2015). To have standing, a litigant must establish that it "suffered a concrete and particularized injury that is fairly traceable to the challenged conduct, and is likely to be redressed by a favorable judicial

decision." *Lewert v. P.F. Chang's China Bistro, Inc.*, 819 F.3d 963, 966 (7th Cir. 2016) (quotation and citation omitted). Where plaintiffs establish that they have standing, a Rule 12(b)(1) motion to dismiss for lack of standing must be denied. *Id.* at 970; *Access Living of Metro. Chicago, Inc. v. City of Chicago*, 372 F. Supp. 3d 663, 671 (N.D. Ill. 2019).

**B.     Evanston has standing to challenge the unlawful conditions.**

The record establishes Evanston's standing to challenge the grant conditions imposed by the Attorney General. The Attorney General makes two arguments as to Evanston's standing. Neither has merit.

First, the Attorney General argues (without citation to legal authority) that as a subrecipient of Byrne JAG funds, Evanston lacks standing to challenge the grant conditions. ECF No. 78 at 11. The Court previously rejected this argument (ECF No. 23 at 3-4), and it should do so once again.

The Attorney General admits that Evanston, like all grant recipients, must supply all information and certifications, and must agree to any conditions, that the Department of Justice ("Department") requires of all grant recipients. Resp. to Pls.' Local R. 56.1 Statement ¶ 21, ECF No. 80. These requirements constitute an "injury in fact" for which Evanston may seek relief. ECF No. 23 at 3-4 (rejecting the Attorney General's argument that as a subrecipient, Evanston lacked standing to seek preliminary injunctive relief); *see also City of Chicago*, 321 F. Supp. 3d at 878; *County of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 526 (N.D. Cal. 2017) (holding that a threatened loss of federal grant funds satisfies Article III's standing requirement); *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1235-36 (9th Cir. 2018) (same). Thus, Evanston has standing to challenge the grant conditions because, like other recipients, the Department requires Evanston to certify compliance with the imposed grant conditions to receive its funds. Resp. to Pls.' Local R. 56.1 Statement ¶ 21.

4

Second, the Attorney General attempts to defeat Evanston's standing to challenge the FY 2018 certification requirement by arguing that Evanston suffered no injury-in-fact because of a notice posted on the Office of Justice Programs ("OJP") website stating that, in light of pending litigation, the Department would not "at this time" enforce the requirement against Evanston. ECF No. 78 at 12; ECF No. 78-1 Ex. D. This argument also fails.

The Attorney General's argument does not present a question of standing, but one of mootness because the Attorney General relies on an online notice issued after Plaintiffs filed suit. ECF No. 78-1 ¶ 4. Standing is measured at the commencement of an action. *Wis. Right to Life, Inc. v. Schober*, 366 F.3d 485, 491 (7th Cir. 2004). The question is not whether Evanston has standing to challenge the certification requirement, but whether the Attorney General's alleged voluntary withdrawal of the requirement moots Evanston's challenge.[2]

It does not. The "voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice," *Friends of the Earth, Inc. v. Laidlaw Env'tl Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000), unless a defendant meets the "heavy burden" of establishing that it is "absolutely clear" that the challenged activity "could not reasonably be expected to recur." *Freedom From Religion Found., Inc. v. Concord Cmty. Schs.*, 885 F.3d 1038, 1051 (7th Cir. 2018). The Attorney General cannot meet that burden. *See id.* (explaining that even a "governor's announcement of voluntary cessation was insufficient to meet the heavy burden required to moot" a claim).

---

[2] The Attorney General's argument also fails to the extent it presents a question of standing. The pending litigation and subsequent online notice does not "insulate Evanston" from the required certifications. ECF No. 23 at 4; *see also City & County of San Francisco v. Trump*, 897 F.3d at 1236 (stating that the possibility of non-enforcement does not mean a plaintiff lacks standing).

The online notice expressly reserves the Department's ability to enforce the FY 2018 certification requirement when "the posture of the pending litigation changes (or if the pending litigation is resolved)." ECF No. 78-1 Ex. D. The Department may change its mind at any time – the Attorney General has not submitted any sworn declaration stating that the Department will never enforce the certification requirement against Evanston. *See Freedom From Religion Found.*, 885 F.3d at 1052 (claim is not moot when defendant fails to permanently stop the challenged activity). Dismissing Evanston's claims as to the certification requirement as moot would leave the Attorney General free to "resurrect the old procedure in the future" and to insulate unlawful action from judicial review. *Id.* Moreover, the Attorney General's conduct strongly indicates that will impose all of the conditions, including the certification requirement, on all recipients, including Evanston. For all of these reasons, Evanston has standing to challenge the imposed conditions, including the required certifications for FY 2018.

### C. The Conference has standing to assert the interests of its members.

In their opening brief, Plaintiffs showed that because Evanston has standing, there is no need to determine whether the Conference also has standing. ECF No. 56 at 12. The Attorney General does not even address this argument, and impliedly concedes this point.

Even though there is no need to determine whether the Conference has standing, the record establishes the Conference's standing to assert the interests of its member cities. Ignoring the evidence in the record, the Attorney General attempts to manufacture doubts about the Conference's ability to stand in the shoes of its members. ECF No. 78 at 28-30. The Attorney General's assertions are based on a fundamental misstatement that the Conference is suing to pursue to its own interests. *Id.* at 29. The record is clear: the Conference is suing on behalf of its members. ECF No. 10 ¶ 40; ECF No. 46 ¶¶ 97, 102, 106; ECF No. 74-1 at 1. The Conference

6

has never claimed to be bringing this lawsuit on behalf of the Conference itself, and the Attorney General's unsupported claims to the contrary must be rejected.

As this Court already held, the Conference meets the three requirements for associational standing and therefore may sue to vindicate the rights of its members. *City of Chicago v. Sessions*, No. 17-5720, 2017 WL 5499167, at *5 (N.D. Ill. Nov. 16, 2017); ECF No. 23 at 7; *see also* ECF No. 33 at 2.

**First**, it is undisputed that Conference members could sue on their own, and therefore the Conference satisfies the first requirement for associational standing. ECF No. 56 at 27.

**Second**, the record establishes, and the Attorney General does not dispute, that the Conference's interests in this case are germane to its organizational purpose. Instead, the Attorney General once again claims that Conference members have "potentially divergent interests" and therefore conflicts exist among Conference members. *Id.* at 28. This argument again fails.

The supposed conflicts or "potentially divergent interests" are not conflicts at all, let alone "profound conflicts" that may preclude associational standing. *See Retired Chicago Police Ass'n v. City of Chicago*, 76 F.3d 856, 863-64 (7th Cir. 1996). No Conference member is a defendant in the action, and none will be adversely affected by the relief sought. In fact, although no authorization is needed from its members to file suit because no conflict exists, the Conference's members overwhelmingly oppose the Attorney General's actions. Decl. of Tom Cochran ¶¶ 13-25, ECF No. 58; Decl. of Sarita Nair ¶¶ 36-38, ECF No. 60.

The Attorney General argues that cities have varying policies regarding immigration and "their own requirements under local law for authorizing and initiating suits" and, therefore, the Court should find a conflict exists among Conference members that defeats the Conference's

standing and its ability to seeks relief on behalf of its members. ECF No. 78 at 30-31. But although the Attorney General would prefer piecemeal litigation so that he can impose the unlawful conditions upon the maximum number of cities, the Attorney General's preference does not create a conflict among the Conference's members or defeat the Conference's right to seek relief. This Court previously held as much when it last rejected the Attorney General's argument. *See* ECF No. 23 at 6-7.

