UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **CITY OF EVANSTON** and **THE UNITED STATES CONFERENCE OF MAYORS,** | |
| *Plaintiffs,* | **Case No. 1:18-cv-04853** |
| v. | **Hon. Harry D. Leinenweber** |
| **WILLIAM P. BARR, in his official capacity as Attorney General of the United States,** | |
| *Defendant.* | |

### DEFENDANT'S REPLY IN SUPPORT OF HIS MOTION TO DISMISS, OR IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

JOHN R. LAUSCH, JR.
United States Attorney

JOHN R. TYLER
BRAD P. ROSENBERG
Assistant Directors

*/s/ Daniel D. Mauler*
Daniel D. Mauler (Virginia State Bar No. 73190)
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20530
Phone: (202) 616-0773
Fax: (202) 616-8470
E-Mail: dan.mauler@usdoj.gov

*Counsel for Defendant*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

ARGUMENT ....................................................................................................................... 3

    I.   The FY 18 Conditions are Authorized by Statute and Do Not Violate Either
        the Separation of Powers or Other Provisions ..................................................... 3

          A.   Plaintiffs Misunderstand the Nature of Special Conditions in the
               Byrne JAG Program. ................................................................................ 3

          B.   The Conditions are Authorized by Multiple Statutes ................................. 5

          C.   Formula Grants are Not Immune to Conditions. ....................................... 9

          D.   The Conditions Do Not Violate 34 U.S.C. § 10228(a). .......................... 10

    II.  The FY 18 Conditions are Consistent with the Spending Clause ............................ 10

          A.   The Conditions are Germane to the Purposes of the Byrne JAG Program ......... 10

          B.   The Conditions are Unambiguous. ......................................................... 13

    III. The FY 18 Conditions are Consistent with the APA. .......................................... 15

    IV. The Association Has Failed to Demonstrate that Wholesale Equitable Relief is
        Appropriate for All of its Members. .................................................................. 16

CONCLUSION ................................................................................................................. 19

# TABLE OF AUTHORITIES

## <u>Cases</u>

*American Sur. Co. of N.Y. v. Marotta*,
  287 U.S. 513 (1933) ................................................................................................................7

*Barbour v. Wash. Metro. Area Transit Auth.*,
  374 F.3d 1161 (D.C. Cir. 2004) ..........................................................................................11

*Benning v. Georgia*,
  391 F.3d 1299 (11th Cir. 2004) ......................................................................................14, 15

*California v. Sessions*,
  284 F. Supp. 3d 1015 (N.D. Cal. 2018) ...............................................................................12

*Charles v. Verhagen*,
  348 F.3d 601 (7th Cir. 2003) ...............................................................................................14

*Chicago-Midwest Meat Ass'n v. City of Evanston*,
  589 F.2d 278 (7th Cir. 1978) ...............................................................................................18

*City of Chicago v. Sessions*,
  No. 1:17-cv-05720 (N.D. Ill.) ..............................................................................................1

*City of Los Angeles v. Barr*,
  No. 18-55599, Slip. Op (9th Cir. July 12, 2019) ......................................................12, 13, 16

*Duvall v. Atty. Gen. of U.S.*,
  436 F.3d 382 (3d Cir. 2006) .................................................................................................11

*Ely v. Velde*,
  451 F.2d 1130 (4th Cir. 1971) .............................................................................................10

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) .............................................................................................................16

*Gill v. Whitford*,
  138 S. Ct. 1916, 1934 (2018) ...............................................................................................17

*Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock*,
  477 U.S. 274 (1986) .............................................................................................................18

*Madsen v. Women's Health Ctr., Inc.*,
  512 U.S. 753 (1994) .............................................................................................................19

*Mayweathers v. Newland*,
  314 F.3d 1062 (9th Cir. 2002) ....................................................................................2, 11, 14

*McKenzie v. Chicago,*
   118 F.3d 552 (7th Cir. 1997) ............................................................................17

*New York v. United States,*
   505 U.S. 144 (1992) ...........................................................................2, 10, 11

*Pension Benefit Guar. Corp. v. LTV Corp.,*
   496 U.S. 633 (1990) ..............................................................................................9

*Providence Yakima Med. Ctr. v. Sebelius,*
   611 F.3d 1181 (9th Cir. 2010) ...................................................................2, 16

*South Dakota v. Dole,*
   483 U.S. 203 (1987) .................................................................10, 14, 15

*Van Wyhe v. Reisch,*
   581 F.3d 639 (8th Cir. 2009) ............................................................................14

### **Statutes**

1 U.S.C. § 1 ..........................................................................................................8

34 U.S.C. § 10102 ........................................................................................2, 5, 7

34 U.S.C. § 10152 .........................................................................................8, 9

34 U.S.C. § 10153 ..............................................................................................5

34 U.S.C. § 10228 ........................................................................................2, 10

34 U.S.C. § 10251 .............................................................................................12

42 U.S.C. § 3712 .................................................................................................7

42 U.S.C. § 3753 (2000) ....................................................................................8

5 U.S.C. § 552 ....................................................................................................5

8 U.S.C. § 1226 .................................................................................................11

8 U.S.C. § 1228 .................................................................................................11

8 U.S.C. § 1231 .................................................................................................11

Violence Against Women and Department of Justice Reauthorization Act of 2005,
   Pub. L. No. 109-162, 119 Stat. 2960 (2006) ...................................................7

### **Other Authorities**

H.R. 3009, 114th Cong. (2015) ..........................................................................9