*Third*, the Conference's claims raise pure questions of law, which do not require the presentation of individualized proof of liability or damages. ECF No. 23 at 7; ECF No. 56 at 14. In fact, claims such as those presented here are precisely the type of claims that associations have standing to pursue. ECF No. 56 at 14; *see also* ECF No. 23 at 7 (concluding that the relief sought by the Conference "raises purely legal questions, is not contingent on evidence from a specific city, and thus is 'amenable to associational standing'") (citation omitted). As the Court previously explained, "every Conference member, regardless of its particular local policies, stands to benefit by being inoculated against federal overreach." ECF No. 23 at 7. All cities have an interest in ensuring that the Attorney General does not impose unauthorized and unconstitutional conditions on federal grant funds. *Id.* at 2; *County of Santa Clara*, 250 F. Supp. 3d at 526.

The Attorney General does not dispute that the Conference's claims do not require the participation of individual members. Instead, the Attorney General attempts to argue, in a roundabout way, that even if the Court again finds that the Conference has standing, the Court should nonetheless order the participation of individual Conference members. ECF No. 78 at 31-32. As set forth in Part IV of this brief, the Attorney General is attempting to manufacture the need for individualized proof where one does not exist, and his arguments should be rejected.

II.     **The challenged conditions are unlawful, and Plaintiffs are entitled to summary judgment on Counts I, II, and IV.**

As set forth in their opening brief, Evanston and the Conference are entitled to summary judgment on Counts I, II, and IV of their amended complaint because these counts present pure questions of law addressed by the Court's prior opinions and no disputed material facts exist. In response, the Attorney General presents no new legal arguments regarding three of the challenged conditions, and instead focuses on two conditions and the certification requirement.

A.      **The notice, access, and compliance conditions are ultra vires and unconstitutional.**

The Attorney General does not dispute that the FY 2017 notice, access, and compliance conditions are materially identical to the FY 2018 notice, access, and compliance conditions, which seek to achieve the same impermissible purpose of conscripting local officers into the service of federal, civil immigration-enforcement priorities. ECF No. 78 at 2, 10, 12. Nor does the Attorney General dispute that nothing has changed since the Court permanently enjoined the three conditions in the *Chicago v. Sessions* case. *See City of Chicago*, 321 F. Supp. 3d at 874-76 (notice, access, and compliance conditions unlawful). Instead, the Attorney General rests on his arguments from the briefing in the *Chicago v. Sessions* litigation—*i.e.*, arguments rejected by this Court, the Seventh Circuit, and other courts throughout the country.[3] ECF No. 78 at 12; *City of Chicago*, 888 F.3d at 284-85; *City of Chicago*, 321 F. Supp. 3d at 874-75; *City of Chicago*, 264 F. Supp. 3d at 941-43; *City of Philadelphia*, 916 F.3d at 287-88; *City & County of San Francisco*, 349 F. Supp. 3d at 947-48; *City of New York*, 343 F. Supp. 3d at 227-28; *City &*

---

[3] As stated in their opening brief (ECF No. 56 at 21), Plaintiffs incorporate and preserve the Conference's and Chicago's arguments in *City of Chicago v. Sessions*, Case No. 17-5720.

*County of San Francisco*, 2019 WL 1024404, at *6; *City of Providence*, No. 18-437, ECF No. 30 at 7-8.

Because there is no dispute that the FY 2017 and FY 2018 notice, access, and compliance conditions are essentially the same, the Court should follow its previous rulings, and the rulings of other courts that considered this issue, and enter summary judgment in favor of Evanston and the Conference on Counts I, II, and IV as they pertain to those three conditions.[4]

### B. The harboring condition, questionnaire condition, and certification requirement are ultra vires and unconstitutional.

The Attorney General's response focuses on the harboring condition, the questionnaire condition, and the certification requirement. Like the notice, access, and compliance conditions, the harboring and questionnaire conditions and the certification requirement are similarly unlawful because nothing in the Byrne JAG statute or any other statute allows the Attorney General to impose the conditions on the formula grant program. ECF No. 56 at 21-23. In response, the Attorney General argues that the authority to impose the conditions flows from two statutory provisions outside of the Byrne JAG statute and two provisions within the statute. The sources of purported authority that the Attorney General points to are all insufficient.

### 1. Section 10102(a)(2) does not give the Attorney General the authority to impose the challenged conditions.

As with the notice, access, and compliance conditions, the Attorney General argues that the authority to impose the harboring and questionnaire conditions flows from two sections of 34 U.S.C. §10102, which "sets forth the duties and functions of the Assistant Attorney General for the Office of Justice Programs." *City of Chicago*, 888 F.3d at 284.

---

[4] The Attorney General's inability to defend the FY 2017 notice, access, and compliance conditions and the repeated FY 2018 conditions confirms that an injunction covering all future grant years is appropriate (*see infra* Part IV).

10

The Attorney General first relies on 34 U.S.C. § 10102(a)(2), which directs the Assistant Attorney General for the OJP (the "AAG") to "maintain liaison with the executive and judicial branches of the Federal and State governments in matters relating to criminal justice." Citing a dictionary definition of the word "liaison," the Attorney General states in a conclusory manner that the AAG's "authority to 'maintain liaison' is alone sufficient" to provide authority for imposing the harboring condition, and in fact, authorizes the Attorney General to impose all of the challenged conditions. ECF No. 78 at 13-14. The Attorney General's argument fails.

The Attorney General's own definition of "liaison" reveals that a liaison is not someone who is empowered to impose conditions on, or dictate the terms of, a relationship. Rather, a liaison is merely someone who communicates to facilitate a close working relationship between two or more people or organizations. *See Liaison*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 1998). Essentially, a liaison is an organizational conduit who carries information from one organization to another and vice versa. Thus, the Attorney General "puts far more weight on 'maintain liaison' than it can hold," and the argument must fail. *City & County of San Francisco*, 2019 WL 1024404, at *8.

Under the Attorney General's interpretation, the ability to "maintain liaison" includes the power to disregard the Byrne JAG statute's formula-based constraints and impose whatever grant conditions that the Attorney General claims might facilitate communication between federal and local governments. ECF No. 78 at 13-14.[5] The plain language of the text simply does not support the Attorney General's interpretation. *City & County of San Francisco*, 2019 WL 1024404, at *8

---

[5] The single case cited by the Attorney General is inapposite. In *Eringer v. Principality of Monaco*, the court described a contract requiring a party to maintain liaison as involving "regularly shar[ing] sensitive intelligence information"; the case did not involve federal grants or the Attorney General's authority to impose conditions on federal grants. No. 10-1803, 2011 WL 13134271, at *5 (C.D. Cal. Aug. 23, 2011).

(Section 10102 "does not support a broad authority to place the challenged conditions on Byrne JAG grantees").

Finally, the Attorney General's reading of "maintain liaison" is contrary to the holding and reasoning of prior court decisions. *See id.* at *8 (rejecting the Attorney General's "maintain liaison" argument). Multiple courts have rejected similar arguments made by the Attorney General in an attempt to support his authority for other challenged conditions. *City of Philadelphia*, 916 F.3d at 287-88; *City of Chicago*, 888 F.3d at 284-85; *City of New York*, 343 F. Supp. 3d at 227-28. For example, the Third Circuit and the Seventh Circuit characterize the function of Section 10102 very differently than the Attorney General. *City of Chicago*, 888 F.3d at 285 (Section 10102(a)(2) is part of AAG's "communication and coordination duties"); *City of Philadelphia*, 916 F.3d at 288 (Section 10102(a)(2) involves a "ministerial" duty to "disseminate criminal justice information and coordinate with various agencies"). Based on the reasoning of these courts and the plain text, Section 10102's direction to the AAG to "maintain liaison" does not authorize the Attorney General to impose any of the challenged conditions.

### 2. Section 10102(a)(6) does not give the Attorney General the authority to impose the challenged conditions.

The Attorney General next turns to 34 U.S.C. § 10102(a)(6) as a source of authority for the challenged conditions. The Attorney General claims that the statutory language and legislative history support his argument. The Attorney General is wrong.