H.R. 5654, 114th Cong. (2016) ............................................................................................9

H.R. Rep. No. 109-233 (2005) .............................................................................................7

Marial Alper, Mathew R. Durose, & Joshua Markman, *2018 Update on Prisoner Recidivism: A 9-Year Follow-UP Period (2005-2014)*, Bureau of Justice Statistics (May 23, 2018), https://www.bjs.gov/index.cfm?ty=pbdetail&iid=6266 ..................................................12

MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 1998) .........................................6

S. 3100, 114th Cong. (2016) ...............................................................................................9

## INTRODUCTION

This case asks whether the Department of Justice ("DOJ") can require recipients of Byrne JAG funds to refrain from publicly disclosing federal law enforcement information for the purpose of shielding from detection unlawfully present aliens and fugitives (the "public-disclosure condition"); to collect certain information from the recipient of a subaward regarding any policies about communication or cooperation with the Department of Homeland Security or Immigration and Customs Enforcement (the "information-reporting condition"); and to certify the absence of any laws or policies that impede the Federal Government's exercise of its authority under certain specifically-identified statutes (the "FY 2018 certification requirement"), in addition to other challenged FY 2018 conditions.[1] Plaintiffs ignore or discount the statutes and standards that govern their challenge to these requirements.

On the merits, Plaintiffs discount Congress' mandate for the AAG of OJP to "maintain liaison" with state and local governments "in matters relating to criminal justice," 34 U.S.C. § 10102(a)(2), essentially arguing that the authority makes the AAG only a messenger. Further, Plaintiffs fail to rebut the fact that Congress has expressly empowered the Assistant Attorney General ("AAG") of the Office of Justice Programs ("OJP") to "plac[e] special conditions on all grants, and determin[e] priority purposes for formula grants," 34 U.S.C. § 10102(a)(6). Plaintiffs assert that this provision confers no authority other than that already vested by other statutes. This argument would transform a

---

[1] The challenged FY 2018 conditions are described in the Memorandum in Support of Defendants' Motion to Dismiss, or in the Alternative, Motion for Summary Judgment, and Opposition to Plaintiffs' Motion for Partial Summary Judgment (ECF No. 78) (hereinafter, the "Def.'s Memo."), at 7-9. Defendant recognizes that the Court has already ruled against the challenged FY 2017 notice, access, and Section 1373 conditions, which are similar to the FY 2018 notice, access, and Section 1373/1644 conditions. *See* Memorandum Opinion and Order, Nov. 16, 2017, *City of Chicago v. Sessions*, 1:17-cv-5720 (N.D. Ill.) (ECF No. 125). Defendant also recognizes that this Court has ruled against the constitutionality of 8 U.S.C. § 1373. *See id.* Defendant respectfully disagrees with those rulings, but does not now repeat in full his arguments in defense of the FY 2018 notice, access, and Section 1373/1644 conditions, other than to incorporate herein the arguments made previously and to preserve them for further review. *See City of Chicago v. Sessions*, No. 1:17-cv-05720 (N.D. Ill.), Dkt. Nos. 32, 139, 167. *See also* Def.'s Memo, at 10.

grant of authority into meaningless surplusage. In fact, the challenged conditions fall squarely within the authority conferred by each of these provisions. Plaintiffs also ignore both the Supreme Court's instruction that the "relatedness" aspect of the Spending Clause requires only "some relationship" between spending conditions and the purposes of the program involved, *New York v. United States*, 505 U.S. 144, 167 (1992), and the principle that this "low-threshold" inquiry is "a far cry from imposing an exacting standard," *Mayweathers v. Newland,* 314 F.3d 1062, 1067 (9th Cir. 2002). Similarly, Plaintiffs ignore that the "arbitrary and capricious" standard under the Administrative Procedure Act ("APA") is "highly deferential" to the agency. *See Providence Yakima Med. Ctr. v. Sebelius*, 611 F.3d 1181, 1190 (9th Cir. 2010).

Under the statutes and standards that govern here, Plaintiffs' challenge to the FY 2018 Byrne JAG Program should be dismissed. The AAG's authority to "maintain liaison" (together with his other statutory authorities) requires him to facilitate a close bond of cooperation between federal law enforcement and state and local enforcement. In addition, the AAG's authority to "plac[e] special conditions on all grants, and determin[e] priority purposes for formula grants" amply supports each of the FY 2018 conditions. These conditions, moreover, bear more than "some relationship" to the purposes of the Byrne JAG Program, as the subject requirements and the program seek to further criminal justice and public safety. And these requirements are more than reasonable under the APA, especially given the demonstrated need to protect federal law enforcement information to safeguard federal officers, the suspects they encounter, and the general public.

Finally, this case also raises the important question of whether an association can attain injunctive relief for members that it does not adequately represent, including at least one member that must seek authorization from a city council before filing a lawsuit, and other members that may not favor or want such relief. The wholesale granting of relief to all of the Association's members located throughout the United States, without further analysis, essentially converts such relief into a nationwide-

injunction.  Such relief should not be granted, in light of warnings about such action from the Seventh Circuit and the Supreme Court.

## ARGUMENT

### I. The FY 18 Conditions are Authorized by Statute and Do Not Violate Either the Separation of Powers or Other Provisions.