Section 10102(a)(6) states that the AAG shall "exercise such other powers and functions as may be vested" in the AAG "pursuant to this chapter or by delegation of the Attorney General, including placing special conditions on all grants, and determining priority purposes for formula grants." The Attorney General argues that the language allowing the AAG to place "special conditions" and "determine priority purposes for formula grants" includes the authority to

12

impose the challenged conditions and exercise broad discretion over formula grants by, among other things, "protect[ing] the confidentiality of related federal law enforcement information." ECF No. 78 at 15-16. The Attorney General's interpretation of Section 10102(a)(6) is contrary to the plain meaning and structure of the statute.

By its plain language, Section 10102(a)(6) does not grant the Attorney General the authority to impose any of the challenged conditions. The language allowing the AAG to place "special conditions" and determine "priority purposes for formula grants" is dependent on the authority vested in the AAG pursuant to that chapter. *City of Chicago*, 888 F.3d at 284-85; *City of Philadelphia*, 916 F.3d at 287-89. That same chapter does not expressly authorize the conditions, and none of the Byrne JAG provisions give the Attorney General "any open-ended authority to impose additional conditions." *Id.* at 285; *see also City & County of San Francisco*, 2019 WL 1024404, at *8 ("[T]he Attorney General does not have the power to impose the conditions independent of Congress, and the Byrne JAG statute does not reference Section 10102.").

Although the statutory test "alone is sufficient to end the inquiry" with respect to the meaning of Section 10102(a)(6), the statutory purpose and structure support the same conclusion. *City of Chicago*, 888 F.3d at 284-85; *accord City of Philadelphia*, 916 F.3d at 287-89; *City & County of San Francisco*, 2019 WL 1024404, at *7-8; *City of New York*, 343 F. Supp. 3d at 228 (Section 10102(a)(6) "does not provide authority for imposing any of the challenged conditions").

The Byrne JAG statute "precisely describes the formula through which funds should be distributed to states and local governments, and imposes precise limits on the extent to which the Attorney General can deviate from that distribution." *City of Chicago*, 888 F.3d at 286. As the

13

Seventh Circuit previously concluded, "it is inconceivable that Congress would have anticipated that the [AAG] could abrogate the entire distribution scheme" set forth in the Byrne JAG statute and "deny all funds to states and localities that would qualify under the Byrne JAG statutory provision." *Id.* Yet to support the challenged conditions, the Attorney General asks this Court to adopt the exact reading of Section 10102(a)(6) that the Seventh Circuit called "inconceivable." *See* ECF No. 78 at 13. The Attorney General's reading should once again be rejected. Interpreting Section "10102(a)(6) to authorize the Attorney General to impose substantive conditions on all grants under the entire chapter is discordant with the specific and clear grants of authority in other sections of the statute." *City of Chicago*, 264 F. Supp. 3d at 943.

Alternatively, the Attorney General argues that the plain language and statutory structure of Section 10102(a)(6) should be ignored in favor of legislative history. ECF No. 78 at 15. But, as the Seventh Circuit held, there is no need to resort to legislative history because the meaning of the statutory text is clear on its face. *City of Chicago*, 888 F.3d at 284-85 (rejecting the Attorney General's interpretation of Section 10102 as contrary to the "plain language" of the statute, which "is the best indicator of Congress's intent"); *see also Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617, 631 (2018) (stating that where a statute's plain language is unambiguous on its face, the judicial inquiry into its meaning "begins with the statutory text, and ends there as well").

Even if the Court ignores the plain language and statutory structure (which it should not), the legislative history supports the finding that Section 10102(a)(6) does not authorize the Attorney General to impose the challenged immigration-related conditions.

The Attorney General first cites a House Judiciary Report for the Reauthorization Act, but that report does not support his position. ECF No. 78 at 15. The cited material simply sets

forth the language of Section 10102(a)(6). *See* H.R. Rep. No. 109-233, at 101 (2005) (reciting the language of Section 10102). In addition, the report explains the purpose of the Byrne JAG program – to allow states and local governments the "flexibility to spend money for programs that work for them rather than to impose a 'one size fits all' solution" for local policing. H.R. Rep. No. 109-233, at 89. That purpose would be undermined, not served, by the Attorney General's unbounded reading of his own authority.

The Attorney General also cites the Reauthorization Act, which created the current Byrne JAG program. ECF No. 78 at 15. But the Reauthorization Act actually demonstrates Congress's desire to unlink the Byrne JAG program from any immigration-related conditions. In that Act, Congress repealed the only immigration-related condition on Byrne JAG funds. *See* 42 U.S.C. § 3753(a)(11) (2000) (requiring grantees to inform federal immigration authorities of an immigrant's criminal conviction), *repealed by* Pub. L. No. 109-162, § 1111(a)(1), 119 Stat. 2094. Since then, Congress has continually rejected legislation to condition grant funds on compliance with immigration-related conditions. *E.g.*, Stop Dangerous Sanctuary Cities Act, H.R. 5654, 114th Cong. § 4 (2016); Stop Dangerous Sanctuary Cities Act, S. 3100, 114th Cong. § 4 (2016); Enforce the Law for Sanctuary Cities Act, H.R. 3009, 114th Cong. § 3 (2015); Mobilizing Against Sanctuary Cities Act, H.R. 3002, 114th Cong. § 2 (2015); Stop Sanctuary Policies and Protect Americans Act, S. 2146, 114th Cong. § 3(a) (2015); Stop Sanctuary Cities Act, S. 1814, 114th Conf. § 2 (2015).

For all of the above reasons, the Attorney General's reading of Section 10102 is contrary to the statutory text, structure, and purpose and therefore should be rejected.

   3.   **Sections 10153 and 10154 do not give the Attorney General the authority to impose any of the challenged conditions, including the harboring condition, the questionnaire condition, and the certification requirement.**

Finally, the Attorney General argues that two provisions of the Byrne JAG statute – 34 U.S.C. §§ 10153(a) and 10154 – authorize the Attorney General to impose the harboring condition, questionnaire condition, and certification requirement. Section 10153(a) states that the Byrne JAG application must be "in such form as the Attorney General may require," and Section 10154 provides that the Attorney General "shall not finally disapprove any application … without first affording the applicant reasonable notice of any deficiencies in the application and opportunity for correction and reconsideration." Neither section gives the Attorney General the power to impose broad, immigration-related conditions on Byrne JAG funds.

The Attorney General contends that he possesses the authority to dictate the form of a grant application, to reject an application, and to dictate what information is included in the application. The Attorney General's contention hinges on the incorrect assumption that the purpose of Byrne JAG applications is to "collect information to determine whether to grant or deny the application." ECF 78 at 14. The Attorney General cites no authority to support this claim. Nor could he. The Byrne JAG grant is a formula grant. Under the program, Congress pre-determines the eligible recipients and the amount each eligible recipient receives, and therefore, the Attorney General's discretion to carry out certain aspects of the program is limited. *See, e.g.*, 34 U.S.C. § 10228 (prohibiting the Attorney General from using the Byrne JAG program to "exercise any discretion, supervision, or control over any police force or any other criminal justice agency of any State or any political subdivision thereof").

By its plain text, the Byrne JAG statute gives the Attorney General only "narrow authority to withhold or re-allocate funds under very limited circumstances," and does not

16

authorize the Attorney General to summarily reject grant applications for whatever reason he chooses. *City of Philadelphia*, 916 F.3d at 285. The term "form" refers to the procedural requirement for completing an application for Byrne JAG funds, and nothing more. *City of New York*, 343 F. Supp. 3d at 230. The discretion to dictate the form of a document does not give the Attorney General the authority to impose additional conditions or request additional information that Congress did not authorize. *City of Philadelphia*, 916 F.3d at 285-86 (references to information in Section 10153 do not "cover Department priorities unrelated to the grant program"); *City of New York*, 343 F. Supp. 3d at 230 ("Attorney General's authority to determine the 'form' of the application does not include the ability to dictate the 'substance' of which laws an applicant must comply with as a condition of grant funding."). Additionally, the Attorney General's interpretation of Section 10153(a) would make other limitations Congress placed on the Byrne JAG program meaningless, including the Attorney General's very narrow authority to re-allocate funds under limited circumstances. *City of Philadelphia*, 916 F.3d at 285-86.