#### A. Plaintiffs Misunderstand the Nature of Special Conditions in the Byrne JAG Program.

In an attempt to undercut the challenged conditions, Plaintiffs argue that "[n]othing in the Byrne JAG statute even impliedly conditions the receipt of grant funds on a state or local government's agreement to comply with any of the challenged conditions or required certifications."  Plaintiffs' Combined Reply in Support of their Motion for Partial Summary Judgment and Opposition to Defendant's Cross-Motion (ECF No. 84) (hereinafter, "Pls.' Memo."), at 20.  The problem here is that the Plaintiffs' argument proves too much, and is in reality, an attack on the Defendant's authority to impose *any* conditions on Byrne JAG grants.

In the Fiscal Year 2018 Byrne JAG grant program, there are approximately 71 Special Conditions.  *See* Am. Compl., Ex. J (ECF No. 46-1).  In the relevant Fiscal Year 2017 program, there are approximately 58 special conditions.  *See id.*, Ex. H.  And in the relevant Fiscal Year 2016 version of the program, promulgated by the Obama Administration and unchallenged by the Plaintiffs, there were approximately 52 special conditions.  *See* Def.'s RJN, Ex. A (ECF No. 78-1).  Most of these special conditions are not expressly or specifically mentioned in the Byrne JAG statute.  And this makes sense, because Congress authorized OJP to impose special conditions each year, as needed.  Those conditions change from year-to-year as law enforcement priorities change during different administrations.

A close examination of past special conditions demonstrates how unrealistic it is to expect each condition to be expressly mentioned or authorized in the Byrne JAG statute.  For example, during

the Obama Administration, OJP required that grantees that acquire certain tactical equipment "must adopt robust and specific written policies and protocols" including policies on "Community Policing" and "Constitutional Policing." *Id.* at ¶ 46; *see also* Defendant's Local Rule 56.1 Statement of Undisputed Material Facts (ECF No. 79) (hereinafter, "Def.'s LR 56.1 Statement"), ¶ 11.[2] The Byrne JAG statute never expressly authorized this special condition, and as such, it would have failed the Plaintiffs' test demanded in this case. *See* Pls.' Memo., at 20. Yet, the promulgation of this special condition was, and is, valid under Section 10102. The same is true for many other past special conditions (*see* Def.'s LR 56.1 Statement, ¶¶ 8-10), including the following conditions which appeared in different fiscal years of the relevant Byrne JAG program:

- Special Condition 32 (FY 2016) – requiring mandatory training for high-ranking law enforcement task members to complete training in "issues including privacy and civil liberties/rights," "task force oversight," and task force "accountability." Def.'s RJN, Ex. A (ECF No. 78-1), ¶ 32.

- Special Condition 29 (FY 2016) – requiring grantees to comply with OJP policies on the protection of "human research subjects." *Id.* at ¶ 29.

- Special Condition 10 (FY 2017) – requiring mandatory reporting of incidences of "trafficking in persons." Am. Compl., Ex H (ECF No. 46-1), ¶ 10.

None of these special conditions are expressly mentioned in the Byrne JAG statute. Yet they would all fail the Plaintiffs' test of express statutory authorization. *See* Pls.' Memo., at 20.

---

[2] In their Response to Defendant's Rule 56.1 Statement (ECF No. 85), Plaintiffs make the curious assertion that the Defendant's LR 56.1 Statement violates Local Rule 56.1 because it contains 48 numbered statements. ECF No. 85 at 1. Plaintiffs then request that the Court strike the Defendant's statement, *see id.*, but the Plaintiffs have not made a formal motion seeking such relief. To the extent this is even a proper motion, Defendant opposes. Defendant's LR 56.1 Statement complies with Local Rule 56.1 because it has fewer than 80 numbered statements and because it supports Defendant's own motion seeking summary judgment. *See* LR 56.1(a). Defendant cites to its LR 56.1 Statement frequently, in both its opening brief and in this reply. That should be the end of this procedural matter.

### B.     The Conditions are Authorized by Multiple Statutes.

In reality, the past use of special conditions by OJP, coupled with the statutory structure of the Byrne JAG program, demonstrate that the Defendant has ample legal authority to issue the challenged conditions. Yet, Plaintiffs fail to adequately rebut these multiple statutory bases.

**1.**     Congress authorized the AAG for OJP to "maintain liaison with . . . State governments in matters relating to criminal justice," 34 U.S.C. § 10102(a)(2), to dictate the "form" of Byrne JAG applications, *id.* § 10153(a), and to require compliance with all "applicable Federal laws," *id.* § 10153(a)(5)(D). These authorities support the public-disclosure condition, the information-reporting condition, and the FY 18 certification requirement.

In their response, the Plaintiffs ignore the real-world risks to federal immigration officers who seek to safely detain deportable criminal aliens. The public-disclosure condition facilitates communication and cooperation between federal, state, and local law enforcement officials, such that it readily falls within the AAG's authority to "maintain liaison." *Id.* § 10102(a)(2). Operational security – the confidentiality of tactical law enforcement operations – is essential to such operations. Thus, for example, the federal Freedom of Information Act protects the confidentiality of operational law enforcement information. *See* 5 U.S.C. § 552(b)(7) (exempting "records or information compiled for law enforcement purposes" to the extent disclosure "could reasonably be expected to interfere with enforcement proceedings" or "disclose techniques and procedures for law enforcement investigations or prosecutions"). Plaintiffs have no real response to the common-sense notion that grant recipients should not disclose tactical information about upcoming immigration enforcement actions that could put individual officers at risk.