The Attorney General offers no argument for how Sections 10153(a) and 10154 allow him to impose substantive grant conditions and requirements, and instead relies on irrelevant authority that does not support his argument. *See Bogues v. United States*, 703 F. Supp. 2d 318, 328-29 (S.D.N.Y. 2010) (interpreting language in the context of statute that grants Health and Human Services broad authority); 26 U.S.C. § 5853(c) (statute concerning tax exemptions for transfer of firearms between police forces).

Finally, the holding and reasoning of prior court decisions foreclose two lynchpins of the Attorney General's argument – that the Byrne JAG statute gives the Attorney General broad authority to dictate what information is included in the application and to withhold funds for any reason the Attorney General chooses. *See City of Chicago*, 888 F.3d at 283-84 (none of the

17

provisions of the Byrne JAG statute, including Sections 10153 and 10154, "grant the Attorney General the authority to impose conditions that require states or local governments to assist in immigration enforcement, nor to deny funds to states or local governments for the failure to comply with those conditions"); *City of Philadelphia*, 916 F.3d at 286 (Byrne JAG statute does not grant the Attorney General "the power to withhold *all* of a grantee's funds for any reason the Attorney General chooses"); *City of Chicago*, 321 F. Supp. 3d at 874-75.

For all of the reasons set forth above and in their opening brief, Evanston and the Conference are entitled to summary judgment on Counts I, II, and IV as to all of the challenged conditions.

## III.   The Court should deny dismissal of Plaintiffs' remaining claims and deny the Attorney General's alternative request for summary judgment.

The Attorney General argues that Evanston and the Conference's Spending Clause and Administrative Procedure Act ("APA") claims (Counts III and V) should be dismissed or that partial summary judgment should be granted in the Attorney General's favor. Those arguments need not be addressed if the Court grants Evanston and the Conference the summary relief requested in their motion for partial summary judgment (*see* ECF No. 56 at 27), but to the extent the Court entertains the Attorney General's arguments, they fail.

### A.   Legal Standard.

The "purpose of a 12(b)(6) motion to dismiss is to test the sufficiency of the complaint." *Vill. of Sugar Grove v. FDIC*, No. 10-3562, 2011 WL 3876935, at *2 (N.D. Ill. Sept. 1, 2011). A motion to dismiss for failure to state a claim must be denied when it does not provide a legally sound basis for dismissal. *Id.*

18

**B.      The challenged conditions fail to satisfy the Spending Clause's requirements.**

Even if the Attorney General had the authority to impose the challenged conditions, the conditions exceed constitutional limits on the spending power. Although Congress may pursue its policy objectives by conditioning receipt of federal funds on compliance with federal directives, Congress's spending power is not unlimited. *South Dakota v. Dole*, 483 U.S. 203, 206-07 (1987). Conditions on federal grants must, among other things, (1) be unambiguous, and (2) relate to the federal interest in the funded program. *Id.* at 207. Contrary to the Attorney General's claims, the challenged conditions do not meet these requirements.[6]

**1.      The challenged conditions are unconstitutionally ambiguous.**

Congress has not unambiguously conditioned the receipt of Byrne JAG funds on compliance with the challenged conditions. *City & County of San Francisco*, 349 F. Supp. 3d at 957-58 (notice, access, and compliance conditions are unconstitutionally ambiguous). As an initial matter, Congress could not have unambiguously authorized the conditions because Congress never authorized them in the first place. *Id.* at 956-57; *see also City & County of San Francisco*, 2019 WL 1024404, at *13; *City of Philadelphia v. Sessions*, 280 F. Supp. 3d 579, 646 (E.D. Pa. 2017) ("Conditions cannot have been unambiguously authorized by Congress if they were never statutorily authorized.").

The Attorney General's claim that the challenged conditions meet Spending Clause requirements thus misses the mark. The Attorney General frames this as a typical Spending Clause case, where the question is one of statutory construction (*i.e.*, in this legislation, did Congress unambiguously, affirmatively impose the relevant conditions?). But the Attorney

---

[6] The Attorney General's motion does not address the other requirements for federal grant conditions – *i.e.*, that the conditions be in pursuit of the general welfare and not induce unconstitutional action. *See, e.g.*, Am. Compl. ¶¶ 135-36, ECF No. 46.

General glosses over a key detail – Congress did not write the challenged conditions; the Department wrote and imposed them. Unlike all of the cases cited by the Attorney General, here the Attorney General argues that conditions written and imposed by a federal agency, not Congress, are unambiguous and related to the purposes of the funded program.

Nothing in the Byrne JAG statute even impliedly conditions the receipt of grant funds on a state or local government's agreement to comply with any of the challenged conditions or required certifications (*see supra* Part II). It is therefore unnecessary to address the Attorney General's Spending Clause arguments because they focus solely on the language of the conditions written by the Department. *City & County of San Francisco*, 349 F. Supp. 3d at 955-58; *City & County of San Francisco*, 2019 WL 1024404, at *11-13; *City of Philadelphia*, 280 F. Supp. 3d at 646. But even if the question was whether the Attorney General's conditions meet the Spending Clause requirements, the answer remains no.

The language of the harboring condition, the questionnaire condition, and the required certifications is far from unambiguous because it fails to provide the clear notice required to attach the conditions to the receipt of Byrne JAG funds. The Attorney General argues that the questionnaire condition is not ambiguous because Evanston and the Conference were able to quote the condition's language in their brief. ECF No. 78 at 19. This argument is a non-starter. The ability to quote language does not in any way establish that the language is unambiguous, and the Attorney General cites no contrary authority.

The harboring condition requires that from the date a city accepts a grant award and throughout the time of the award's performance, "no public disclosure may be made of any federal law enforcement information in a direct or indirect attempt to conceal, harbor, or shield from detection" any undocumented immigrant, even when doing so would not violate any statute

20

or other law. Pls.' Local R. 56.1 Statement ¶ 53, ECF No. 57. Pointing to "Rules of

Construction" in the award documents that define terms like "federal law enforcement

information" and "public disclosure," the Attorney General makes the conclusory assertion that

the conditions clearly state what conduct is required of grant recipients. ECF No. 78 at 19. But

the definitions do nothing to clarify what is required of recipients. For example, the award

documents define "law enforcement information" to mean "records or information compiled for

any law enforcement purpose," "communicated or made available, by the federal government, to

a State or local government … through any means." Pls.' RJN Ex. S ¶¶ 44(4)(A)(2)-(3), ECF No.

62. Not only does this definition not clarify the scope of the harboring condition, or any of the

conditions, the solicitations and award documents do not define or specify key terms such as

"conceal, harbor, or shield." Nor does the Attorney General even attempt to explain or define the

what it means to engage in an "indirect attempt" to conceal or harbor.

Similarly, the solicitations and award documents do nothing to clarify the questionnaire

condition. Those documents state that recipients must certify compliance with Sections 1373 and

1644, the immigration-related conditions, and immigration-related provisions of the federal code.