In arguing to the contrary, Plaintiffs assert that this authority makes the Attorney General a mere "organizational conduit who carries information from one organization to another." Pls.' Memo., at 11. But one who "maintains liaison" does more than engage in dialogue. A liaison is

— 5 —

defined as "a close bond or connection" or "a person who establishes and maintains communication for mutual understanding and cooperation." *See Liaison*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 1998). Thus, the AAG is responsible for maintaining "a close bond or connection" between federal and state criminal justice authorities and for facilitating "mutual understanding and cooperation" among such authorities. In order to work together effectively and safely, the free flow of law enforcement information is essential. This clearly encompasses, at minimum, protecting the confidentiality of federal law enforcement information provided to state and local agencies and assessing the ability of such agencies to engage in law enforcement cooperation by gathering information about their laws and policies.

One important aspect of the "liaison" duty is to encourage "deconfliction" between federal and local law enforcement agencies. When agencies conduct law enforcement operations, they must "de-conflict" to protect officer safety and to ensure that other agencies do not inadvertently jeopardize their operations. *See, e.g.*, Nationwide Officer Safety Event Deconfliction, National Criminal Intelligence Resource Center, https://www.ncirc.gov/Deconfliction/ (last visited Apr. 7, 2019); Best Practices in Event Deconfliction, Commission on Accreditation for Law Enforcement Agencies, https://www.calea.org/sites/default/files/EventDeconfliction_PoliceFoundation.pdf
(last visited Apr. 7, 2019). Obviously, information-sharing diminishes if agencies fear that recalcitrant jurisdictions will publicly release information shared through these channels for purposes of subverting the law. Thus, when federal authorities liaise with State and local authorities, it is wholly reasonable for federal authorities to insist on the protection of sensitive law enforcement information that, if publicly released, could endanger federal law enforcement and personnel. *See* Def.'s Memo., at 1. Plaintiffs fail to offer a persuasive rebuttal to this common-sense point.

2.    In 2006, when Congress created the Byrne JAG program, the Assistant Attorney General for OJP (AAG) already possessed the authority to "exercise such other powers and functions

— 6 —

as may be vested in the [AAG] pursuant to this chapter or by delegation of the Attorney General." 42 U.S.C. § 3712(a)(6) (2000). In the same statute that created the Byrne JAG program, Congress amended this language, for the first time conferring power on the AAG to "plac[e] special conditions on all grants, and determin[e] priority purposes for formula grants." 34 U.S.C. § 10102(a)(6); *see* Violence Against Women and Department of Justice Reauthorization Act of 2005, Pub. L. No. 109-162, §§ 1111, 1152(b), 119 Stat. 2960, 3094, 3113 (2006) (hereinafter, the "Reauthorization Act"). And to remove any doubt about the new nature of this power, the legislative history of the Byrne JAG program confirms that the language added in 2006 "allows the Assistant Attorney General to place special conditions on all grants and to determine priority purposes for formula grants." H.R. Rep. No. 109-233, at 101 (2005).

Plaintiffs essentially contend that Congress added this language to no purpose at all. They insist that the "special conditions" and "priority purposes" language provides no new authority, but is merely "dependent on the authority vested in the AAG pursuant to that chapter." Pls.' Memo., at 13. But, when the relevant language was added in 2006, the AAG already possessed authority to exercise powers already granted to him by statute or delegated by the Attorney General. *See* 42 U.S.C. § 3712(a)(6) (2000). Indeed, the plaintiffs have not identified any such power vested in the AAG elsewhere or delegated by the Attorney General to which this language could plausibly apply. In other words, the apparent grant of authority is merely authorization to wield authority that does not exist, but might exist someday in the future. This does not make sense.

Plainly, the term "including" as used in this statute means "and" or "in addition to." *See, e.g.,* *American Sur. Co. of N.Y. v. Marotta*, 287 U.S. 513, 517 (1933) (observing that the term "include" is often used as "a word of extension or enlargement"). Indeed, the Dictionary Act uses the term in precisely this fashion, repeatedly using the word "include" to expand the meaning of the preceding language. For example, Congress used "include" to expand the definition of words using the

masculine gender to also reach the feminine gender. *See* 1 U.S.C. § 1 ("words importing the masculine gender include the feminine as well"). And Congress does this repeatedly: "words importing the plural *include* the singular"; "words used in the present tense *include* the future as well as the present"; and "'oath' *includes* affirmation, and 'sworn' *includes* affirmed." *Id.* (emphases added). As a matter of straight, textual interpretation in these examples, the word *include* expands the relevant definitions. Congress did the same thing in the 2006 amendment to Section 10102(a)(6).

Whatever the limits of the Department's previous authority, the amendment undoubtedly established that the AAG has the power to impose "special conditions" and determine "priority purposes" for grants. If that were not the case, there would have been no reason to enact the amendment. Thus, even if the "including" clause were read to refer only to authority that was conferred on the AAG in Chapter 101 of Title 34, the "including" clause *itself*, as the legislative history confirms, "allows the Assistant Attorney General to place special conditions on all grants and to determine priority purposes for formula grants." H.R. Rep. No. 109-233, at 101.