Pls.' RJN Ex. H at 1, 10, 24; Pls.' RJN Ex. S ¶¶ 41, 61. None of the documents, however, clearly

inform recipients what exactly they must certify, which is particularly problematic because the

Department continues to change the language in the certifications. *Compare* Pls.' RJN Ex. C at

38 ¶ 5 (FY 2017 certification of compliance with Section 1373 attached to local solicitation),

*with* Pls.' RJN Ex. E ¶ 5 (August 10, 2018 version of FY 2017 certification of compliance with

Section 1373); *compare also* Pls.' RJN Ex. H at 41 (FY 2018 chief executive certification

attached to local solicitation), *with* Pls.' RJN Ex. K (August 22, 2018 version of FY 2018 chief

executive certification); *compare also* Pls.' RJN Ex. H at 43 (FY 2018 certification of

compliance with Sections 1373 and 1644 attached to local solicitation), *with* Pls.' RJN Ex. J
(August 28, 2018 version of FY 2018 certification of compliance with Sections 1373 and 1644),
*and* Pls.' RJN Ex. M (FY 2018 subrecipient certifications of compliance with Sections 1373 and
1644); *compare also* Pls.' RJN Ex. H at 45 (FY 2018 certification of compliance *with* 8 U.S.C.
§§ 1226, 1231, 1324, 1357, and 1366 attached to local solicitation), *with* Pls.' RJN Ex. L
(October 25, 2018 version of FY 2018 certification of compliance with 8 U.S.C. §§ 1226, 1231,
1324, 1357, and 1366).[7]

Notably, the Attorney General concedes that there is "uncertainty regarding the outer
boundaries" of the conditions, but claims that allowing grant recipients to contact OJP with
questions about the conditions' meaning and scope somehow resolves the uncertainty. ECF No.
78 at 19-20. However, the Attorney General cites no authority for the proposition that an
agency's willingness to explain an otherwise ambiguous condition in response to a request
somehow cures a Spending Clause violation; nor does the Attorney General explain the basis on
which an agency would be bound by any such informational explanation. *Id.* at 16-20.[8]

The questions and discrepancies about the conditions go beyond uncertainty about the
conditions' "outer boundaries," and are clearly distinguishable from the conditions at issue in the
cases on which the Attorney General relies. In each of those cases, the asserted ambiguity was

---

[7] Changes to the certifications include revising the final acknowledgment paragraphs and adding
a certification of compliance with 8 U.S.C. § 1324(a). *See, e.g.*, Pls.' RJN Ex. H at 41 ¶¶ 6-8, Ex.
K ¶¶ 6-8.

[8] Recent tweets by President Trump underscore the harboring condition's uncertain boundaries.
On June 17, 2019, the President alerted the country that large-scale immigration raids would
begin the following week. *See* Nick Miroff & Maria Sacchetti, *Trump vows mass immigration
arrests, removals of 'millions of illegal aliens' starting next week*, Wash. Post (June 17, 2019),
https://wapo.st/2MVAj5p?tid=ss_mail&utm_term=.359ead214019. Under the Attorney
General's interpretation of the harboring condition, if a mayor of a city that receives Byrne JAG
funds sent the same tweet that President Trump sent, he or she would arguably be in violation of
the harboring condition.

based on alleged uncertainty as to how grant conditions imposed by the Religious Land Use and Institutionalized Persons Act ("RLUIPA") would be applied, not what the conditions meant. *Charles v. Verhagen*, 348 F.3d 601, 608 (7th Cir. 2003) (RLUIPA's application of a "least restrictive means test" did not render the conditions imposed by the Act unconstitutionally ambiguous); *Van Wyhe v. Reisch*, 581 F.3d 639, 650 (8th Cir. 2009) (same); *Benning v. Georgia*, 391 F.3d 1299, 1306 (11th Cir. 2004) ("The standard of least restrictive means is far from ambiguous in informing states of their responsibilities when they receive federal funds."). Unlike in the cases cited by the Attorney General, here fundamental questions exist about what the challenged conditions mean.

As demonstrated by the Attorney General's concession that uncertainty about the scope of the conditions exists, the Attorney General cannot affirmatively resolve the operative question of whether award recipients can agree to the conditions "knowingly, cognizant of the consequences." *Dole*, 483 U.S. at 207. As explained in one case cited by the Attorney General, Congress must "make the existence of the condition itself – in exchange for receipt of federal funds – ***explicitly obvious***." *Mayweathers v. Newland*, 314 F.3d 1062, 1067 (9th Cir. 2002) (emphasis added).

The Spending Clause requires the Attorney General to clarify each condition's meaning before recipients decide whether to accept the condition. In this case, recipients simply cannot accept Byrne JAG funds "knowingly, cognizant of the consequences." *Dole*, 483 U.S. at 207.[9]

---

[9] The Attorney General's reference to irrelevant Illinois statutes does nothing to support his arguments. ECF No. 78 at 19-20 n.7. Language appearing in irrelevant statutes does not somehow make the conditions unambiguous, and the Attorney General cites no authority to support that illogical inference.

### 2. None of the challenged conditions relate to the Byrne JAG program's purposes.

Congressional conditions on federal grants must also relate to "the federal interest in particular national projects or programs." *Dole*, 483 U.S. at 207 (internal quotation omitted). Put another way, conditions on congressional spending must "share some nexus such that they are reasonably related to the purpose of the federal program." *City & County of San Francisco*, 349 F. Supp. 3d at 958; *see Verhagen*, 348 F.3d at 609 (explaining that conditions relate to federal interest when the conditions and federal funds "share[] the same goal").

The Attorney General admits that the purpose of the challenged conditions is "immigration enforcement." ECF No. 78 at 17 (stating that "immigration enforcement" is what "the challenged conditions promote"). The purpose of the Byrne JAG program is to support local efforts to fight crime by providing "additional personnel, equipment, supplies, contractual support, training, technical assistance, and information systems for criminal justice" related to one of eight program areas specified in the statute. 34 U.S.C. § 10152(a)(1). In specifying the types of programs funded under the Byrne JAG program, Congress did not include federal civil immigration enforcement because "the Byrne JAG statute is clearly designed for the purpose of enhancing <u>local</u> criminal justice." *City of Philadelphia*, 280 F. Supp. 3d at 642.

Unable to identify language in the Byrne JAG statute to support the contention that the program relates to federal civil immigration enforcement, the Attorney General relies on a broad, convoluted interpretation of "criminal justice" to support the claim that civil immigration enforcement "intersects" with criminal law enforcement. ECF No. 78 at 17. Pointing to a statutory definition of criminal justice, the Attorney General argues that federal civil immigration enforcement promotes "activities pertaining to crime prevention, control, or reduction, or the enforcement of the criminal law" (34 U.S.C. § 10251(a)(1)) because "[o]nce removed," an

24

immigrant "is no longer present in this country with the potential" to commit a crime (ECF No. 78 at 17-18). The Attorney General misses the mark.

The Attorney General cites no authority for the proposition that conditions on federal grants relate to the federal interest in the grant program if the purposes of the conditions and program somehow intersect. Although the Attorney General claims that the relatedness requirement is not an exacting standard and requires only a low threshold of relatedness between the challenged conditions and the purpose of the grant funds, the Attorney General relies on cases that deal exclusively with whether conditions written by Congress are related to Congress's interest in the related grant funds. ECF No. 78 at 17. The Attorney General cites no cases that stand for the proposition that the Attorney General is only required to meet a low threshold of whether grant conditions written by a federal agency somehow intersect with the purposes of the funded program. *Id.* at 17-18.

Even under the caselaw cited by the Attorney General, the challenged conditions do not satisfy the relatedness requirement because the conditions extend well beyond federal "activities pertaining to crime prevention, control, or reduction, or the enforcement of the criminal law." 34 U.S.C. § 10251(a)(1). For example, the harboring condition applies to any public disclosure of "federal law enforcement information" made in a direct or indirect attempt to shield certain individuals from detection from enforcement of civil immigration laws. The Attorney General's interpretation of criminal justice is so broad that any condition on Byrne JAG funds could relate to the program's purposes as long as the condition involved any area of law that intersects in any way with the criminal code.

More importantly, the Attorney General fails to answer the relevant question of whether the conditions relate to – *i.e.*, share the same goal as – the purposes of the Byrne JAG grant

25

program to which the funds are attached. As the language and legislative history of the Byrne JAG statute make clear, the answer is no (*see supra* Part II.B).