**3.** Plaintiffs argue that the Reauthorization Act "actually demonstrates Congress's desire to unlink the Byrne JAG program from any immigration-related conditions." Pls.' Memo., at 15. To support this proposition, Plaintiffs point to the repeal of former 42 U.S.C. § 3753(a)(11) (2000), which required grantees to inform federal immigration authorities of an immigrant's criminal conviction. But this only tells half the story. Plaintiffs fail to mention that, in the Reauthorization Act, Congress incorporated by reference that same provision as an optional purpose for which for which grant recipients may use Byrne JAG funds. *See* 34 U.S.C. § 10152(a)(2) (stating that a grant "may be used for any purpose for which a grant was authorized to be used . . . immediately before January 5, 2006."). In other words, when Congress repealed former 42 U.S.C. § 3753(a)(11), at the same time it incorporated that section by reference into the new Byrne JAG program via what is now 34 U.S.C. § 10152(a)(2), which is statutory authorization by Congress for Byrne JAG funds to be used for

immigration-related activities. Thus, Plaintiffs are mistaken to say that Congress decoupled Byrne JAG from immigration enforcement in the Reauthorization Act.

4. Finally, plaintiffs mistakenly attempt to rely on various failed legislative proposals as evidence that Congress's 2006 amendment conferred no substantive power on the AAG. *See* Pls.' Memo., at 15. Such failed legislative history is not a reliable tool of statutory interpretation. *See Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990). And all of the failed legislative proposals Plaintiffs trumpet are inapposite on their own terms. Some did not propose to amend the Byrne JAG program at all, *see, e.g.*, H.R. 5654, 114th Cong., § 4 (2016) (addressing funds from Economic Development Administration Grants and Community Development Block Grants under Title 42); S. 3100, 114th Cong., § 4 (2016) (same), and the remainder would have required the Department to withhold Byrne JAG funds from jurisdictions that did not provide specified forms of immigration cooperation, *see, e.g.*, H.R. 3009, 114th Cong., § 3(b) (2015). Plaintiffs' argument thus illustrates the aptness of the Supreme Court's warning that "'several equally tenable inferences' maybe drawn from [congressional] inaction, 'including the inference that the existing legislation already incorporated the offered change.'" *LTV Corp.*, 496 U.S. at 650 (quoting *United States v. Wise*, 370 U.S. 405, 411 (1962)).

## C. Formula Grants are Not Immune to Conditions.

The Byrne JAG Program provides that the "Attorney General may . . . make grants to States and units of local government" for law enforcement and related purposes. 34 U.S.C. § 10152(a)(1). Contending that the additional conditions exceed DOJ's statutory authority, Plaintiffs focus heavily on the formula used for Byrne JAG grants. But the Department has never claimed authority to deviate from the statutory formula established by Congress for determining the size of a particular jurisdiction's award. The fact that a grantee's *allocation* is determined by the statutory formula does not excuse a grantee from the *requirements* of the grant, nor does it permit a grantee to demand its share free from special conditions—provided, of course, that those conditions are statutorily authorized.

As the Defendant has previously explained, the additional conditions are authorized by multiple statutory provisions.

### D. The Conditions Do Not Violate 34 U.S.C. § 10228(a).

Contrary to the Plaintiffs' suggestion (Pls.' Memo., at 16), 34 U.S.C. § 10228(a) does not prohibit the challenged conditions. As the Fourth Circuit has explained, "[t]he dominant concern of Congress apparently was to guard against any tendency towards federalization of local police and law enforcement agencies," avoiding "the establishment of a federal police force" by allowing federal authority to control the "routine operations of a local police force," such as by "prescribing the type of shoes and uniforms to be worn" or "the type or brand of ammunition to be purchased." *Ely v. Velde*, 451 F.2d 1130, 1136-37 (4th Cir. 1971). The challenged conditions do no such thing. Ensuring that state and local governments do not undermine federal law enforcement as a condition of the receipt of federal funds does not remotely implicate these concerns. Indeed, Plaintiffs' arguments on this score prove far too much, in that they would appear to call into question any funding condition imposed by DOJ on a State or local law enforcement entity, including those that have been imposed, unchallenged, for many years.

## II. The FY 18 Conditions are Consistent with the Spending Clause.

Under the Spending Clause, conditions on federal spending must bear "some relationship" to the purpose of the spending, *New York v. United States*, 505 U.S. 144, 167 (1992), and the conditions must be stated so as to enable the recipients "to exercise their choice knowingly, cognizant of the consequences of their participation." *South Dakota v. Dole*, 483 U.S. 203, 207 (1987). These are not demanding requirements and, despite Plaintiffs' arguments, they are easily met here.

### A. The Conditions are Germane to the Purposes of the Byrne JAG Program.

The Supreme Court has held that the Constitution requires only "*some* relationship" between spending conditions and the purposes of the program involved, *New York v. United States*, 505 U.S.

144, 167 (1992) (emphasis added), and this "low-threshold" inquiry is "a far cry from imposing an exacting standard," *Mayweathers v. Newland*, 314 F.3d 1062, 1067 (9th Cir. 2002). Indeed, the Supreme Court has *never* "overturned Spending Clause legislation on relatedness grounds." *Barbour v. Wash. Metro. Area Transit Auth.*, 374 F.3d 1161, 1168 (D.C. Cir. 2004). As Defendants previously explained, this "some relationship" test is easily met here. *See* Def.'s Memo., at 16-20.

Plaintiffs' responses ignore the highly permissive standard for relatedness under the Spending Clause. Plaintiffs also discount the multiple ways in which criminal law is intertwined with immigration law. Among other things, the term "criminal alien" appears multiple times in the Immigration and Nationality Act ("INA"), and "[a] primary goal of several recent overhauls of the INA has been to ensure and expedite the removal of aliens convicted of serious crimes." 8 U.S.C. §§ 1226(c), 1228(a), 1231(a)(6), 1378; *Duvall v. Atty. Gen. of U.S.*, 436 F.3d 382, 391 (3d Cir. 2006). The requirements challenged here ensure, among other things, that any "program or activity" funded by the Byrne JAG Program does not publicly disclose any sensitive federal law enforcement information in an attempt to harbor or shield from detection either a "fugitive from justice" under the federal criminal laws or an alien who "has come to, entered, or remains in the United States" in violation of federal immigration law – thus also serving the purposes of the program.