The challenged conditions, which seek to conscript local officers into the service of federal civil immigration-enforcement priorities, do not share any goal with, or have any nexus to, the Byrne JAG program. *See City & County of San Francisco*, 349 F. Supp. 3d at 959-60 (notice and access conditions do not meet the relatedness requirement). Immigration enforcement is fundamentally an area of civil – not criminal – law and is a function of federal – not state or local – government. *See Arizona v. United States*, 567 U.S. 387, 396 (2012). Federal immigration law and immigration status have "nothing to do with the enforcement of local criminal laws." *City of Philadelphia*, 280 F. Supp. 3d at 642.

Accordingly, the Attorney General cannot impose the challenged conditions without violating the Spending Clause because the conditions are (1) unconstitutionally ambiguous and (2) do not in any way relate to the Byrne JAG program, the exclusive purpose of which is to support local efforts to fight crime.

### C. The challenged conditions violate the APA.

The Attorney General contends that Plaintiffs' Administrative Procedure Act claim (Count V) should be dismissed for two reasons. Neither argument has merit.

### 1. The imposition of the challenged conditions constitutes final agency action under the APA.

The Attorney General first argues that Plaintiffs' APA claim concerning the FY 2018 Byrne JAG funds is not reviewable because neither Evanston nor the Conference challenges a final agency action.[10] According to the Attorney General, final agency action occurs only when the Department decides to grant or deny an application. The Attorney General's argument fails.

---

[10] The Attorney General's argument focuses entirely on FY 2018 awards. He does not assert that

26

In order for an APA challenge to agency action to be ripe for review, the challenged action must be final. *Citizens for Appropriate Rural Roads v. Foxx*, 815 F.3d 1068, 1079 (7th Cir. 2016). For an agency action to be final, it must both "mark the consummation of the agency's decisionmaking process" and be an action "by which rights or obligations have been determined, or from which legal consequences will flow." *City of Chicago*, 321 F. Supp. 3d at 865 (quoting *Bennett v. Spear*, 530 U.S. 154, 177-78 (1997)). As this Court held, both requirements are "clearly met here." *Id.*

The decision to impose the challenged conditions on the Byrne JAG program itself "constitutes final agency action that is ripe for judicial review." *Id.* at 866; *City of Philadelphia v. Sessions*, 309 F. Supp. 3d 271, 280 (E.D. Pa. 2018); *California ex rel. Becerra v. Sessions*, 284 F. Supp. 3d 1015, 1030-31 (N.D. Cal. 2018). The record clearly establishes that the Department decided to impose the challenged conditions on all Byrne JAG funds, including funds allocated to Evanston and other Conference members. ECF No. 80 ¶¶ 26, 29, 41-47. By imposing the challenged conditions, the Attorney General forces each city "to choose between accepting the award with the Conditions or foregoing the award in favor of maintaining the City's policy preferences." *City of Chicago*, 321 F. Supp. 3d at 866.[11]

The Attorney General claims that Evanston cannot seek review under the APA because the Department issued "Evanston's FY 2018 Byrne JAG award pursuant to court injunctions" and therefore "has not yet determined to grant or deny [Evanston's] application administratively." ECF No. 78 at 21. This argument fails for at least three reasons. As noted

Plaintiffs have not identified a final agency action for FY 2017. Even if the Attorney General were correct, which he is not, he thus concedes that final agency action was taken for FY 2017.

[11] Notably, in the *City of Chicago* case, on appeal the Attorney General did not challenge the Court's ruling that the decision to impose conditions on the Byrne JAG program constitutes final agency action. *City of Chicago v. Sessions*, Appeal No. 18-2885, Appellant's Br. 4, ECF No. 5.

27

above, whether the Department has issued Evanston's FY 2018 award is irrelevant because the decision to impose conditions on the Byrne JAG program itself "constitutes final agency action that is ripe for judicial review." *City of Chicago*, 321 F. Supp. 3d at 866. In addition, even if the Department issues an award pursuant to a court injunction, the presence of the unlawful grant conditions still causes legal consequences. *Id.* And finally, Evanston's FY 2018 award was not issued pursuant to any court injunction.

The Attorney General also argues that the Conference must identify a specific denial of a particular city's Byrne JAG grant application. The Attorney General once again misunderstands what constitutes final agency action. Again, the Department's decision to impose the challenged conditions alone "constitutes final agency action that is ripe for judicial review." *Id.* Even if the Attorney General were correct – which he is not – the record demonstrates that the Department approved numerous Conference members' applications for FY 2017 and FY 2018 Byrne JAG funds. *E.g.*, Pls.' RJN Ex. R at 1, Ex. S at 1, ECF No. 62. The Attorney General's claim that Plaintiffs are not challenging final agency action should be rejected.

### 2.  The Attorney General acted arbitrarily and capriciously in adopting the conditions.

The imposition of the challenged conditions on Byrne JAG funds is arbitrary and capricious and must be set aside. *See* 5 U.S.C. § 706(2)(A). The Attorney General claims that the challenged conditions are not arbitrary and capricious because the decision to impose them was rational and reasonable. The Attorney General misunderstands the nature of this requirement and is incorrect.

Agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended to consider [or] entirely failed to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm*, 463 U.S. 29, 43 (1983). The agency

28

must also demonstrate that its decision "was the product of reasoned decisionmaking." *Owner-Operator Indep. Drivers Ass'n v. Fed. Motor Carrier Safety Admin.*, 656 F.3d 580, 588 (7th Cir. 2011) (citation omitted). The challenged conditions fail to meet those requirements.

In an effort to justify the decision to impose the conditions as rational, the Attorney asserts a number of conclusory statements. The Attorney General claims that the harboring condition is rational because it makes sense to "deny federal law enforcement funding to a jurisdiction that publicly discloses sensitive federal law enforcement information in an attempt to shield an alien or fugitive from detection." ECF No. 78 at 22-23. The Attorney General claims that the questionnaire condition is rational because it "allows the Federal Government to learn if [federal] immigration enforcement agents will operate in jurisdictions with laws or policies at odds with their missions." *Id.* at 23. Finally, the Attorney General claims that all of the conditions are rational because federal civil "immigration enforcement undoubtedly relates to criminal justice." *Id.* at 24.

None of these conclusory, after-the-fact assertions satisfy the requirement that the Attorney General must not have acted arbitrarily and capriciously at the time he imposed the challenged conditions. The relevant question under the APA is whether the Attorney General's decision to impose the challenged conditions was the result of "reasoned decisionmaking." *Owner-Operator Indep. Drivers Ass'n*, 656 F.3d at 588 (citation omitted). A court must look to the reasons given by the agency when it took the challenged action; it "may not supply a reasoned basis for the agency's action that the agency itself has not given." *Zero Zone, Inc. v. U.S. Dep't of Energy*, 832 F.3d 654, 668 (7th Cir. 2016) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43).

The Attorney General now attempts to provide reasons for the challenged conditions, but the after-the-fact explanations are no substitute for considered agency decision making in the first instance. "The Justice Department's lawyers are not allowed to supply the agency's missing rationale in its brief." *Gattem v. Gonzales*, 412 F.3d 758, 768 (7th Cir. 2005). And concerns about the need for appropriate agency decision making should be at their peak here considering the "conspicuous lack of a record surrounding why the [harboring] condition was imposed in its current form, where it could be used wittingly or unwittingly as a Trojan horse for acts and interpretations of the law that this court and others across the country have enjoined." *City & County of San Francisco*, 2019 WL 1024404, at *16.