Urging otherwise, Plaintiffs' response focuses almost entirely on the purportedly local nature of criminal law enforcement and the proposition that immigration enforcement is civil in nature. Pls.' Memo., at 24. As an initial matter, the Ninth Circuit recently concluded that "DOJ's determination that illegal immigration enforcement is a public safety issue" was reasonable despite immigration enforcement being a predominantly civil matter. *City of Los Angeles v. Barr*, No. 18-55599, Slip. Op at 23 (9th Cir. July 12, 2019) (internal quotation marks omitted). The Plaintiffs' observations are plainly insufficient to demonstrate that there is *no* relationship between the challenged requirements and the purposes of the Byrne JAG program. Indeed, the term "criminal justice" is defined broadly under the

Byrne JAG statute. *See* 34 U.S.C. § 10251(a)(1). There, Congress defined it to mean more than simply prosecuting individuals for violations of criminal law. Rather, it includes "activities pertaining to crime prevention, control, or reduction" in addition to the mere "enforcement of the criminal law." *Id.* In other words, "[C]ooperation relating to enforcement of federal immigration law . . . meets the low bar of being germane to the federal interest in providing the funding to . . . enhance public safety." *City of Los Angeles*, No. 18-55599, Slip. Op at 19 (internal quotation marks omitted). Here, ensuring that grantees do not publicly disclose sensitive federal law enforcement information to shield dangerous individuals from detection obviously fits within this broad definition.

This is particularly true given high recidivism rates, indicating that it is likely that a criminal alien not removed will again engage in criminal activity. *See* Marial Alper, Mathew R. Durose, & Joshua Markman, *2018 Update on Prisoner Recidivism: A 9-Year Follow-UP Period (2005-2014)*, Bureau of Justice Statistics (May 23, 2018), https://www.bjs.gov/index.cfm?ty=pbdetail&iid=6266. Moreover, ensuring that immigration enforcement efforts are not in conflict with the activities of local criminal law enforcement is an essential component of proper management of dual law enforcement entities. *Cf. California v. Sessions*, 284 F. Supp. 3d 1015, 1033 (N.D. Cal. 2018) (noting that "criminal law impacts the INA in a variety of ways" and that "the relationship the government needs to add conditions to the receipt of grants does not need to be close"). Thus, preventing the disclosure of federal law enforcement information that is shared to ensure the safety and avoid conflicts between the operations of two authorized law enforcement agencies is necessarily related to the criminal-justice purposes of the Byrne JAG Program. The challenged conditions fall squarely within the statutory definition of "criminal justice," even if immigration enforcement itself is considered to be civil in nature.

The Federal Government, it goes without saying, routinely enforces any number of law enforcement purposes and priorities through a variety of means apart from direct criminal prosecution, including civil proceedings and administrative actions, and indeed, the payment of grant

— 12 —

funds. Nowhere, either as a matter of logic or law, is there a requirement that a federal law enforcement interest may only be furthered where the activity in question is guaranteed to end in federal criminal prosecution. As noted above (*supra* at 11-12), the term "criminal justice" is defined broadly under the Byrne JAG statute to include "activities *pertaining* to crime prevention, control, or reduction" and not just criminal prosecution. *See* 34 U.S.C. § 10251(a)(1) (emphasis added). Here, it is important to remember that the challenged conditions focus on identifying criminal aliens. Once removed, a criminal alien has no opportunity to re-offend, which controls, prevents, and reduces crime. Thus, the challenged conditions fall squarely within this definition of "criminal justice," even if immigration enforcement itself is considered to be civil in nature. Declining to fund jurisdictions that fail to comply with federal law in a manner that hinders the removal of actual, or at least suspected, criminal aliens is plainly related to the criminal-justice purposes of the Byrne JAG program. *See City of Los Angeles*, No. 18-55599, Slip Op. at 23.

Moreover, the "federal law enforcement information" to be protected by the public-disclosure condition encompasses any "law enforcement sensitive information communicated or made available, by the federal government, to a State or local government entity," Am. Compl., Ex. J (ECF No. 46-1), Special Condition ¶ 44 (FY 2018 Byrne JAG award), not just information regarding the enforcement of immigration law. Additionally, the fact that the public-disclosure condition forecloses grantees from disclosing federal law enforcement information for the purpose of concealing either unlawfully present aliens or fugitives from criminal justice further shows the requirement's relationship to the purposes of the Byrne JAG Program. Thus, this condition seeks to prevent federal grantees from using federal law enforcement information to defeat federal law enforcement objectives, whether the targets of that enforcement are violating federal immigration law *or* federal criminal law.