Not only do the Attorney General's conclusory, after-the-fact statements fail to satisfy the basic requirement of reasoned decision making, but the Attorney General also misstates the language and scope of the challenged conditions. For example, on its face, the harboring condition is not limited to disclosures of only sensitive federal information; rather, it applies to a broad category of information – namely, any "records or information compiled for any law enforcement purpose … communicated or made available by the federal government … through any means." Pls.' RJN Ex. S ¶ 44, ECF No. 62. The Attorney General's need to rewrite the harboring condition while trying to make the condition seem rational reveals the disconnect between the Attorney General's stated reasons for the conditions and their effects. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

Even if the Attorney General was now able to articulate some sort of rationale for imposing the conditions, the administrative record filed by the Attorney General does not provide any evidence to support any rationale for any of the challenged conditions. The Attorney General cites four documents to support his arguments: (1) a 2016 memorandum issued by the

Office of the Inspector General ("OIG"); (2) a two-page guidance document regarding Section 1373; (3) a one-page "Backgrounder"; and (4) two social media posts. None of these documents justify the decision to impose the conditions. *See City of Philadelphia v. Sessions*, 309 F. Supp. 3d 289, 324-25 (E.D. Pa. 2018).

In fact, the administrative record contains no explanation why the Attorney General chose to impose any of the conditions. For example, the only evidence in the record supposedly supporting the harboring condition consists of two social media posts from the mayor of Oakland, California. *See* AR 1038-39. But nothing in the record explains how these posts influenced agency decision making or justified a program-wide grant condition. To support the questionnaire condition, the Attorney General points to the July 2017 background document issued when the Attorney General announced the FY 2017 notice, access, and compliance conditions. Again, however, nothing in the record explains how a general background document that concerns FY 2017 conditions and does not even mention the questionnaire condition, influenced or justified the Attorney General's decision to impose the questionnaire condition on FY 2018 funds.

Other than the two social media posts, all of the documents cited by the Attorney General were included in the administrative record in the *Philadelphia* case. In that case, the court reviewed the documents and concluded that they did not provide adequate reasons for the Attorney General's decision to impose the conditions. *City of Philadelphia v. Sessions*, 309 F. Supp. 3d 289, 324-25 (E.D. Pa. 2018). In fact, the court determined that the administrative record "reinforces" and "bolsters" the conclusion that the decision to impose the conditions was arbitrary and capricious. *Id.* The Attorney General does not distinguish the court's ruling in *Philadelphia* and fails to explain, or even acknowledge, that the challenged conditions represent

31

a dramatic departure from prior practice. This too is fatal to the Attorney General's arguments here. *See, e.g.*, *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016).

For all of the above reasons, the challenged conditions are both final and unlawful, and the Attorney General's motion to dismiss Count V of the amended complaint should be denied.

## IV.    Plaintiffs are entitled to an on-going, permanent, program-wide injunction.

The conditions should be enjoined on an ongoing, forward-looking, program-wide basis.

### A.    Plaintiffs are entitled to a permanent injunction.

The Attorney General does not dispute that Plaintiffs established that each of the permanent injunction factors is satisfied here. Specifically, the Attorney General does not contest that Evanston and the Conference's other members will suffer irreparably harm absent a permanent injunction against the challenged conditions and that they have no adequate remedy at law; that the balance of equities favors granting a permanent injunction; and that a permanent injunction would serve the public interest. ECF No. 56 at 23-26.

Rather, faced with a record establishing the Conference's standing to assert the interests of its member cities, the Attorney General attempts to rewrite the laws of associational standing and remedial relief. The Attorney General claims that this case is somehow unique and therefore, only certain Conference members should be entitled to relief. The Attorney General is wrong. This is a typical, straightforward case where an association has standing to assert the interests of its members. *See, e.g.*, *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *Ezell v. City of Chicago*, 651 F.3d 684, 696-97 (7th Cir. 2011); *Ass'n for Fairness in Bus., Inc. v. New Jersey*, 82 F. Supp. 2d 353, 355 (D.N.J. 2000); *Alliance of Auto. Mfrs., Inc. v. Jones*, 897 F. Supp. 2d 1241, 1253-55 (N.D. Fla. 2012).

B.     **The Court should again reject the Attorney General's request to impose new requirements on the Conference's ability to seek relief for its members.**

In a last-ditch effort to erect additional barriers to relief, the Attorney General argues that even if the Court again finds that the Conference has standing to represent its members in this action, it should nonetheless deny relief to Conference members unless they can meet several additional requirements. ECF No. 78 at 26-33. Thus, the Attorney General argues that based on unidentified equitable principles and to avoid concerns about whether Conference members otherwise may be bound by an adverse judgment in this case, the Court should grant injunctive relief only to those Conference members that "affirmatively request such relief, have demonstrated their authorization to seek it, and have agreed to be bound by the results of this litigation." *Id.* at 26-27. The Attorney General's argument is an improper attempt to re-write the law of associational standing, and the Court should reject it, for several reasons.

First, although the Attorney General cites neither decision, both this Court and the Seventh Circuit previously rejected the principal argument the Attorney General advances here: that it would be unfair or improper to grant relief to Conference members unless they commit now to being bound in a future action by an adverse judgment in this case. *City of Chicago*, 2017 WL 5499167, at *5 (citing *Chicago-Midwest Meat Ass'n v. City of Evanston*, 589 F.2d 278, 281 n.3 (7th Cir. 1978)). The Seventh Circuit in *Chicago-Midwest Meat Ass'n* ruled that the *stare decisis* effect of that court's decision provides ample protection to the government against further litigation. 589 F.2d at 281 n.3. And, as this Court ruled in the *City of Chicago* case, the United States Supreme Court expressly endorses the right of an association to seek relief for its members notwithstanding the risk that individual members may not be bound. *City of Chicago*, 2017 WL 5499167, at *5 (citing *Hunt*, 432 U.S. at 343).

Second, the Attorney General does not cite a single case in which any court held that an association had standing to pursue relief for its members but nonetheless denied relief on "equitable grounds" unless individual association members came forward with individualized proof that they were authorized to, or wished to, obtain the requested relief. The reason is simple: once an association establishes its standing, as the Conference has in this case, then the association is entitled to seek relief on behalf of its members. *See, e.g.*, *United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 552 (1996); *Automobile Workers v. Brock*, 477 U.S. 274, 287 (1986); *Hunt*, 432 U.S. at 343. Indeed, that is the very purpose of associational standing. In *Brock*, the Supreme Court stated:

> "[T]he doctrine of associational standing recognizes that the primary reason people join an organization is often to create an effective vehicle for vindicating interests that they share with others. *The only practical judicial policy when people pool their capital, their interests, or their activities under a name and form that will identify collective interests, often is to permit the association or corporation in a single case to vindicate the interests of all.*"

477 U.S. at 290 (emphasis added). For these reasons, an association that establishes standing and prevails is entitled to relief for all of its impacted members. *See, e.g.*, *Hunt*, 432 U.S. 333 at 345 (1977); *Ezell*, 651 F.3d at 711; *Texas Democratic Party v. Benkiser*, 459 F.3d 582, 595 (5th Cir. 2006); *Ass'n for Fairness in Bus., Inc.*, 82 F. Supp. 2d at 355.

The pre-*Hunt* case cited by the Attorney General, *Local 194, Retail, Wholesale & Dep't Store Union v. Standard Brands, Inc.*, 540 F.2d 864 (7th Cir. 1976), is not to the contrary. In that case, the court considered a union's claim under Title VII of the Civil Rights Act for race and gender discrimination against some of its members. *Id.* at 865. The court found that, notwithstanding conflicts among its members, the union could represent those members who were discriminated against. *Id.* at 866. The court also noted without explanation, but presumably due to the highly individualized nature of each plaintiff's claims, that the union should give

34

notice to the individual members and give them an opportunity to seek individual counsel. *Id.* at 867-68. The court never suggested, as the Attorney General does here, that the absence of such notice precluded the union from seeking relief for its effected members. In addition, it was plain in that case that each individual union member who suffered discrimination would have to prove his or her entitlement to relief, notwithstanding the union's representation. *Id.* at 865. No such circumstance exists in this case, and *Local 194* is therefore inapposite.