## B.  The Conditions are Unambiguous.

The challenged conditions also satisfy the governing standards on clarity under the Spending

— 13 —

Clause. On this point too, Plaintiffs largely ignore the governing legal standards. To avoid blindsiding State grantees, if the Federal Government "desires to condition the States' receipt of federal funds, it must do so unambiguously, enabling the States to exercise their choice knowingly, cognizant of the consequences of their participation." *Dole*, 483 U.S. at 207 (citation omitted). Although the Federal Government must clearly state *the existence* of a condition, the courts hold that "the *exact nature* of [grant] conditions may be largely indeterminate, provided that the existence of the conditions is clear, such that States have notice that compliance with the conditions is required." *Charles v. Verhagen*, 348 F.3d 601, 607 (7th Cir. 2003) (citation omitted) (emphasis added). "Once Congress clearly signals its intent to attach . . . conditions . . . it need not specifically identify and proscribe in advance every conceivable state action that would be improper." *Benning v. Georgia*, 391 F.3d 1299, 1306 (11th Cir. 2004). Indeed, courts have found the notice requirement satisfied even where a particular condition "provide[s] a pliable standard," *Van Wyhe v. Reisch*, 581 F.3d 639, 650 (8th Cir. 2009), or a "standard [that] is perhaps unpredictable because it has resulted in different determinations in different courts." *Mayweathers*, 314 F.3d at 1067.

In arguing that the challenged requirements are impermissibly ambiguous, Plaintiffs complain that the Rules of Construction purportedly provide insufficient guidance on what constitutes an "indirect" attempt to "conceal" an undocumented person. Pls.' Memo., at 19-23. But the FY 2018 Byrne JAG solicitation identifies the specific statutes at issue and merely requires applicants to certify through their chief legal officer and chief executive that the jurisdiction has no laws or policies that impede the Federal Government's exercise of its authority under the specific cited statutes. In these instances, Plaintiffs appear to require the Department of Justice to "specifically identify and proscribe in advance every conceivable . . . action that would be improper," which the Spending Clause does not require. *See Benning*, 391 F.3d at 1306. The challenged requirements are set forth at some length, with definitions and Rules of Construction as needed, which more than satisfies the Spending Clause's

standards of clarity. *See* Am. Compl., Ex. J (ECF No. 46-1), Special Condition ¶ 44 (FY 2018 Byrne JAG award).

Plaintiffs also argue that the challenged requirements are unconstitutionally ambiguous because they allegedly cover indeterminate types of sensitive law enforcement information. Pls.' Memo., at 21-22. But the purported uncertainty cited by Plaintiffs is either not ambiguous at all or is too particular to constitute a constitutional violation. As is clearly understood by Plaintiffs, the point of this requirement is to prevent state and local authorities from disclosing in advance tactical information of federal law enforcement operations. A clear example is the disclosure by the Mayor of Oakland, California, on Twitter and Facebook, of a planned operation. *See* Admin. Rec. at AR01038-39. Further, the Rules of Construction clearly define "federal law enforcement information" as "law enforcement sensitive information communicated or made available, by the federal government, to a State or local government entity." *See See* Am. Compl., Ex. J (ECF No. 46-1), Special Condition ¶ 44(4)(A)(2) (FY 2018 Byrne JAG award).

In any event, Plaintiffs can always ask OJP for clarification on these questions. The question under the ambiguity element of the Spending Clause is whether applicants can "exercise their choice knowingly, cognizant of the consequences of their participation." *Dole*, 483 U.S. at 207. To the extent an applicant is uncertain about the meaning of a grant requirement, it can seek clarification from the federal agency, allowing the applicant to act "knowingly." It is also consistent with the liaison role specifically assigned by Congress.

### III. The FY 18 Conditions are Consistent with the APA.

Plaintiffs fail to meaningfully explain how the challenged conditions can be "arbitrary and capricious" under the APA if it is statutorily authorized and comports with the Spending Clause, as shown above. Indeed, virtually all of Plaintiffs' arbitrary-and-capricious arguments amount to claims that the conditions are inconsistent with the Byrne JAG statute. If these claims are rejected—which

they should be—there is no basis for deeming the conditions arbitrary and capricious.

In any event, the FY 2018 conditions readily satisfy this "highly deferential" standard, *see Providence Yakima Med. Ctr. v. Sebelius*, 611 F.3d 1181, 1190 (9th Cir. 2010), especially in light of the actual disclosure of an impending federal law enforcement operation by an elected official in California. *See* Admin. Record at AR01038-39. It is "entirely rational" for OJP to deny federal law enforcement funding to a jurisdiction that publicly discloses sensitive federal law enforcement information in an attempt to shield an alien or fugitive from detection or that refuses to provide information about its laws or policies on communicating with certain federal law enforcement authorities. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 517 (2009). Similarly, it is entirely rational for DOJ to seek information from jurisdictions to determine if those jurisdictions' own laws will hinder the enforcement of federal immigration law. As the Ninth Circuit recently concluded in rejecting a similar APA challenge brought by the City of Los Angeles, "DOJ reasonably concluded that working with the federal government to enforce the federal immigration laws against aliens who have committed crimes or are suspected of having committed crimes makes communities safer." *City of Los Angeles*, No. 18-55599, Slip Op. at 31 (quotation marks and brackets omitted).

In response, Plaintiffs argue that the advanced disclosures of federal law enforcement operations by the mayor of Oakland are insignificant and insufficient to justify a special condition. Pls.' Memo., at 31. They incorrectly minimize the serious risks that law enforcement officers could face when tactical details of an operation are revealed publicly. Moreover, nothing in the APA requires evidence of a large problem of unauthorized disclosures to establish the reasonableness of conditioning federal law enforcement funds on protecting federal law enforcement information.