Third, the Attorney General frames his request as one based on equitable principles, rather than the law governing associational standing; but the pre-requisites for relief he asks the Court to impose, and the supposed reasons for imposing them, are precisely those that the test for associational standing is designed to address. Thus, for example, the Attorney General complains about conflicts among the Conference's members and, on that basis, asks the Court to ensure that each Conference member wants the relief the Conference seeks. ECF No. 78 at 30-31. Similarly, the Attorney General complains that the Conference's members did not vote to bring this action and that members may have differing political views.[12] However, as this Court already ruled, only profound conflicts of interest are sufficient to restrict an association's right to represent its members, and here there are none. ECF No. 23 at 6-7. Moreover, the political differences of any Conference members are irrelevant here, because each member shares an interest in protecting its sovereign right to be free from the Attorney General's unilateral imposition of unlawful conditions on the receipt of federal grant funds. *Id.* at 7; *see also Bond v. United States*, 564 U.S. 211, 221 (2011) (stating that sovereignty is among the most fundamental of the Constitution's

---

[12] This argument's impact is severely blunted because the Attorney General failed to provide any evidence that even a single Conference member would have voted against such a resolution, were it required. Indeed, for all of his bluster about so-called severe conflicts among Conference members, the Attorney General does not provide an affidavit from a single city's representative who objects to this action or to being included in the relief sought by the Conference.

protections; it "is not just an end in itself," but a guarantee that "secures to citizens the liberties that derive from the diffusion of sovereign power").

Moreover, notwithstanding the Attorney General's appeal to equitable principles, he ignores the bedrock principle of equity that governs the scope of this Court's relief. An injunction must be broad enough to remedy the harm that would be suffered absent such relief. *Russian Media Grp., LLC v. Cable Am., Inc.*, 598 F.3d 302, 307 (7th Cir. 2010). Moreover, district courts have discretion to issue expansive injunctive relief where "a proclivity for unlawful conduct has been shown." *Id.* In this case, constitutional harm extends at a minimum to every Conference member that applied for, or has been allocated, Byrne JAG grant funds. This Court already held as much. ECF No. 23 at 11. Having found that the Conference has standing to assert the rights of these members, the Court should decline the Attorney General's invitation to deny relief to those members unless they take additional individual action in this case. To do so would be to afford relief that is insufficient to redress the constitutional injury established by the Conference.

## C.    Plaintiffs are entitled to program-wide relief.

As set forth in Plaintiffs' opening brief, the permanent injunctive relief granted in this case should be program-wide in scope. In response, the Attorney General asserts a general, vague argument about nationwide injunctions, but does not actually respond to Plaintiffs' explanation about why program-wide injunctive relief is an appropriate remedy for an unlawful, program-wide agency action like the Attorney General's imposition of the challenged conditions. Nor does the Attorney General rebut Plaintiffs' argument that program-wide relief is compelled in this case because Plaintiffs challenge a single, integrated federal policy promulgated under a uniform, nationwide formula grant program and the Attorney General's arbitrary, capricious, and otherwise unlawful imposition of the challenged conditions violates the APA.

Instead, in a throwaway sentence at the end of his brief, the Attorney General requests an indeterminate stay of the application of any program-wide relief beyond Plaintiffs. The request should be denied. The Attorney General bears the threshold burden to show a likelihood of success on the merits and that denial of a stay will cause irreparable harm. *In re Forty-Eight Insulations, Inc.*, 115 F.3d 1294, 1300-01 (7th Cir. 1997). He has not done so.

Alternatively, and at a minimum, the Court should grant a permanent injunction against the imposition of the challenged conditions upon Evanston and any Conference member that has been allocated, applied for, or been awarded Byrne JAG funds for FY 2017, 2018, and in future grant years, as this Court already substantially affirmed Plaintiffs' right to seek such relief. *City of Chicago*, 2017 WL 5499167, at *5.

In addition, the Court should not stay any relief it awards to the Conference because the Seventh Circuit held that the circumstances of this case are "fundamentally different" from the circumstances that led the Seventh Circuit to stay the injunction in the *City of Chicago* case. ECF No. 33 at 2. By opposing program-wide relief, the Attorney General once again forces cities and states to acquiesce to the unlawful conditions. The Attorney General seeks to mandate jurisdiction-by-jurisdiction relief knowing that some jurisdictions will be forced to sacrifice their sovereign rights because they cannot spend significant time and money to litigate against the federal government and also cannot forgo critical Byrne JAG funds. Requiring each jurisdiction to litigate its entitlement to the formula grant funds in separate lawsuits does not serve the public interest or the interest of judicial economy.

For these reasons, the Court should enjoin the Attorney General from imposing the conditions on a program-wide basis. At a minimum, however, the Court should extend relief to all Conference members.

**D.     Plaintiffs are entitled to ongoing, forward-looking injunctive relief.**

The conditions should be enjoined on an ongoing, forward-looking, program-wide basis. The Attorney General makes no attempt to rebut Plaintiffs' argument that they are entitled to injunctive relief extending to future grant years, not just FY 2017 and FY 2018. The Attorney General thereby concedes that the request for relief is proper. *See, e.g.*, *MCI WorldCom Network Servs., Inc. v. Atlas Excavating, Inc.*, No. 02-4394, 2006 WL 3542332, at *3 (N.D. Ill. Dec. 6, 2006) ("The general rule in the Seventh Circuit is that a party's failure to respond to an opposing party's argument implies concession."). Beyond that failure to respond to the requested relief, the Attorney General's actions demonstrate the need for forward-looking relief.

In April, while the parties were briefing Evanston and the Conference's motion for partial summary judgment, the Department released the FY 2019 Byrne JAG state solicitation, which again contains the exact same conditions being litigated in this case.[13] Without forward-looking relief, Evanston and the Conference will be forced to incur unnecessary legal costs, and courts will need to expend judicial resources, to again halt the same grant conditions that courts throughout the country declared unlawful. *See City of Chicago v. Sessions*, No. 18-6859, Aug. 15, 2018 Tr. 6:4-15 (warning the Attorney General that plaintiff's "lawyers would get paid" if forced to file another lawsuit).

**CONCLUSION**

For the reasons set forth above and in Plaintiffs' opening brief, the Court should: (1) deny the Attorney General's motion to dismiss; (2) deny the Attorney General's motion for partial summary judgment; (3) grant Evanston and the Conference's motion for summary judgment in its entirety; and (4) enter a permanent injunction preventing the Attorney General from

---

[13] A copy of the solicitation is available at https://www.bja.gov/funding/JAGState19.pdf.

conditioning, withholding, or delaying FY 2017, FY 2018, and future Byrne JAG awards on the

basis of the challenged conditions. Finally, the Court should grant Plaintiffs' request, pursuant to

Fed. R. Civ. P. 54(d)(2), for leave to file a motion for attorney fees.


Dated: June 21, 2019                                      Respectfully submitted,

Brian C. Haussmann                                        THE UNITED STATES CONFERENCE
Katherine M. O'Brien                                      OF MAYORS
John M. Fitzgerald
Kyle A. Cooper                                            By:  /s/ Brian C. Haussmann
Tabet DiVito & Rothstein LLC                              One of Its Attorneys
209 South LaSalle Street, 7th Floor
Chicago, IL 60604
Telephone: (312) 762-9450
bhaussmann@tdrlawfirm.com
kobrien@tdrlawfirm.com
jfitzgerald@tdrlawfirm.com
kcooper@tdrlawfirm.com

Michelle L. Masoncup                                      CITY OF EVANSTON
Corporation Counsel
Law Department                                            By:  /s/ Michelle L. Masoncup
City of Evanston                                          One of Its Attorneys
2100 Ridge Avenue
Evanston, IL 60201
Telephone: (847) 448-8009
mmasoncup@cityofevanston.org

## CERTIFICATE OF SERVICE

I hereby certify that on June 21, 2019, I electronically filed the foregoing document by using the Court's CM/ECF system. Counsel for all parties are registered CM/ECF users, and service will be accomplished by the CM/ECF system.


By:    /s/ Brian C. Haussmann
       Brian C. Haussmann