## IV. The Association Has Failed to Demonstrate that Wholesale Equitable Relief is Appropriate for All of its Members.

Basic equitable and Article III principles dictate that a court should not award relief for a party that would not otherwise be bound by an adverse judgment. This is so because "plaintiffs lack

standing to seek—and the district court therefor lacks authority to grant—relief that benefits third parties." *McKenzie v. Chicago*, 118 F.3d 552, 555 (7th Cir. 1997). Here, the Association's members are properly considered as third parties under *McKenzie*, especially after the Association asserted that it "does not purport to bind those cities that separately sued or may do so in the future." Pls.' PI Reply (ECF No. 19) at 13. If the Association loses in this case without binding its members, there is nothing to stop those members from simply starting a new association and filing suit again in a different, friendlier forum.

The Defendant recognizes that this Court has already ruled that the Association has standing to participate in this case. *See* Order, Aug. 9, 2018 (ECF No. 23), at 5-7. The Defendant respectfully disagrees with the Court's analysis for the reasons set forth in its previous briefing. *See* Defendant's Opposition to Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction (ECF No. 15), at 4-10. But even if the Association has standing, that does not answer the question about the proper scope of equitable relief. Before awarding wholesale equitable relief to all members of the Association, this Court should consider whether such relief is appropriate. A "plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018) (quotation marks omitted). Defendant's previous memorandum demonstrated the problems with the Association's effort to attain sweeping injunctive relief for all of its members, many of which are outside the Seventh Circuit, let alone the Northern District of Illinois. *See* Def.'s Memo., at 26-33. Notably, the Plaintiffs argue that "because Evanston has standing, there is no need to determine whether the Conference also has standing." Pls.' Memo, at 6. Yet, the Plaintiffs still demand relief for all members of the Association. It is simply not right to ignore at the beginning of a lawsuit whether a party has standing to bring a claim, but then give that party broad relief at the end of a lawsuit, simply because another party is determined to have standing.

Further, Plaintiffs' response fails to justify why the Association is an adequate representative

— 17 —

of its members – including many that are maintaining their own lawsuits in other district courts – let alone those members who have failed to obtain the necessary authorization to bring and participate in litigation. *See, e.g.,* Def.'s LR 56.1 Statement ¶ 46 (noting that the Association "did not consider each individual city's process for authorizing a lawsuit brought by that individual city."); *id.* at ¶¶ 47-48 (demonstrating that at least one member, the City of St. Petersburg, Florida, is required to seek approval from the city council before filing a lawsuit). Instead, this demonstrates that the Association seeks to satisfy its *own* goals and political objectives, not necessarily those of its members. *See id.* at ¶ 40 ("The Conference's decision to file this action was made by its Chief Executive Officer and Executive Director . . . and senior leadership of the Conference. . . ."); *id.* at ¶ 41 ("Consistent with the Conference's constitution, the decision to file this action was not put to a vote of the Conference's members. The Conference does not know the position of all of its members regarding whether the Conference should be pursuing this litigation."). This is evident from the factual concessions made by the Association. *See* Def.'s Memo., at 29-30; Joint Stipulation of the United States Conference of Mayors and the Attorney General, Apr. 5, 2019 (ECF No. 74-1), ¶¶ 3-9.

Plaintiffs' response fails to grapple with the concerns raised by the Supreme Court regarding inadequate representation by associations in *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock*, 477 U.S. 274 (1986). There, the Court noted that when there is reason to doubt an association's ability to adequately stand in the shoes of its members, courts must "consider how [that problem] might be alleviated." *Id.* at 290. If a member is not bound by a loss in this case by the Association, it is impossible to say that the Association stands in the same shoes as the member.

This problem is further illustrated by a case relied upon by the Plaintiffs in their response. Relying upon *Chicago-Midwest Meat Ass'n v. City of Evanston*, 589 F.2d 278 (7th Cir. 1978), Plaintiffs argue that the Seventh Circuit has already rejected the Attorney General's principal argument on this point. *See* Pls.' Memo, at 33. Yet, that case cuts against the Plaintiffs. There, the Seventh Circuit

— 18 —

allowed associational representation in part because an adverse judgment would bind the association's members:

> We see little likelihood that the defendants will suffer the burden of relitigating the claims raised in this case. The Stare decisis effect of our decision provides the defendants with substantial protection against further litigation. In addition, the defendants would have the opportunity in any case brought by members of the association to argue that the members are bound by the Res judicata effect of our decision in this case.

*Chicago-Midwest Meat Ass'n*, 589 at 281 n. 3. That is obviously not true in this case, where the Association is seeking relief for members outside of the Seventh Circuit, and at the same time, claims that its members would not be bound by an adverse decision. In reality, the Seventh Circuit's reasoning illustrates why wholesale relief for all members of the Association is problematic.

In summary, the Plaintiffs have failed to adequately explain why this Court should ignore the "general rule . . . 'that injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs.'" *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)). Here, the Association has failed to show that all of its members would be entitled to relief if they had sued in their own capacities. Until the Association does so, awarding wholesale injunctive relief to all members goes beyond what is necessary to provide relief to the parties *properly* before this Court – yielding an injunction that is more burdensome on the Defendant than necessary.

## CONCLUSION

Accordingly, the Court should dismiss with prejudice Plaintiffs' challenges to the FY 2018 conditions, including the public-disclosure condition, the information-reporting condition, and the certification requirement.

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

JOHN R. LAUSCH, JR.
United States Attorney

JOHN R. TYLER
BRAD P. ROSENBERG
Assistant Directors

/s/ Daniel D. Mauler
Daniel D. Mauler (Virginia State Bar No. 73190)
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20530
Phone: (202) 616-0773
Fax: (202) 616-8470
E-Mail:   dan.mauler@usdoj.gov

*Counsel for Defendant*